# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

Plaintiff and Respondent,

v.

ANTHONY GEORGE BANKSTON,

Defendant and Appellant.

S044739

Los Angeles County Superior Court
VA007955

June 1, 2026

Justice Kruger authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Groban, and Jenkins[*] concurred.

Justice Liu filed a concurring opinion.

Justice Evans filed a concurring opinion.

---

[*] Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. BANKSTON

S044739


Opinion of the Court by Kruger, J.


After a first guilt phase trial, a jury convicted defendant Anthony George Bankston of the first degree murder of Benson Jones; the willful, deliberate, and premeditated attempted murder of Benjamin Jones; and possession of a firearm by a felon. (Pen. Code, § 187, subd. (a), former §§ 189, 664, subd. (1), 12021, subd. (a).) The jury also found true allegations that Bankston personally used a firearm in committing the murder and attempted murder and had personally inflicted great bodily injury on Benjamin Jones. (Pen. Code, former §§ 1203.06, subd. (a)(1), 12022.5, subd. (a), 12022.7.) The jury failed to reach a verdict on charges that Bankston committed the murder of Noel Jesus Enrique Sanchez,[1] the attempted murder of Ernest Johnson, and assault with a firearm on Linda Jones. The trial court declared a mistrial and the prosecution elected to retry the charges.

At a second guilt phase trial, a jury acquitted Bankston of the attempted murder of Ernest Johnson but convicted him of the first degree murder of Jesus Sanchez and of the assault with a firearm on Linda Jones. (Pen. Code, § 187, subd. (a), former §§ 189, 245, subd. (a)(2).) The jury also found true related

_____

[1] The amended information refers to this victim as Noel Enrique Sanchez, but his family and friends testified that his name was Jesus Sanchez. We refer to him by the latter name.

1

assault weapon and firearm-use enhancement allegations. (Pen. Code, former § 12022.5, subds. (a), (b)(2), (d).)

In a separate proceeding, the jury found true a multiple-murder special circumstance allegation. (Pen. Code, § 190.2, subd. (a)(3).) At the penalty phase, the jury returned a death verdict and the trial court entered a judgment of death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); Pen. Code, § 1239, subd. (b).)

As both sides agree, the penalty phase in this case was marked by errors under the California Racial Justice Act of 2020, Penal Code section 745, subdivision (a), that require us to reverse the judgment of death. We affirm the judgment in all other respects and remand for further proceedings.

## I. FACTUAL BACKGROUND

### A. First Guilt Phase

#### 1. Prosecution evidence

Benjamin Jones testified that on the afternoon of May 18, 1991, he was driving in Los Angeles, accompanied by his sister Linda Jones and his brother Benson Jones. Benjamin and Benson dropped Linda off at the corner of Beach and Firestone to purchase food at a taco truck and parked about 100 feet away in front of a liquor store. Benjamin testified at trial that this was a "Blood neighborhood"; Benson, however, was a member of the rival Crip gang.

Benson was walking away from the car when Bankston and two other men approached and one of the men asked, "What's up Blood?" When Benson turned around and approached Bankston, Bankston pulled out a .38-caliber gun

and shot him. Bankston then turned and shot Benjamin. Benjamin could see his sister Linda screaming hysterically. Bankston returned to Benson, shot him in the neck at close range, and fled. Benjamin testified that Bankston was wearing a black-striped gray jumpsuit that had been cut off at the bottom to make shorts. He identified Bankston from a photo lineup a few days after the murder and later in court during his trial testimony. Before the preliminary hearing, Benjamin received a collect telephone call from someone named "Anthony" who said, "I'm the one that's supposed to have shot you and your brother." Anthony suggested that Benjamin and Linda "not come to court" but deal with the shootings "on the street."

Linda testified that she heard shots and saw Benjamin and Benson fall; she then saw Bankston shoot Benson again, shoot in her direction, and flee. Linda also identified Bankston as the shooter in a photo lineup shortly after the murder and at trial.

On May 22, 1991, Los Angeles County Sheriff's Deputy Michael Patterson pulled Bankston over for a traffic violation. Bankston had a loaded rifle, which appeared and functioned like an AK-47, lying in his lap and a loaded .38-caliber revolver was found on the passenger seat. After his arrest, Bankston told Deputy Patterson that his nickname was "Ant Dog" and that he was from "Nine Deuce Bishops."

Bankston's acquaintance Paul Torrez testified that Bankston used the moniker "Ant Dog" and belonged to the Nine Deuce Bishops, which was a Blood gang, and associated with the Compton Varrio 70s gang, also called the CV 70s. The parties stipulated that Bankston had a tattoo on his right earlobe of the letters CK with two lines drawn through the

middle of the C.  Torrez testified that Bankston's tattoo stood for "Crip killer."

Los Angeles County Sheriff's Deputy Alexander MacArthur, who was assigned to the Operation Safe Streets (OSS) gang unit, and who testified both as a percipient and gang expert witness, said that the Bloods and the Crips were rival gangs.  The intersection of Beach and Firestone Streets, where Benson and Benjamin Jones were shot, was in Bishop Blood territory.  Following Bankston's arrest, Deputy MacArthur and his partner obtained permission from Bankston's parole officer to search Bankston's motel room.  They found a cutoff black-striped grey sweat suit, a red photo album, and an envelope in the album addressed to "Anthony Bankston."

Another gang expert, Compton Police Lieutenant Reginald Wright, testified that writing in Bankston's album indicated that the author was an active Blood gang member.  On cross-examination, Lieutenant Wright testified that he had known Benjamin and Benson Jones in the late 1970's and early 1980's, and agreed that the brothers had been "proud" members of the Atlantic Drive Crips.

The Los Angeles County Deputy Medical Examiner who performed the autopsy on Benson Jones testified that Benson died from a gunshot wound to his abdomen that perforated his aorta.  He had also been shot in the neck.  A firearms examiner testified that test bullets fired from Bankston's .38-revolver had the same general rifling characteristics as bullets that had been removed during Benson's autopsy.  The examiner was not able

to conclude, however, that Bankston's gun was the "only firearm that could have fired these two bullets." [2]

### 2. *Defense evidence*

D.J., Benson's wife, testified that on the day of Benson's death, the couple had argued, and the Firestone Sheriffs were called. D.J. was pregnant and had previously told Benson that the father was a man named Nate. Benson's sister testified that Nate frequented the area where Benson's murder occurred.

Apparently to undermine Linda Jones's identification of Bankston as the shooter, Bankston presented the testimony of Sergeant John Babbitt. Babbitt testified that on the day of the shooting, he spoke with Linda, who described the shooter as a Black man about 20 to 25 years old, five foot nine to 5 feet 11 inches, weighing about 170 pounds, with short black hair, wearing black glasses and a "gray with black stripe sweat suit, cut off at [the] knees," a white T-shirt, and black shoes. At trial, by contrast, Linda had testified that the shooter had "no hair," and Bankston introduced his Department of Corrections fingerprint card that described him as 5 feet 5 inches tall.

James Warner, a former Los Angeles County Crime Lab firearms examiner, testified that he had examined Bankston's .38-revolver. Warner was unable to "eliminate or identify" whether bullets from the Benson crime scene had been fired from the revolver. On cross-examination, Warner agreed with

---

[2] Evidence regarding Sanchez's murder was also presented at the first guilt phase, but the first guilt phase jury failed to reach a verdict on that count. For brevity, we recount the facts regarding this murder in the second guilt phase factual background.

the prosecutor that his conclusions as to the revolver were "identical" to those of the prosecution's ballistics expert.

Compton Police Officer Timothy Brennan testified that on May 24, 1991, he had interviewed Torrez, who had been arrested that night on unrelated charges. Torrez told Officer Brennan he had information about a Compton homicide (the Sanchez murder) and described Ant Dog and his car. On cross-examination, Officer Brennan agreed with the prosecutor that during the interview Torrez said, "All 70's like Ant Dog 'cause he would kill . . . whoever they want." Torrez also described Ant Dog's physical appearance and said Ant Dog "claims Nine Deuce Bishops, and hangs out with the CV 70s." He also stated that Ant Dog's first name might be Antonio, and that Ant Dog had been released from prison about three months before the interview.

## B. Second Guilt Phase

### 1. *Prosecution evidence*

Florentino Melendez testified that on May 10, 1991, at about 5:30 p.m., he and Jesus Sanchez were walking in a residential area on Thorson Street toward Laurel Street in Compton. Melendez heard six to nine gunshots, ran toward Laurel Street, and hid behind a car. Sanchez ran back up Thorson Street. Melendez saw what looked like a gray Volvo in the middle of the intersection. Only the driver, identified at trial by Melendez as Bankston, was in the vehicle. Melendez and Bankston made eye contact, and Bankston made a motion with his gun. Bankston then put the car in reverse and drove off. Melendez ran to Sanchez, who had been shot and later died. Sometime after Sanchez's murder, Bankston called Melendez

and told him "[n]ot to come to court" and that "we could handle this out in the street."

John Aguilera, Melendez's brother-in-law, testified that on May 10, 1991, Sanchez and Melendez had attended a Mother's Day barbecue at Aguilera's house. After Sanchez and Melendez left the barbecue, Aguilera heard gunshots, ran out, and saw Sanchez on the ground. Aguilera recognized the person Melendez described as the shooter as Ant Dog, who associated with the CV 70s. After Aguilera had identified Ant Dog's photograph for law enforcement, Aguilera received two or three telephone calls from Bankston telling him "not to come to court . . . we can take care of it like men out in the street." The parties stipulated that Bankston had been in possession of the addresses and telephone numbers of Melendez and Aguilera since June 1991, having obtained the information as a result of ongoing discovery.

Catalina Franco and her sister, Maria Lopez, testified that they had also witnessed the shooting and corroborated the description of the shooting Melendez had given. Franco also identified Bankston's car as the car from which the shooting occurred.

Melendez testified he had been associated with the Compton Chicano Gang (CCG) gang until the year of Sanchez's murder, and Aguilera testified that the CCG controlled the area where Sanchez was shot. Gang expert Lieutenant Wright testified that at the time Sanchez was shot the CV 70s and the CCGs were hostile rivals.

Torrez testified that at the time of the shooting he had been a member of the CV 70s gang. Bankston, whom Torrez had known for a few months and called Ant Dog, was from the Blood gang Nine Deuce Bishops, but was a friend of the CV 70s gang.

7

According to Torrez, on the day after the shooting Bankston visited Torrez and told him he had shot a member of the CCG with an AK-47. Bankston said the shooting occurred on Thorson, which Torrez identified as CCG's territory. Bankston saw two men and shot one of them. Bankston then smiled at the other man and left. Bankston said he "just rolled by and caught them slipping," which Torrez said meant "not looking around." Bankston had an AK-47 with him when he visited Torrez, and Torrez identified it at trial as the same assault rifle Bankston had at the time of his arrest.

The autopsy revealed that Sanchez sustained two gunshot wounds, and the cause of death was the gunshot wound to his chest. Ballistics testimony indicated that a bullet recovered at Sanchez's autopsy was consistent with being fired from Bankston's AK-47-type rifle.

To establish the firearm assault on Linda Jones, Benjamin Jones largely repeated his original guilt phase testimony about the shooting of himself and Benson. Linda Jones also described that attack and testified that Bankston shot once in her direction. Ballistics evidence indicated that expended bullets recovered from the scene were consistent with being fired from Bankston's .38 revolver.

The prosecution also introduced evidence about Bankston's arrest, the search of his motel room, his photo album writings, and his gang affiliation, all of which was similar to evidence presented at the first guilt phase. As additional evidence regarding Bankston's gang affiliation, Los Angeles County Sheriff's Legal Deputy Maurice Kempner, who worked at the North County Correctional Facility, testified that about six months earlier, Bankston told Kempner he was "Blood affiliated." Los Angeles County Sheriff's Sergeant John Baylis

testified that on February 7, 1994, he was standing near Bankston in the North County Correctional Facility and was given an out-of-order sign from a law library Xerox machine. Bankston later admitted the writing on the out-of-order sign was his. Deputy MacArthur testified that on the out-of-order sign was written, as relevant, "Antt 2 Dogg," "CK" with two lines through the "C," and "92nd Street Watts Gang, east 'side' Bishops Blood." The trial court precluded admission of the remaining writing on the sign under Evidence Code section 352. Lieutenant Wright opined that the writing on the sign indicated the author was a member of the "East Side Bishop Bloods."

### 2. *Defense evidence*

A Pacific Bell Telephone Company customer service representative testified regarding bills for the telephone number associated with Melendez. The representative reviewed bills for several months following Sanchez's May 1991 shooting and identified a handful of collect calls but could not be sure whether there were any collect calls from a county jail facility.

### C. Special Circumstance Phase

At a separate proceeding concerning the multiple-murder special circumstance allegation, the trial court took judicial notice of Bankston's earlier conviction for the first degree murder of Benson Jones. The prosecutor introduced into evidence the redacted minutes reflecting the jury's verdict regarding Benson's murder and a redacted copy of the amended information that included counts 1 and 2 concerning the Jones and Sanchez murders. The jury found true the multiple-murder special-circumstance allegation. (Pen. Code, § 190.2, subd. (a)(3).)

### D. Penalty Phase

#### 1. *Prosecution evidence*

The prosecution relied on the circumstances of the charged crimes. It also presented victim impact testimony and evidence of Bankston's prior convictions and custodial misconduct.

Benjamin Jones described the May 18, 1991 shooting. Benson's last words to Benjamin were to ask him to "[t]ake care of my boys," meaning Benson's sons. D.J., Benson's wife, testified that she had known Benson for about 22 years, they were married on Christmas in 1987, and he had been her best friend. He was 36 years old when he died. She described seeing Benson after he had been shot, going to the hospital with him in the ambulance, and learning of his death. She and Benson had five sons who were between four and 16 years old at the time of Benson's death. They had been excellent students before Benson's murder, but one was now in jail and another never finished school. The jury also heard testimony from one of Benson's sons and from Benson's mother, who stated that Benson had a total of seven children.

Edilberto Enriquez, Sanchez's younger brother, described receiving a telephone call on May 10, 1991, that Sanchez had been hurt, running to that location, and seeing him lying on the ground. Enriquez was joined by their younger sister, who started crying. Sanchez, who was 21 years old when he died, had been like a father to Enriquez. Since the murder, Enriquez had experienced trouble concentrating and financial difficulty. The jury also heard from Sanchez's father and mother.

The prosecution also presented evidence of Bankston's 1985 conviction for assault with a deadly weapon with a great bodily injury enhancement, 1987 conviction for attempted

possession of an explosive while in prison, and 1989 conviction for possession of a firearm by a felon. (Pen. Code, former §§ 245, subd. (a)(2), 664, 4502, 12021, subd. (A), 12022.7.) The assault conviction arose from Bankston threatening and shooting an "East Coast Crip" gang member.

A series of correctional officers and sheriff's deputies described a long series of incidents while Bankston was incarcerated. A correctional officer described Bankston rushing up behind him, grabbing him by the neck, and pinning him against a wall with such force he feared for his life. After another guard came to his aid and Bankston was subdued, the guards found an eight-inch metal shank, a jail-made knife, in Bankston's pocket. Additional testimony indicated that on other occasions, large metal shanks were found in Bankston's cell and that Bankston had stabbed other inmates, on one occasion with a six-inch shank and on another with a four-foot spear.

The prosecutor also presented testimony regarding four custodial incidents that the trial court later deemed to be outside the purview of Penal Code section 190.3, factor (b). The trial court precluded the prosecutor from relying on these incidents during closing argument, and instructed the jury that it could not consider evidence of these incidents in determining the appropriate penalty.

### 2. *Defense evidence*

Bankston presented no witnesses but introduced two exhibits. One exhibit was a cell inspection sheet, apparently to show that Bankston was in a different cell than the one in which one of the weapons attributed to him was found. The other was a form he had signed in October 1989 declining to speak with Deputy MacArthur about "this case" when arrested as a felon in

possession of a firearm, apparently to impeach MacArthur's testimony that he had then admitted his gang affiliation to MacArthur.

## II. DISCUSSION

### A. Representation Claims

Before his trial began, Bankston expressed dissatisfaction with his appointed counsel and sought to represent himself. He ultimately represented himself with the assistance of advisory counsel at both guilt phase trials and the penalty phase trial. Bankston contends that the trial court should have treated his expression of dissatisfaction with counsel as a request for substitute counsel under *People v. Marsden* (1970) 2 Cal.3d 118, 124 (*Marsden*), and that his self-representation choice was involuntary (see *Faretta v. California* (1975) 422 U.S. 806, 835 (*Faretta*)).[3] Bankston further contends that while he was self-represented, the court committed reversible error by conducting two pretrial proceedings in his absence. We find no merit in these claims.

---

[3]     "[A]s to many claims [Bankston] allege[s] for the first time that the error complained of violated [his] federal constitutional rights. To the extent that in doing so [Bankston] ha[s] raised only a new constitutional 'gloss' on claims preserved below, that new aspect of the claims is not forfeited. However, '[n]o separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of [the] constitutional theory . . . .' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364.)

### 1. Asserted Marsden motion

#### a. Factual background

On March 25, 1993, during a brief appearance before a commissioner, Bankston's counsel informed the court that Bankston was "talking about having a *Marsden* [m]otion." A hearing on a "*Marsden* motion," as reflected in the minute order, was scheduled for March 31, 1993. On March 31, the court referred to Bankston's "request to go pro per," stating "it is either a *Marsden* or *Faretta* [motion]. I don't know what the problem is for the request."

Later that day, the motion came up for hearing before a different bench officer, Judge Robert Armstrong, and the judge asked, "[W]hat . . . would [you] like this court to resolve or determine today?" Counsel said: "Mr. Bankston had previously advised [the commissioner] that, I believe, he wanted to go pro per. Is that correct?" Defendant said, "Yes." Counsel said, "I spoke to [Bankston] today, and he advises me he would like to go pro per." He added, "The commissioner . . . se[n]t this case over . . . for Mr. Bankston's pro per motion."

The court asked counsel, "Just to straighten out what the motion is, I assume from what you have said, [counsel], so far, that it's the defendant's desire to represent himself; but have you, in your handling of this case so far . . . discovered any reason why, if you have a conflict of interest, that would prevent you from continuing as Mr. Bankston's attorney?" Counsel replied, "No."

The court then stated: "Mr. Bankston, there are two ways that we can handle this. One is to have the court find a conflict between you and your attorney. The fact that you don't approve of him or the way he is handling the case is not a basis for conflict. A conflict is a situation where an attorney represents

someone whose interests are opposed to yours.  For instance, supposing that your attorney was the attorney of record for a witness who was scheduled to testify against you. . . .  That would be a conflict.  In that kind of situation, [counsel] would instantly appreciate that conflict and remove himself from the case and say not only he but his office could not continue to represent you.  That's why I made the preliminary inquiry of him. So I can't find from what he said that there is any conflict."

The court continued:  "Now, a separate question is, first, you don't have to accept what he is saying or what I am saying. If you feel there is a conflict that you want to present, you just want to let me know what the nature of it is, I would ask the district attorney to leave the courtroom so you could tell me privately what you felt the conflict was without disclosing anything to the prosecution.  However, if there isn't any conflict, you have a constitutional right to represent yourself."

The court went on, however, to counsel against self-representation in such a serious case, note the importance of having appointed counsel, and inquire into Bankston's educational background and prior legal experience.

Bankston asked the prosecutor to leave the courtroom so that he could "express why I would choose to represent myself." The court responded: "[I]f you want to represent yourself, you have a right to . . . represent yourself.  That doesn't have anything to do with the prosecution.  It's not a basis for excluding him . . . from the proceedings." Bankston said: "I am opting to represent myself because there is a lot of things that's irrelevant to my case that [have] been asked that I feel have no basis [for] me being found not guilty, or whatever.  I have to choose to represent myself." The court replied: "But there is no better person to evaluate that . . . than an experienced

attorney." Bankston said: "But [the] irrelevancy of the questions being asked by the attorney to my family." Counsel explained that Bankston objected to "some of the questions I asked his family, he doesn't like me asking those questions. He wants to relate to the court what those questions were that so offended him." The court responded: "All right. We will call this a modified *Marsden.* I will ask the prosecutors to leave the room so we can see what Mr. Bankston has to say."

During the hearing outside the prosecutor's presence, Bankston said he felt that nobody would fight for his freedom more than he would. He also appeared concerned that aspects of counsel's investigation, including some of the questions posed to his family members, were not pertinent to ascertaining whether Bankston was guilty. The court explained to Bankston that defense counsel had many years of experience and had tried murder cases. The court stated, " 'I, as a judge, would certainly not restrict [his investigation]. . . because the whole field is open to him. He is a capable and experienced attorney.' "

Although stating that Bankston had a constitutional right to represent himself, and "[i]f that's what you want to do, you got it," the court strongly discouraged him from electing self-representation. It suggested a defendant had as much chance of successfully preparing himself for trial in two months as the judge would preparing himself to perform brain surgery. The court stated, "I wouldn't give you better advice . . . than to say don't do it." It observed that the prosecutor was trained and experienced, and "it would just be an unfair match for you. . . . So I can't deny you your right to go pro per, but I can counsel you against it."

Bankston said: "I been with [counsel] fighting this case, and it is a capital case. My views I presented to him maybe how

15

these cases could have occurred. I am saying I am not the suspect, period. . . . I'm saying through all the discussions we had so far, I am not satisfied right now. I feel that I have a better chance of fighting this myself. Even if I do get the death penalty or life without parole, I [would] be more comfortable [than] sitting here every night wondering why did I let him defend me." The court responded, "If you want to represent yourself, . . . you will be given your pro per privileges." The court noted that the case was old, that it would be tried "before the summer is gone," and that "[y]ou can't get a legal education in two or three months." It asked Bankston, "Would you like to have some kid who just graduated from law school trying your case?" Bankston replied, "But this is not a kid. This is me fighting for my life here." He added, "I [am] just hoping with my strong desire to prevail in this case, I can research adequately to present some kind of defense that's going to be favorable to me — more favorable than what I been getting with [counsel]."

The trial court granted Bankston's motion for self-representation. Following the closed hearing, the court recounted for the prosecutor Bankston's desire to represent himself, stating, "[H]e is adamant that's what he wants to do."

### b. *Analysis*

Bankston contends that when he appeared in court for the hearing on his motion, the trial court was obligated to conduct a *Marsden* inquiry but "made no effort" to do so. He asserts that the court instead erroneously informed him that a *Marsden* inquiry was limited to determining the existence of an actual conflict of interest, leaving him no choice but to represent himself. The record does not support the claims of error.

Under *Marsden*, a defendant may seek to have appointed counsel discharged upon a showing that " 'counsel is not

providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 599.) When a defendant seeks substitution of appointed counsel under *Marsden*, " 'the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance.' " (*Ibid.*) "Although no formal motion is necessary" to trigger a duty to conduct a *Marsden* inquiry, "there must be 'at least some clear indication by defendant that he wants a substitute attorney.' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 157.)

When the representation question first arose, counsel briefly indicated Bankston was "talking about" a *Marsden* motion, and the minute order reflected that a "*Marsden* motion" had been scheduled. But the record also shows that when the motion subsequently came up for hearing on March 31, the bench officer initially responsible for hearing the motion was evidently uncertain of the precise nature of Bankston's request and understood that Bankston may instead have been seeking to represent himself.

When the matter came before Judge Armstrong for hearing later that afternoon, Bankston's attorney informed the court that Bankston had previously advised the commissioner he wanted to go pro per, and Bankston confirmed that was correct. Counsel said he had spoken to Bankston earlier that day, "and he advises me he would like to go pro per." Counsel added, "The commissioner . . . se[n]t this case over . . . for Mr. Bankston's pro per motion."

At that point Judge Armstrong, "[j]ust to straighten out what the motion is," expressed his understanding that Bankston

17

was seeking self-representation, but also inquired about any possible conflict of interest — an issue most relevant to a *Marsden*, not a *Faretta* motion for self-representation. Bankston ultimately responded that he wanted a hearing to explain why he wished to represent himself. But he also requested that the hearing be held outside the prosecutor's presence, as would occur in a *Marsden* hearing. And counsel explained that Bankston objected to inquiries counsel had made of Bankston's family. Concerns about counsel's performance are also most relevant to a *Marsden* hearing. At this point, the court, either still unsure of the exact nature of the motion or simply wanting to accommodate Bankston's desire for a hearing outside the prosecutor's presence, said: "All right. We will call this a modified *Marsden*."

Once at the hearing on the motion, however, there was no ambiguity as to the nature of Bankston's motion. Counsel clearly stated, and Bankston confirmed at length, that Bankston sought to represent himself. Bankston did express dissatisfaction with counsel, but at no time during the hearing did he ask to substitute different counsel, as opposed to representing himself. In other words, despite counsel's initial brief mention of *Marsden* six days earlier, Bankston did not ultimately make a *Marsden* motion. "Given [Bankston's] insistence on self-representation, the trial court was under no obligation to conduct an inquiry into any dissatisfaction [Bankston] might have with his appointed counsel so as to necessitate substitution of counsel." (*People v. Mendoza, supra,* 24 Cal.4th at p. 157.)

Although Bankston argues otherwise, the record contains no indication that the trial court dissuaded Bankston from making a proper *Marsden* motion. Bankston contends the trial

18

court made it seem that the only way to remove counsel was to establish an actual conflict of interest; confronted with this inaccurately narrow description of a *Marsden* motion, Bankston says he felt "he had no choice but to represent himself." But Bankston made it clear that he was seeking to represent himself at the very start of the hearing, before the trial court said anything about his representation at all. The trial court then asked counsel about any conflict, described the type of conflict that would require counsel's removal, and gave Bankston an opportunity to privately raise any conflict he wished to discuss, stating that Bankston did not "have to accept what [counsel] is saying or what I am saying." When Bankston addressed the court directly, he expressed his dissatisfaction with counsel, but then went on to explain his view that nobody would fight harder in his case than he would and stated that he would be more comfortable accepting the outcome, even the death penalty, if he represented himself.

In sum, the record does not support Bankston's claim that the trial court erred in failing to make a *Marsden* inquiry or that the court's reference to a conflict of interest prevented him from asking for substitute counsel.

### 2. *Faretta motion*

#### a. *Factual background*

As noted, Judge Armstrong granted Bankston's *Faretta* motion after a lengthy hearing in which the court discussed the disadvantages of self-representation. Judge Armstrong reviewed the gravity of charges Bankston was facing, noting "the case is about as serious as it can get." The court emphasized that unless Bankston had experience in capital trials and knew the law, he would be at a "tremendous disadvantage" without an

attorney. Explaining that the court would not assist Bankston, Judge Armstrong stated, "[Y]ou need an attorney at your side who is able to look out for your rights and protect you at all stages of the proceedings." Judge Armstrong asked how far Bankston had gone in school, and he replied, "Senior high." In response to the court's further inquiry, Bankston said that he had never represented himself, but had "dabble[d]" in the study of law in the prison law library. The court cautioned Bankston that he had no real chance of successfully preparing himself for trial and that he would be unfairly matched against a trained and experienced prosecutor. Ultimately Judge Armstrong granted the motion.

After Bankston had represented himself for several months, the case was transferred to Judge James Bascue. The court confirmed that Bankston was self-represented but had not previously signed a written waiver of his right to counsel. The court provided him with a self-representation form to complete and asked whether standby counsel had been appointed. Bankston responded that he was moving for "standby counsel/advisory counsel."

The next day, Bankston submitted his completed self-representation form to the court. A portion of the form stated: "If the Court grants this petition and if I am permitted to represent myself, I understand I will have to conduct my own defense by myself and without the aid of [a] lawyer." Bankston had not initialed or checked the box next to this sentence and had crossed out the language "and without the aid of [a] lawyer." When the court asked him about it, Bankston explained that "not only are you maybe appointing me standby counsel" but that he also had a lawyer in court, Jackson Chandler, who he wanted the court to appoint "[t]o advise me."

The court told Bankston that he would be heard on the question of advisory counsel, but clarified: "I am saying that if I do not grant you advisory counsel, you will have to conduct your own defense by yourself without the aid of a lawyer. Do you understand that?" Bankston replied, "Yes, I understand." The court repeated the question, and Bankston again said he understood. The court also confirmed that Bankston understood that if he gave up his right to represent himself, the court would appoint an experienced trial lawyer to try the case for him. After additional discussion and admonitions, the court found that Bankston made a knowing, intelligent, and voluntary waiver and denied his motion for advisory counsel. The court declined to appoint Chandler as standby counsel, finding there was no preexisting relationship with Bankston and expressing concern about the manner in which Chandler had approached Bankston's family. Instead, the court tentatively appointed Albert De Blanc as standby counsel and transferred the case to Judge Nancy Brown, who conducted all further proceedings.

At Bankston's first hearing with Judge Brown, Bankston stated that he had previously requested "standby and advisory counsel to assist me." The court replied that Bankston was not entitled to advisory counsel. When the court encouraged Bankston "to carefully consider representing yourself," Bankston affirmed that he was "totally willing to accept the consequences of representing myself in this case." At a later hearing, Judge Brown informed Bankston she had reconsidered his motion and would appoint Mark Borden as advisory counsel to replace DeBlanc, who had been relieved. (See *post*, p. 30.) The court explained that Bankston could seek Borden's advice and that Borden "will assist you in any way he can regarding the defense of your case, but he is advisory counsel only. . . . So

21

he will be seated at counsel table with you, but he can be seen but not heard." Borden remained Bankston's advisory counsel for all further trial court proceedings.

Judge Brown also reviewed with Bankston the written self-representation form he had previously completed. The court noted that the form stated that Bankston would have to conduct his defense without the aid of a lawyer, but that with the appointment of advisory counsel "you will have the aid of a lawyer, but not as lead counsel. You are still in pro per." Bankston said, "Right." The court went over the advisement that Bankston had the right to have an experienced trial lawyer represent him, and had Bankston complete another self-representation form acknowledging that right and other standard advisements. Finally, Judge Brown asked, "So now you do understand, sir, because you were represented by the public defender before, you do understand that you have a constitutional right to be represented by counsel at all stages of these proceedings?" Bankston said that he understood. The court confirmed, "And is it your desire to represent yourself in this trial, which is a very serious case, with the understanding that I have appointed Mr. Borden to assist you as advisory counsel?" Bankston said, "Yes." The court asked: "[Y]ou do understand that he will be seated there at counsel table with you. He can be seen, but not heard. You have to do all the talking." Bankston replied, "Yes." The court stated: "All right. [The] court finds that the defendant understands his right to be represented by counsel and he does knowingly, intelligently and understandingly and voluntarily give up his constitutional right to be represented by counsel."

### b. *Analysis*

Bankston contends that he did not voluntarily, knowingly, and intelligently waive his right to counsel and that the trial court therefore erred in granting his motion for self-representation. We reject the claim.

"The Sixth Amendment secures to a defendant who faces incarceration the right to counsel at all 'critical stages' of the criminal process." (*Iowa v. Tovar* (2004) 541 U.S. 77, 87 (*Tovar*).) Criminal defendants also have the right to waive counsel and represent themselves. (*Faretta*, *supra*, 422 U.S. at p. 807.) But "[w]hile the Constitution 'does not force a lawyer upon a defendant,' [citation], it does require that any waiver of the right to counsel be knowing, voluntary, and intelligent." (*Tovar*, at pp. 87–88.)

In evaluating the validity of a waiver, "we examine the record as a whole to see whether the defendant actually understood the consequences and import of the decision to waive counsel, and whether the waiver was freely made. [Citation.] There is no prescribed script or admonition that trial courts must use in warning a defendant of the disadvantages of self-representation." (*People v. Mickel* (2016) 2 Cal.5th 181, 211–212; see also *Tovar*, *supra*, 541 U.S. at p. 88 ["The information a defendant must possess in order to make an intelligent election, . . . will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding"].) Although the high court has stated that "[w]arnings of the pitfalls of proceeding to trial without counsel . . . must be 'rigorous[ly]' conveyed" (*Tovar*, at p. 89), it is also true that "[c]ountless disadvantages might result from a

waiver of the right to counsel," and the trial court "need only inform the defendant in general terms of the most common disadvantages" (*People v. Frederickson* (2020) 8 Cal.5th 963, 1003).

Bankston contends his initial *Faretta* waiver was "coerced" because the court gave him "a legally erroneous choice: he could either have [counsel] replaced upon demonstrating an actual conflict of interest between himself and his counsel, or he could proceed in pro. per." Bankston claims that the court affirmatively misled him about his right to effective assistance of counsel by suggesting he was entitled only to conflict-free counsel, not to effective counsel.

But as we have already explained, the trial court's statements did not put Bankston to any such choice. Bankston expressed his desire to represent himself at the outset of the *Faretta* hearing, before any remarks from the trial court about his representation, and later indicated that he wished to represent himself because nobody would fight for his freedom as hard as he would. Nor would the trial court's statements have been reasonably understood to mean that Bankston was not entitled to the effective assistance of counsel. The court referred to conflict as a basis for removing counsel in the context of clarifying the nature of Bankston's *Faretta* motion and options for resolving it. Because Bankston consistently asserted his desire to represent himself, and never sought to replace his lawyer, there was no reason for Judge Armstrong to explore the topic of counsel's effectiveness and no basis for viewing his remarks as defining or limiting the nature of representation to which Bankston was entitled.

What is more, at no time after the hearing at which Bankston's *Faretta* motion was granted did Bankston seek to relinquish his self-representation status and have counsel reappointed. Instead, Bankston repeatedly confirmed his desire to represent himself in lengthy colloquies with Judge Bascue and Judge Brown, at one point stating, "I'm totally willing to accept the consequences of representing myself in this case." In sum, Bankston fails to demonstrate he was coerced into representing himself.[4]

Bankston also asserts that his waiver of counsel was invalid because at a series of hearings following his initial waiver of counsel, Judge Bascue and Judge Brown did not advise Bankston as to the "difference between his Sixth Amendment right to the assistance of counsel at trial, and his right to represent himself at trial with advisory counsel." Bankston further contends he was "never admonished that he was waiving his Sixth Amendment right to counsel and would be fully responsible for his own representation even though he was proceeding with advisory counsel."

Bankston suggests that when a defendant seeks self-representation and also requests advisory counsel, the trial court must advise the defendant about the difference between representation by counsel and self-representation with advisory counsel. Without deciding whether such an advisement would

---

[4] The circumstances here are distinct from the cases on which Bankston relies, *People v. Hill* (1983) 148 Cal.App.3d 744 and *People v. Cruz* (1978) 83 Cal.App.3d 308. In *Hill*, the defendant made clear that he did not want to represent himself but was doing so only because he felt current counsel was inadequate. (*Hill*, at pp. 750, 754.) And in *Cruz*, the defendant moved for reappointment of counsel. (*Cruz*, at p. 319.)

be constitutionally required, we conclude that Bankston was fully informed of his right to representation by counsel and of his responsibility for his own defense even after the appointment of advisory counsel.

When Bankston first waived his right to counsel and successfully moved for self-representation status before Judge Armstrong, there was no discussion of advisory counsel. Judge Armstrong made it clear that if Bankston represented himself, he would not have an attorney and would be responsible for his own defense. Nothing in Judge Armstrong's statements could have suggested to Bankston that circumstances would be different if he later chose to proceed with advisory counsel. Later, reviewing Bankston's waiver of counsel, Judge Bascue again explained Bankston's right to have an experienced trial lawyer appointed to represent him and impressed upon Bankston the fact that he would have to conduct the defense by himself if the court denied his motion for advisory counsel. The court then denied that motion. When Judge Brown later appointed advisory counsel for Bankston, she explained multiple times that Bankston could seek advisory counsel's advice but that Bankston would be responsible for the defense and would have to "do all the talking." Judge Brown also repeated Bankston's right to be represented by counsel, as he had been for the first part of his case, and reviewed with Bankston the two written self-representation forms he completed. In sum, in the course of a lengthy series of colloquies, the court repeatedly confirmed that Bankston understood his right to counsel, that he wanted to surrender that right and represent himself, and that he understood he would be responsible for his own defense even after the court appointed advisory counsel to assist him.

Bankston further contends that his waiver of counsel is invalid because the self-representation forms he completed for Judge Bascue and Judge Brown "did not explain the circumstances under which [Bankston] had the right to replace his appointed counsel." This omission does not affect the validity of Bankston's waiver of counsel. Again, a defendant's motion to represent himself does not trigger a trial court's duty to inquire or advise concerning the possibility of substituting counsel instead. (*People v. Mendoza, supra,* 24 Cal.4th at p. 157.)

Finally, Bankston asserts that his waiver of his right to counsel was not knowing and intelligent "because he was not adequately advised regarding the nature of the capital proceedings, the meaning of capital charges, and the possible defenses available to him," and that any penalty phase would include "its own complex and unique set of requirements, evidentiary rules, and standards of proof." But the record indicates that Bankston was well aware of these matters. Judge Armstrong told Bankston a year before trial began that the case was "about as serious as it can get" because he faced possible penalties of life imprisonment or the death penalty for charges including two counts of murder. Moreover, contrary to Bankston's assertion, the record indicates he was well familiar with the concept of distinct guilt and penalty phases of the trial and other aspects of the capital proceedings. The record of the nearly two years between Bankston's arrest and his motion for self-representation is replete with references to this distinction. In addition, after Bankston had been granted self-representation status, and before he appeared before Judge Bascue and Judge Brown, he engaged with the court and prosecutor on questions the court would pose during jury

selection, including questions specific to the possibility of a death penalty, and he focused on obtaining aggravating evidence the prosecutor intended to introduce at the penalty phase, requesting the evidence and stating his need for it. Detailing some of the aggravating evidence, the prosecutor said he would be seeking to use it "in the penalty phase of your trial, should we get to that point." Bankston's exposure to proceedings while represented and the record of his conduct as his own counsel reveal that he was aware of the nature of the capital proceedings and the defenses it would require. Contrary to Bankston's argument, the trial court was not required to advise Bankston in greater detail of his available defenses or the procedural and evidentiary requirements at any penalty phase. (*People v. Riggs* (2008) 44 Cal.4th 248, 277 [the trial court is not required to advise the defendant of "aspects of the substantive law of a capital case" because they are not "dangers and disadvantages arising from a decision to represent oneself in a capital trial"].)

### 3. *Ex parte hearings*

#### a. *Factual background*

Bankston next claims the trial court erroneously conducted two pretrial proceedings in his absence. The first proceeding occurred on August 30, 1993, when the prosecutor and Mark Borden, who would later be appointed as advisory counsel, appeared before Judge Brown. Bankston had not yet arrived at the courthouse.

The court explained to Borden that the week before, Judge Bascue had appointed De Blanc as Bankston's standby counsel. The court and Borden discussed De Blanc's availability and qualifications to work on a "grade-four" case. The court

discussed with the prosecutor why the only reporter's transcript was denoted "Volume two."

Because Borden was unfamiliar with the case, the court informed him that the Thursday before, Bankston had unsuccessfully requested appointment of advisory counsel. The court was of the view that "there is no such animal as advisory counsel," and said that if Borden were appointed, it would be as standby counsel. It explained, "[Y]ou sit in the courtroom, but you do not talk to the defendant under any circumstances whatsoever." The court and Borden then discussed Borden's pending cases and his availability for trial. Borden said he was "more than willing to take this case" and review the apparently extensive materials if Bankston was willing to waive time. Borden added that he did not think the court would "be able to get any attorney in here who is going to be ready in the next 30 days to do a death penalty case even on a standby status because basically you are put in a worse position because you don't control the tactical decisions." He noted that if defendant "wants to drop the ball" and have standby counsel step in halfway through trial, "you are stuck in a tactical position worse than if you . . . prepared the case from the get go." The court replied it was familiar with the difficulties "not only of a pro per death penalty case, but also as to the situation standby counsel would be placed in." The court expressed concern about Borden's schedule and suggested investigating whether another attorney was available "who could get ready in a reasonable period of time." Borden said that he could "probably be ready . . . by the end of the year" or "within 90 days."

The court stated that Bankston had been given an eyewitness identification expert, a jury selection expert, and an investigator. Borden said he had met the investigator, who was

apparently present. The court suggested Borden speak with Bankston about waiving time until the end of the year, and noted that the case was old.

Borden asked for the "court's idea of standby counsel." The court replied: "You stand by. You do not advise him in any way whatsoever." They discussed court standby counsel resources. The court again said that it had told Bankston it would not appoint advisory counsel, adding, "I don't know of anyone who would be willing to undertake that type of situation." Borden replied, "Worst of all possible worlds." The court said, "Worst of the worst of the worst. So he's either pro per or he's not. And I have told him that in open court about 25 times."

After a recess, Bankston was present in the courtroom. Borden said he had explained the options to Bankston, and Bankston would need about five minutes to make up his mind. The court told Bankston it had read his case file. It also explained that De Blanc did not have the necessary classification to serve as standby counsel in a death penalty case, so the bar panel had sent Borden. If Bankston wanted Borden appointed as standby counsel, Borden would need to familiarize himself with the case and would not be prepared for trial until "close to the end of the year."

Bankston appeared to agree to Borden's appointment as standby counsel, but observed that he had "someone that I have been consulting with that is familiar with the case that would be interested in pursuing the case." He added, "[I]f somebody has to be appointed [as standby counsel], I just don't understand why it cannot be that individual that is familiar with the case and that would definitely have this process rolling smoothly in this courtroom." The court replied that Bankston's motion to

appoint Chandler had already been ruled on and the court would not rehear it. The court stated it was "not appointing Mr. Chandler, absolutely, not in any capacity." Bankston said that standby counsel would be "of no benefit to me" because "I don't have any . . . intention of relinquishing my pro per status." He observed, however, that if Chandler were standby counsel, "he would freely answer any questions I have." The court appointed Borden as standby counsel, and Borden said he would "be in with an order for [the court] to sign on this matter." The matter was continued to September 13, 1993.

The second challenged proceeding occurred on September 7, 1993. Borden, who had a proposed order appointing standby counsel, and a prosecutor, but not Bankston, were present in court. The court stated it had done "some reading over the recess" and was going to revisit the issue of advisory counsel once Bankston was present. Borden noted an appearance was scheduled for September 13. He also expressed confusion about whether his appointment would be vacated. The court replied, "Absolutely not," stated it had previously relied on case law involving cocounsel, not advisory counsel, and that it would have to "start on the issue of advisory counsel which [Bankston] has requested at least five or six times." It added, "If anything happens, it's going to be an increase as opposed to a decrease in [Borden's] services." Borden said he had some paperwork pending before a different judge and was "just trying to get the grasp on where we're going to go on that." The court stated that on September 13, when Bankston would be present, it would go through the "entire colloquy of whether or not he should have advisory counsel." It would also by then have reviewed Borden's proposed order. The court told Borden: "If I appoint you as advisory counsel, then you are not only

advisory, but you are standby as well. . . . But as I understand it, even advisory counsel can only be seen and not heard because the court cannot take away the defendant's aura of representing himself." A time for the hearing on September 13 was agreed to and the hearing was adjourned.

At the September 13, 1993 hearing, Bankston, Borden, and the prosecutor were present. The court told Bankston it had decided, based on Bankston's argument and motion, to appoint Borden as advisory counsel. The court explained that it had been wrong about the law concerning advisory counsel and that it had discretion to appoint such counsel. It explained that Bankston could seek Borden's "advice regarding all of those persons that you feel would assist you in the presentation of your case and the defense of your case. . . . [H]e will be at your side ready, willing and able to advise you when you seek such advice. He will assist you in any way he can regarding the defense of your case, but he is advisory counsel only. And he cannot take away from you your right to serve as your own attorney in pro per. So he will be seated at counsel table with you, but he can be seen but not heard." The court also informed Bankston that Borden had "dropped by an order for the court to sign last week, but you weren't here and the matter wasn't on calendar so we didn't have any proceedings outside of your presence." Borden remained Bankston's advisory counsel for all further trial court proceedings.

### b. *Analysis*

A criminal defendant "is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." (*Kentucky v. Stincer* (1987) 482 U.S. 730, 745.)

That right is not violated when "his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him." (*People v. Harris* (2008) 43 Cal.4th 1269, 1306; see *People v. Caro* (2019) 7 Cal.5th 463, 479 [noting that the California Constitution and Penal Code section 977 subdivision (b)(1) confer a similar right to be present if the proceeding has a reasonable, substantial relation to a defendant's opportunity to defend the charges against him].) Here, Bankston asserts that the hearings on August 30 and September 7 were critical proceedings because they addressed his right to advisory counsel. He contends that his presence was imperative because he was representing himself when the hearings occurred.

Contrary to Bankston's assertion, the hearings bore no substantial relation to Bankston's opportunity to defend against the charges he faced. The hearings involved discussion of the availability of panel attorneys available to take an appointment as standby counsel, scheduling issues, a few background details about previous appointments and rulings regarding Bankston's representation, the judge's intention to revisit one of its rulings, and the numbering of the reporter's transcript. The trial court did not rule on the appointment of either standby or advisory counsel in these hearings but waited until Bankston was present to do so. In other words, the hearings were largely devoted to scheduling and administrative matters of a sort that do not ordinarily implicate a defendant's right to be present and to have counsel at a critical proceeding. (See, e.g., *People v. Clark* (2011) 52 Cal.4th 856, 987 [trial court's ex parte contact communication with jurors implicating defendant's right to be present and to be represented by counsel was not a critical stage

of the trial when it involved scheduling and administrative matters].)

But even assuming it was error to hold these discussions in Bankston's absence, the error was harmless under any standard. Bankston arrived midway through the first hearing, received an oral summary of it, made an argument for the appointment of his preferred counsel over Borden, and eventually agreed to the appointment of Borden. At the second hearing, the trial court did not reconsider Bankston's motion for advisory counsel but waited until a later date when Bankston was present.

Although no essential business was conducted in his absence, Bankston argues he was prejudiced because he was not there to hear Borden's various statements about scheduling and the difficulty of acting as advisory counsel; if he had, Bankston says, he might have tried to prevent Borden's appointment in favor of Chandler. The argument finds no support in the record. Once present at the August 30 hearing, Bankston did unsuccessfully propose Chandler's appointment to Judge Brown, noting that Chandler was "familiar with the case" and "would definitely have this process rolling smoothly in this courtroom." The court was adamant that it would "not appoint[] Mr. Chandler, absolutely, not in any capacity." Although Bankston received a transcript of the hearing two months after the hearing — and well before trial — he never raised concern over Borden's remarks in the trial court. Borden thereafter served as Bankston's advisory counsel through both guilt phases and the penalty phase, and Bankston raises no criticism of Borden's work in this role.

Insofar as Bankston argues that reversal is warranted based on deprivation of his rights to representation at critical

stages or to conduct his own defense as a self-represented litigant, those arguments fail for the same reasons.

## B. Jury Selection Issues

Bankston contends that the voir dire was inadequate to reveal prospective juror biases and that the trial court improperly limited the use of peremptory challenges. We reject these claims.

### 1. *Adequacy of the general voir dire*

Bankston contends the trial court's general voir dire — meaning the voir dire separate from the death-qualification process — was inadequate in several respects. In particular, he contends the trial court erred in (1) refusing to ask prospective jurors open-ended questions "on key issues likely to expose the jurors' actual biases and to support challenges for cause," and (2) using a "short-cut voir dire procedure that resulted in unexplained, contradictory responses by the prospective jurors, and made it impossible for the jurors to answer the questions truthfully and in a meaningful manner." These errors, Bankston argues, prevented him from learning about the prospective jurors' potential biases, including, in particular, their "thoughts about gangs and gang members." As such, Bankston contends the voir dire violated his Sixth, Eighth, and Fourteenth Amendment rights to due process, an impartial jury, and a reliable death judgment. We reject the claim.

### a. *Factual background*

Before the first guilt phase, the trial court informed the parties it would not use a jury questionnaire but would instead personally question prospective jurors orally. The court invited the parties to propose voir dire questions, and if the court believed the questions were relevant, it would ask them. In

response, Bankston submitted more than 50 suggested questions covering all aspects of the trial. The court stated it would "very carefully voir dire this jury, and . . . ask all appropriate and proper questions that Mr. Bankston" and the prosecutor had proposed. Bankston responded: "All right. And I have no problem with that. That's why I submitted them as you asked."

The trial court reviewed Bankston's proposed questions with him, modifying some and rejecting others that either did not go to any basis for excusal or were duplicative of the court's own questions. Bankston did not object to these revisions. During voir dire, the court asked all but one of Bankston's eight suggested questions, as modified, regarding the prospective jurors' knowledge of and views regarding gangs and gang members. It also accommodated defense input that might suggest additional questioning. For example, when the defense observed during a recess that two prospective jurors, who had not been individually questioned by the trial court, had appeared to be hesitant in response to a question about the effect of a death verdict, the court acknowledged it had not observed the hesitation but "certainly [would] inquire" and ask the two prospective jurors "whether or not they believe death means death and life means life for the rest of your life." The following day, the court made this inquiry. The court also asked the parties during a recess if there was "[a]nything else you picked up that I didn't," and told Bankston: "[A]s soon as I finish all of these questions that have been submitted here. . . . [I will] give you an opportunity to phrase any additional questions that you want to ask as follow up based upon their answers. The same with [the prosecutor] if there is any follow up."

Before the second guilt phase, the court again declined to use a jury questionnaire. Bankston submitted a new list of proposed questions and asked the court to disregard his earlier list, noting he had "deleted a lot of the gang allegations on these questions." The court again reviewed the proposed questions with Bankston and the prosecutor, noting how some questions would be modified. On Bankston's new list he proposed only one question about the prospective jurors' views about gangs: "Do you have any biases that would affect you in any way from being fair and impartial regarding the following [areas]: . . . gang al[l]egations." The court revised this question to ask, "Would gang affiliation affect their ability to be fair and impartial[?]" Bankston thanked the court, adding, "[A]ny amendments you might suggest, I would take them wholeheartedly." The prosecutor then requested that prospective jurors be asked additional questions about gangs, including their "knowledge, training, or education regarding gangs," involvement in "discussions about changing the law in gang cases," and views on gang members testifying as witnesses. During voir dire, the court asked Bankston if there were any other questions he would like the court to ask, and he said, "No. I'm satisfied, your honor."

At each guilt phase, the court generally conducted voir dire, including death-qualification voir dire, in front of all of the prospective jurors in a panel. Twenty-five prospective jurors were seated in and in front of the jury box, while the remaining prospective jurors sat in the public section of the courtroom. The prospective jurors in and in front of the jury box answered a series of biographical questions that were written on a courtroom board, and the court asked follow-up questions. The court then generally asked these prospective jurors, as a group,

voir dire questions. Some of the questions called for a yes or no answer, such as whether the prospective jurors knew Bankston or his advisory counsel, or whether they had been arrested for or convicted of a crime. If the answer was yes for any prospective jurors, they raised their hands and discussed the matter with the court. If no one raised a hand, the court moved on to the next question.

Before general voir dire for the first guilt phase trial, the trial court told prospective jurors it would ask them a long series of questions. "After I finish all of these questions, and we've gotten all of your answers — and I want everyone to listen very carefully to the questions. And those of you who are not seated up here, I want you to make a written note of any answers that would differ so that when you're called to be seated up here, I'll say to you, 'Would your answers differ in any way?' You can look at your written note and say this answer would differ and this answer would differ, if that is the case." Thus, when prospective jurors in the audience were later questioned by the court, they were generally asked if they had any "different" or responsive answers to the questions asked earlier. The court gave a similar explanation to prospective jurors before the second guilt phase. Bankston raised no objection to this procedure at either guilt phase.

### b. Analysis

Bankston has forfeited his claim of error based on the conduct of the general voir dire by not objecting below to the court's questions to prospective jurors or to its procedure of asking all of the prospective jurors to listen to the questions asked of those in and in front of the jury box and to write down any responsive information. (*People v. Salazar* (2016)

63 Cal.4th 214, 240 [the defendant forfeited his claim that the trial "court failed to adequately explore" the prospective jurors' gang views by failing to object]; *People v. McKinnon* (2011) 52 Cal.4th 610, 640 ["We have repeatedly required that an objection be interposed in the trial court to preserve jury selection issues other than [death qualification issues], including inadequate voir dire"].)  Nor, to the extent Bankston raises the claim, did he object to the trial court's decision not to use a jury questionnaire.

Bankston's claim also fails on the merits.  "No hard-and-fast formula dictates the necessary depth or breadth of *voir dire*. [Citation.] . . .  Jury selection, we have repeatedly emphasized, is 'particularly within the province of the trial judge.' " (*Skilling v. United States* (2010) 561 U.S. 358, 386; see *Morgan v. Illinois* (1992) 504 U.S. 719, 729 [the United States Constitution "does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury"]; *People v. Harris* (2013) 57 Cal.4th 804, 831 [a trial court "has wide discretion in deciding what questions should be asked on voir dire to determine potential jurors' biases"].)   " 'To be constitutionally compelled, . . . it is not enough that . . . questions might be helpful.' " (*Skilling*, at p. 387, fn. 20.)  Rather, a trial court " 'abuses [its] discretion if its failure to ask questions renders the defendant's trial " 'fundamentally unfair' " or " ' "if the questioning is not reasonably sufficient to test the jury for bias or partiality." ' " ' " (*Harris*, at p. 831; see *Skilling*, at p. 387, fn. 20.)

At the time of Bankston's 1994 trial, "the jury selection provisions of Proposition 115, codified in Code of Civil Procedure former section 223, applied to this case. (Code Civ. Proc., former § 223, added by Prop. 115, as approved by voters, Primary Elec.

(June 5, 1990); *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 299−300 [jury voir dire provisions of Prop. 115 apply to all trials occurring after the proposition's effective date].)" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 608 (*Beck and Cruz*).) Code of Civil Procedure former section 223 provided in relevant part: "In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper. . . . [¶] Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause." (Code Civ. Proc., former § 223.) "Accordingly, the trial court here properly assumed primary responsibility for questioning prospective jurors" (*Beck and Cruz*, at p. 608) and limited that inquiry to questions that would "aid [in] the exercise of challenges for cause" (Code Civ. Proc., former § 223).

Bankston contends that the trial court erroneously modified certain proposed questions by substituting open-ended questions about prospective juror's feelings and views with questions that elicited a yes or no answer. For instance, rather than ask, "In general, how do you feel about individuals who belong to gangs?", the trial court asked whether any of the prospective jurors had "personal feelings, strong personal feelings or any personal feelings, for that matter" about gang members. Bankston contends that these modifications undermined the effectiveness of the proposed questions, which "were designed to expose any juror-disqualifying bias by having the [prospective] jurors describe their thoughts and opinions about gangs and the gang problem in Los Angeles." But

Bankston offers no persuasive reason to believe the questions posed by the court were inadequate to expose prospective jurors' gang-related bias. Indeed, many of Bankston's own proposed questions about gangs at the first guilt phase were structured to elicit a yes or no answer. Moreover, as noted, at the second guilt phase, Bankston proposed only one question about the prospective jurors' attitudes toward gangs and, when the court revised this question, he did not object but instead thanked the court. In any event, at both guilt phases, if prospective jurors answered "yes" by raising their hands in response to a question, the trial court then generally explored the matter further with them. Any revisions to Bankston's proposed questions therefore did not, as he asserts, "prevent[] [Bankston] from learning about each juror's thoughts about gangs and gang members" or result in each prospective juror "being the sole assessor of his or her own ability to be fair and impartial."

As noted, Bankston has forfeited any challenge to the trial court's method of asking prospective jurors who were not in or in front of the jury box to listen to the questions asked and to make a note of any different answers if they were called upon. We observe the trial court's unusual approach to voir dire presents avoidable risks that prospective jurors will fail to recall all relevant information. But our review of the voir dire at both guilt phases indicates prospective jurors generally understood that if they had responsive information to any previously asked questions, they should mention it when it was their turn to be individually questioned. That some prospective jurors may have failed initially to give a responsive answer does not mean, as Bankston asserts, that this method of questioning "was insufficient to ferret out potential bias, and to produce the information necessary for the parties to exercise challenges."

Overall, our review of the record does not indicate that the voir dire was so inadequate as to render the trial fundamentally unfair.

Although we conclude there was no reversible error on the basis of Bankston's unpreserved challenge, we discourage trial courts from engaging in this method of voir dire. Courts should instead either repeat for each panelist those questions pertinent to uncovering possible bias or use a jury questionnaire delineating such questions.

### 2. *Use of peremptory challenges against prospective jurors*

At the first guilt phase, after a panel of 12 prospective jurors had been accepted by the parties, but before the jury was sworn, the trial court received a note that one of the 12, Prospective Juror F.B. in seat number five, had a conflict. Bankston and the prosecutor stipulated to F.B.'s excusal and substitution.

The parties then discussed the procedure for replacing F.B. The court explained that it would fill the seat with a prospective juror and allow the parties to exercise peremptories against that prospective juror but would not allow them to exercise peremptories anew against the remaining 11 seated jurors they had already accepted. Both sides expressly agreed with this procedure.

Bankston now contends that the trial court prejudicially erred by preventing the parties from using their remaining peremptory challenges against the entire panel. He relies primarily on *People v. Armendariz* (1984) 37 Cal.3d 573, 577–583, in which this court held it was error to refuse to reopen jury selection and allow the use of peremptories against any seated

juror when two jurors were discharged after the swearing of the jury but before completing the selection of alternates. Without addressing the merits of Bankston's contention, we conclude the claim is forfeited by his failure to timely raise it in the trial court.

Objections to restrictions on the use of peremptories are subject to forfeiture if not timely raised. In *Caro*, for example, after the 12-person jury was sworn, and before the selection of alternate jurors, one of the jurors was discharged. (*People v. Caro* (1988) 46 Cal.3d 1035, 1046 (*Caro*).) The parties agreed to the court's proposed procedure of selecting "three alternates rather than the two originally planned, and to have one of those take the place of the juror who had been excused." (*Ibid*.) Both sides were allotted three peremptory challenges, and one of the selected alternate jurors was then seated on the jury. (*Ibid*.) On appeal, the defendant claimed that "this procedure improperly denied him the use of his 26 allotted peremptory challenges, of which he had used only 18 when the panel was sworn." (*Ibid*.) He contended that "upon the excuse of a sworn juror prior to the selection of the alternates, the court had a duty under" *In re Mendes* (1979) 23 Cal.3d 847 and *Armendariz* "to reopen jury selection and to allow defendant to exercise any of his remaining eight peremptory challenges against any of the already seated jurors." (*Caro*, at p. 1046.) This court rejected the claim, explaining that *Mendes* and *Armendariz* did not apply when the defendant had "registered no objection" to the "jury selection process." (*Id.* at p. 1047; *ibid.* ["there [was] no indication that defendant was in any way dissatisfied with the panel as it was constituted"].)

Here too, Bankston stipulated to Prospective Juror F.B.'s excusal and substitution. He did not move to exercise his

remaining peremptory challenges against the 11 other jury members he had previously accepted. The claim is therefore forfeited on appeal. (See *Caro, supra,* 46 Cal.3d at p. 1047; see also *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 313–314 (*Gonzales and Soliz*) ["we have stated that '[o]bjections to the jury selection process must be made when the selection occurs' "].) We reject Bankston's contention that any objection would have been futile merely because the prosecutor had asked for clarification of the procedure.[5] Although Bankston further broadly contends that violation of "the right to a fair and impartial jury" can be "considered for the first time on appeal," he fails to explain how that right was implicated here.

### 3. *Alternate juror peremptory challenges*

Bankston contends the trial court erred at the first guilt phase when it prevented him from using his allocated peremptory challenges to the prospective alternate jurors. We reject the claim.

### a. *Factual background*

Before the parties began exercising peremptory challenges against prospective alternate jurors, the court stated: "[W]e will

---

[5] After the trial court explained the procedure, to which Bankston responded, "Okay," the prosecutor asked, "Because it's now open again, [and] we now have the remaining peremptories that we do, are we allowed to perempt any of the other individuals other than No. 5," meaning individuals other than the prospective jurors called to replace F.B. in that seat. The court replied, "No." Bankston asked, "What about [Alternate Juror No.] 16?" The court replied, "Oh, yes, we're talking about the first 12." Bankston said, "Oh, the first 12, okay. All right." The court continued, "Just this one seat because both sides accepted everybody else," and Bankston again said, "Okay."

select the 12 alternates who will be serving in this case." Bankston used four peremptory challenges. After the lunch recess, the court informed the parties: "[T]he jury room has advised us that they can't send any jurors right now. So what we're going to do is I'm going to just continue on with the peremptory challenges here and see what we have left of our people. And then if it's going to be necessary to have an additional panel, we'll do it. But we'll have to wait for the jury room to send them to us." Bankston then exercised three more peremptory challenges for a total of seven. The prosecutor accepted the alternate jurors. Bankston requested a side bar. The court said, "I don't think that's necessary at this point," and asked, "Do you have another peremptory you'd like to exercise?" Bankston replied, "Your Honor, I accept the panel at this time." The court asked the seven prospective alternate jurors if they were feeling healthy and they answered collectively in the affirmative. The court said it would "chance it" with seven alternates. The jury panel and the alternates were sworn, given further instructions, and left the courtroom.

The court then held a hearing with the parties, and at one point asked Bankston why he had earlier requested a side bar. He replied: "Precisely what happened here, saving the peremptories for the possible fourth panel to try to find out maybe if we did exercise them, were we going to go with less or not. I didn't know that at first until when I accepted the panel and then you made up your mind it seems to me to not call the fourth panel, and then you decided to go with only seven when I was under the impression that we were going to go with twelve. That's why I saved five peremptories. But that was just about the size of it there." The court said: "All right. But both sides had accepted . . . the seven that we have. That's why I made the

inquiry if everybody was feeling in good health and so forth because I believe that we can conclude this case with the seven alternates as long as they are acceptable to both sides. And I think that will be adequate. Also, I haven't any idea how long it would take us to get another panel. If they can't send us a panel on a Monday at 2:00 o'clock in the afternoon, who knows if they have a panel on Wednesday. So as long as we have twelve jurors [who] are acceptable to both sides and we have seven alternates here, I think that that is sufficient for the trial." Bankston replied, "Okay, your honor," then turned to a different topic.

Later that afternoon, after a recess in the hearing, the court asked, "Mr. Bankston, since you made mention of saving five peremptory challenges, are you in truth and in fact satisfied with the seven alternates that you accepted?" Bankston replied, "Yes, I'm satisfied." Two alternate jurors were subsequently selected to serve as jurors on the first guilt phase jury.

### b. *Analysis*

In a death penalty case, "the defendant is entitled to 20 . . . peremptory challenges." (Code Civ. Proc., § 231, subd. (a).) If a trial court in its discretion decides to also have alternate jurors, a defendant is "entitled to as many peremptory challenges to the alternate jurors as there are alternate jurors called." (*Id.* § 234; see Pen. Code, former § 1089.)

Here, although the court informed the parties 12 alternate jurors would serve and then swore the jury and alternates when there were only seven alternates, Bankston had at that point exercised seven peremptory challenges. He therefore received what he was entitled to under Code of Civil Procedure section 234 and Penal Code former section 1089. Indeed, Bankston expressly states he is not asserting "he was statutorily

entitled to twelve peremptory challenges." Rather, Bankston claims that the trial court's "sudden change" in the number of alternates denied him "his right to peremptory challenges." But he received every peremptory to which he was entitled under state law. (See Code Civ. Proc., § 234.) Moreover, at the time the jury and the alternates were sworn, Bankston had accepted the panel. He did not object to the decision to reduce the number of alternates, and he subsequently expressly stated he was satisfied with the alternate jurors chosen. Bankston therefore fails to demonstrate that any objection to error was preserved and, even if so, that any error was made. (See *Gonzales and Soliz*, *supra*, 52 Cal.4th at pp. 313–314 [" '[o]bjections to the jury selection process must be made when the selection occurs' "].) Indeed, even if there had been error, Bankston's expressed satisfaction with the selected alternates establishes that no " 'objectionable juror had been forced on' " him, which means that any " 'error cannot be held to be prejudicial.' " (*People v. Crowe* (1973) 8 Cal.3d 815, 832; see *ibid*. [although the trial court had the jury sworn after mistakenly stating the defendant had no more peremptory challenges, the error was not prejudicial because the defendant subsequently stated he did not want to exercise further peremptory challenges and did not express dissatisfaction with the jury selected].)

## C. Guilt Phase Issues

### 1. *Hearsay regarding gang membership*

Bankston contends the trial court erred when it admitted hearsay from his field identification (FI) card and Los Angeles County General Report Evaluation and Tracking (GREAT) printout to establish he was an active gang member at the time

of the capital crimes.  We conclude that any state law or federal constitutional error was harmless beyond a reasonable doubt.

### a.  Factual background

At the first guilt phase trial, the jury heard evidence that in May 1991 Bankston told Deputy Patterson that he was from "Nine Deuce Bishops" and that his name was "Ant Dog." Bankston's acquaintance Torrez similarly testified that in May 1991 Bankston used the moniker "Ant Dog," belonged to the Nine Deuce Bishops, which was a Blood gang, and also associated with the CV 70s.  Bankston stipulated that he had a "CK" tattoo that had two lines through the "C."

The jury also heard evidence of writings in a photo album recovered from Bankston's motel room that pointed to his gang affiliation.  At the first guilt phase, Deputy MacArthur testified that written in large block letters on the front inside cover of the album was "UBN," and inside each of these letters the words "United Blood Nation" were spelled out.  Also on the front inside cover of the album were the words "Antt dogg,"  and a reference to "Ninety Sekond Street Bishop Bloods Gang of Watts" and "E.S.B. 92nd Blood gang," which Deputy MacArthur said referred to "Eastside Bishops, 92nd Street," and references to "CV 70" or "Compton Varrio 70."  On the back inside cover of the album appeared the words, "Mr. Ant dogg OG."  Deputy MacArthur said OG meant "original gangster."  Many of the writings in the album substituted a "k" for a "c."  In Deputy MacArthur's opinion, hardcore Blood gang members will not usually use the letter "c" because it "stands for Crip."

Deputy MacArthur testified that the OSS generally collected identifying information about gang members on FI cards.   Deputy MacArthur had interviewed Bankston on

October 30, 1989, after his arrest for firearm possession, and had updated some of the information on his FI card, noting a "Stella" tattoo on Bankston's wrist, his driver's license number, and his parole officer's name. Deputy MacArthur could not recall coming into contact with Bankston at any time other than the 1989 arrest. Bankston's FI card stated that his moniker was "Ant Dog" and showed his gang affiliation as "ESB 92" and "Bishops . . . 92." When subsequently asked if he was "aware of any gang that Mr. Bankston affiliates with," Deputy MacArthur answered, "Nine Bishop Blood or Eastside Bishops." In his defense case, Bankston introduced a version of his FI card that stated his moniker and his gang affiliation as "Bishops . . . 92."

Deputy MacArthur also testified that starting in 1987, Los Angeles County maintained a computerized "general report evaluation and tracking" or "GREAT" system that collected gang member information. Bankston's GREAT printout, as relevant, stated his name, his Ant Dog (also spelled Ant Dogg) moniker, and that he had a CK ear tattoo. Under "Group," it stated: "BISHOP (BLOODS), ACTIVE, BLOOD."

Lieutenant Wright testified that he had information that Bankston belonged to the Nine Deuce Bishops gang in Watts and was also affiliated with the Compton Varrio 70s. He did not identify the source of his information. Lieutenant Wright opined that if the front inside cover of the album described by Deputy MacArthur had been written by Bankston, "[w]ithout a doubt, he's an active Blood member." On redirect, Wright stated that "CK" on a tattoo "for the most part" meant "Crip killer."

The GREAT printout and FI card were both admitted into evidence, over defense hearsay objections, at the close of the prosecution case.

At the second guilt phase, the prosecution again introduced the testimony of Torrez, who stated that Bankston was associated with the Nine Deuce Bishops and was a friend to the CV 70s at the time of the charged offenses. Aguilera testified that Bankston associated with the CV 70s. In 1994, Bankston admitted that he was responsible for various writings on an out-of-order sign at the North County Correctional Facility — "Antt 2 Dogg," "CK" with two lines through the "C," and "92nd Street Watts Gang, east 'side' Bishops Blood" — that provided further evidence of his gang membership and moniker. Deputy Kempner also testified that Bankston told him he was Blood-affiliated a few months before Kempner's testimony in the 1994 trial.

Deputy MacArthur testified regarding the album contents and their meaning in a manner similar to his first guilt phase testimony. Deputy MacArthur's testimony about Bankston's FI card and GREAT printout likewise echoed his earlier testimony. In addition, Deputy MacArthur testified that on October 30, 1989, when he interviewed Bankston and updated his FI card, Bankston told him his moniker was Ant Dog and he was from the Nine Deuce Bishop Bloods. In court during his testimony, Deputy MacArthur personally looked at the CK tattoo on Bankston's ear before commenting on its meaning.

Lieutenant Wright again testified he had information that Bankston belonged to the Nine Deuce Bishop gang and was affiliated with the Compton 70s. On cross-examination, Bankston described the photo album recovered from his motel room as "defendant's" and referred to the interpretation "of what these writings meant to the defendant." He asked Lieutenant Wright: "Now, at no time do you get the impression that the defendant is like disavowing his membership in the 9 Deuce

Bishop Bloods, do you?" Lieutenant Wright answered, "No, sir." Bankston also asked if Lieutenant Wright had received "the impression that the author of [the album writing] . . . was trying to hide his street gang commitment," and Lieutenant Wright replied, "By no means."

The GREAT printout and FI card were both again admitted into evidence at the close of the prosecution case. Although Bankston objected to admission of the FI card, stating that it contained "so much biographical information" about him, he did not object to the GREAT printout.

### b.  *Analysis*

Bankston contends the trial court erred in allowing the prosecutor to rely on hearsay from the FI card and GREAT printout to establish he was an active gang member at the time of the capital crimes and to demonstrate his motive, intent, and identity.  Specifically, he contends it was error both to permit the prosecution's gang experts to testify about his gang affiliation based on information contained in the documents and to allow the documents to be admitted into evidence.  He contends that admission of the evidence violated both state evidence law under *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) and his federal constitutional right of confrontation under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

As a preliminary matter, the People assert that Bankston has forfeited his challenge by failing to object during his 1994 trial.  But we have held that a defendant does not forfeit a claim based on *Sanchez* by failing to object at a trial that took place before *Sanchez* was decided, as did the trial in this case.  (*People v. Perez* (2020) 9 Cal.5th 1, 4 (*Perez*).)  The same is true of a confrontation claim based on *Crawford*.  (*People v. Rangel* (2016)

62 Cal.4th 1192, 1215 (*Rangel*); see *ibid.* ["in a case tried before *Crawford* [was decided], a defendant does not forfeit a *Crawford* challenge by failing to raise a confrontation clause objection at trial"].)  We therefore turn to the merits.

In *Sanchez*, this court disapproved prior law "to the extent it suggested an expert may properly testify regarding case-specific out-of-court-statements without satisfying hearsay rules" because the statements are not being admitted for their truth.  (*Sanchez, supra,* 63 Cal.4th at p. 686, fn. 13.)  We explained:  "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay."  (*Id.* at p. 684; see *Smith v. Arizona* (2024) 602 U.S. 779, 783 [affirming *Sanchez*'s approach, stating, "When an expert conveys an absent analyst's statements in support of his opinion, and the statements provide that support only if true, then the statements come into evidence for their truth"]; *id.* at p. 789, fn. 2 [noting *Sanchez* "reject[ed] the 'not for the truth' rationale for admitting an expert's basis testimony"].)

" 'Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried.' [Citation.]  'Generally, parties try to establish the facts on which their theory of the case depends by calling witnesses with personal knowledge of those case-specific facts. An expert may then testify about more generalized information[, even if derived from hearsay,] to help jurors understand the significance of those case-specific facts. . . .  The expert is generally not permitted, however, to supply case-specific facts about which he has no personal knowledge.' "  (*People v. Valencia* (2021) 11 Cal.5th 818, 831.)  To be admissible, such

evidence either must come within an exception to the hearsay rule or must be supported by competent evidence in the record. (*Sanchez*, *supra*, 63 Cal.4th at p. 686.)

Under *Crawford*, the admission of hearsay may also violate the confrontation clause of the Sixth Amendment if the hearsay qualifies as "testimonial" and if the hearsay declarant has not been made available for cross-examination at trial or in a prior proceeding. (*Crawford*, *supra*, 541 U.S. at pp. 51, 53–54.) "The high court has yet to state definitively just *what* facts conclusively demonstrate that particular hearsay qualifies as testimonial. [Citation.] However, it has never held a hearsay statement to be testimonial unless it was sufficiently formal and made by or to a government agent during the course of a criminal investigation, for the primary purpose of preserving evidence for trial." (*People v. Ramirez* (2022) 13 Cal.5th 997, 1147, citing *Sanchez*, *supra*, 63 Cal.4th at pp. 687–689.)

Here, at both guilt phases the juries heard Deputy MacArthur's testimony about Bankston's FI card. Deputy MacArthur testified that the card documented Bankston's moniker, "Ant Dog," and his gang affiliation. The card itself had a date from 1984, which was then crossed out and replaced with a 1989 date, and reflected Bankston's moniker "Ant Dog" and his affiliation with the gang "ESB 92" or "Bishops . . . 92." Deputy MacArthur did not claim in either guilt trial that the FI card contained information about Bankston's gang affiliation at the time of the offenses in 1991. In the first guilt trial, however, he testified that he was "aware of" Bankston's affiliation with the "Nine Bishop Blood or Eastside Bishops." The juries likewise heard Deputy MacArthur testify about Bankston's GREAT printout; he stated that it showed that Bankston's moniker was Ant Dog and that his gang affiliation was Bishop

Bloods. The printout itself also noted Bankston's CK tattoo and referred to him as an "active" Bishop Bloods gang member.

The juries also heard from Lieutenant Wright, who testified that he had information that Bankston belonged to the Nine Deuce Bishops gang and was also affiliated with the CV 70s, but could not recall where he got this information. The FI card and GREAT printout both were admitted into evidence at the close of the prosecution case.

At the outset, Bankston challenges the officers' testimony concerning his gang affiliation under *Sanchez*. Their testimony did contain case-specific facts. (See *Sanchez*, *supra*, 63 Cal.4th at p. 676 ["Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried"].) But "that does not necessarily make the admission of the testimony error under *Sanchez*. Its admission was improper only if the expert's testimony about the case-specific facts was not otherwise supported by competent evidence in the record." (*People v. Navarro* (2021) 12 Cal.5th 285, 310.) Here, the record contains ample evidence supporting the challenged testimony. In the first trial, evidence of Bankston's own statements to Deputy Patterson, testimony from Torrez, and writing in an album the jury could reasonably infer belonged to Bankston, all conveyed evidence of his gang membership at the time of the offenses. In the second trial, testimony from Torrez and Aguilera and the album writing again provided evidence of Bankston's gang membership at the time of the offenses, along with Bankston's statements to Deputy Kempner acknowledging his gang affiliation again in

1994.[6]  Evidence of Bankston's CK ("Crip Killer") tattoo was established through stipulation and Deputy MacArthur's personal observation.  In other words, "[t]here was abundant competent evidence admitted at trial to demonstrate" that Bankston was an active gang member at the time of the offenses. (*Navarro*, at p. 310.)  From this we can conclude that the jury had "independent competent proof" (*Sanchez*, *supra*, 63 Cal.4th at p. 684) of Bankston's gang membership, such that there was no state law error in Lieutenant Wright's or Deputy MacArthur's testimony under *Sanchez*.  This evidence was separate from the statements on the FI card and GREAT printout.

The core of Bankston's argument on appeal is that the information contained in the FI card and GREAT printout was inadmissible testimonial hearsay.  Aside from Deputy MacArthur's testimony that he updated the FI card in 1989, the evidence in the record does not clearly indicate the sources of the information contained in the FI card and the GREAT printout, and thus sheds little light on whether the contents of those documents were testimonial.  (See *Sanchez*, *supra*, 63 Cal.4th at p. 697 ["Because the parties did not focus on this issue, the point was not properly clarified, leaving the circumstances surrounding the preparation of the FI card unclear"].)  Nonetheless, even if we were to assume that Deputy MacArthur's testimony as to case-specific facts from Bankston's FI card and GREAT printout was erroneously admitted in

---

[6]  Although some of the testimony conveyed Bankston's out-of-court statements to the jury, such statements were admissible against Bankston as a party admission exception to the hearsay rule. (Evid. Code, § 1220; *People v. Mendoza*, *supra*, 24 Cal.4th at p. 185.)

violation of state hearsay law, and to further assume it constituted testimonial hearsay admitted in violation of *Crawford*, it would be harmless beyond a reasonable doubt.

Bankston contends information from and testimony about the FI card and GREAT printout was "the primary evidence used by the prosecutor to argue that [Bankston] was an active street gang member when the charged offenses were committed." The record indicates otherwise. As noted, Deputy MacArthur's testimony about the documents did not refer to Bankston's gang membership status at the time of the offenses in 1991; only the GREAT printout later received into evidence referred to Bankston's status as "active." In the first trial, there was evidence that upon his arrest in May 1991, Bankston acknowledged his gang membership to Deputy Patterson. Torrez also testified that in May 1991 Bankston belonged to the Nine Deuce Bishops and associated with the CV 70s. And writing in an album apparently belonging to Bankston, and found in his motel room shortly after his arrest, contained numerous references to his gang membership. Indeed, after the prosecution rested in the first guilt trial, Bankston told the jury that the prosecutor "has successfully proven that I am a member of a Blood gang." In the second trial, Torrez and Aguilera both testified that Bankston was either a gang member or associated with a gang at the time of the offenses and the prosecution again presented testimony about the album. Cross-examining Lieutenant Wright, Bankston prompted him to agree that the writing in the album showed that Bankston had no intention of disavowing his gang membership. The same year as the trial, Bankston told Deputy Kempner that he was Blood-affiliated and wrote expressions of his gang affiliation on an out-of-order sign. Ultimately, at both guilt phase trials the evidence of Bankston's

gang affiliation throughout the relevant time period was overwhelming. No reversible error occurred.

### 2. *Prison gang evidence*

Bankston contends the prosecution's gang experts were not qualified to testify about prison gangs. He further contends that the trial court erroneously admitted evidence that he had been a prison gang member. We reject the claim.

### a. *Factual background*

As noted, on the front inside cover of Bankston's photo album "UBN" was written in large block letters. Inside each of these letters the words "United Blood Nation" were spelled out. At the first guilt phase, Lieutenant Wright testified that the United Blood Nation or UBN was a prison gang comprised of "all Blood sets that are within the institution." On recross-examination, Bankston asked Lieutenant Wright if he was "familiar with prison organizations or gangs." Lieutenant Wright replied, "I have some familiarity, yes." Bankston then asked Lieutenant Wright about a different topic.

When Deputy MacArthur was asked about the writing on the front inside cover of Bankston's album, he noted that the letters "UBN" were "predominant." The prosecutor asked what UBN stood for, and Deputy MacArthur replied, "United Blood Nation, which is a prison gang." The prosecutor asked if Deputy MacArthur was "familiar with the four primary" California prison gangs, and Deputy MacArthur identified the Black Guerilla Family, the Mexican Mafia, the Aryan Brotherhood, and the United Blood Nation. Bankston objected on relevancy grounds.

During the ensuing recess, the trial court excluded as irrelevant further testimony about prison gangs other than the

United Blood Nation.  Bankston asserted that a "stipulation can be agreed upon by myself and [the prosecutor] that [Deputy MacArthur] is an expert in gangs and that would include prison gangs."  The court suggested the parties discuss a stipulation over the noon recess.  Bankston subsequently stated:  "The United Blood Nation . . . is a prison based organization.  So, if it's prison based, nowhere in Mr. MacArthur's testimony of his expertise did he give that he worked inside prisons.  It's the county jail. . . . there is a distinction between prison and county jail to a certain extent."  The court noted Bankston would have an opportunity to cross-examine Deputy MacArthur and that if he "want[ed] to frame a stipulation, then it can be offered to the prosecution."

When the hearing resumed after the recess, the prosecutor read Bankston's proposed stipulation to the court:  "The evidence now before the court regarding the defendant's association and/or membership in the U.B.N., i.e., United Blood Nations be deemed true thereof.  Any writings . . . the prosecution is in possession of is also deemed to be an accurate statement of the defendant in pro per.  It is also proposed that Deputy Alexander MacArthur, having testified in these proceedings . . . be deemed to have . . . given an accurate account in his expert capacity on prison gangs, specifically" about the photo album.  The prosecutor declined to accept the stipulation because, as Bankston clarified, it would not allow the prosecutor to "bring out whatever he felt was necessary in these writings."  The court repeated that there was no reason to have Deputy MacArthur, "who does qualify as an expert," testify regarding prison gangs other than the UBN, and stated that the prosecutor "should not be precluded" from exploring the album writings.

On cross-examination, Bankston asked Deputy MacArthur if he was "well-versed with prison organizations." Deputy MacArthur replied, "No, I'm not." Bankston also asked Deputy MacArthur if there were any "officers that you work with . . . [who] might be well-versed in prison gangs," and Deputy MacArthur replied: "There are. There's a prison gang unit [i]n our department."

At the second guilt phase, the prosecutor asked Deputy MacArthur if he saw the letters "UBN" in the album's "Poison of thee Blood Streme" poem, and if that "st[ood] for United Blood Nation." He replied: "Yes. UBN is a prison gang." When the prosecutor then asked whether there were at least "four other major prison gangs," Bankston successfully objected on relevancy grounds. In Deputy MacArthur's opinion, the album's author was a member of two gangs. He said, "The street gang would be 92nd Street, Eastside Bishops and while in prison [it] would be U.B.N. or United Blood Nation."

On cross-examination, Lieutenant Wright testified that UBN was "the consolidation of Pirus and Blood members in the prison system." In response to Bankston's inquiry, Lieutenant Wright explained the connection between the Blood and Pirus gangs, that the names were synonymous, and the historical reason for the different names. Both were rivals of the Crips.

Bankston asked Lieutenant Wright, "You stated that you are familiar with prison-based organizations, correct?" Lieutenant Wright replied, "Somewhat, yeah." Bankston asked, "Particularly the U.B.N., the United Blood Nation?" Lieutenant Wright said, "Yes," and in response to Bankston's further inquiry, said the UBN was a "compilation of Pirus and/or Blood members that are within the institution that are united and under one umbrella." On redirect, Lieutenant Wright opined

that Bankston's writings showed "an association with [the] CV 70s," "Nine Deuce Bishop and the Blood Piru[s] set as a whole." The prosecutor asked, "[W]hat about [the] U.B.N.?" Lieutenant Wright replied, "Yes, that's part of the Blood set, the United Blood Nation."

### b. *Analysis*

Bankston contends that the prosecution gang experts were not qualified to testify about prison gangs. (Evid. Code, § 720.) He also argues evidence that Bankston had been a prison gang member was irrelevant and unduly prejudicial. (*Id.* §§ 350, 352.)

Although Bankston now contends that the gang experts were not qualified to testify regarding prison gangs, he never objected below to the qualifications of Deputy MacArthur or Lieutenant Wright to define "UBN" and "United Blood Nation." Nor did Bankston dispute that "UBN" stood for United Blood Nation or that the United Blood Nation was a prison gang. Indeed, at the first guilt phase, when asked what UBN stood for, Deputy MacArthur replied without objection, "United Blood Nation, which is a prison gang." During the next recess Bankston suggested that the parties could stipulate that Deputy MacArthur "is an expert in gangs and that would include prison gangs." Although Bankston noted that UBN was a prison gang, and Deputy MacArthur had not testified he had worked inside a prison, he did not assert that Deputy MacArthur thereby lacked the expertise to testify that UBN was a prison gang. At the second guilt phase, Bankston asked Lieutenant Wright to describe the UBN. Any objection to the experts' qualifications on this topic was thus forfeited.

Bankston further contends that evidence of his membership in a prison gang was irrelevant and unduly prejudicial under Evidence Code sections 350 and 352. This claim is also forfeited. In any event, the evidence of prison gangs at trial was quite limited. Deputy MacArthur and Lieutenant Wright defined what the terms "UBN" or "United Blood Nation" in Bankston's photo album meant, explained that the United Blood Nation was a prison gang, and offered their opinions that Bankston was either a member of or associated with the UBN. They did not describe the activities of the United Blood Nation. Deputy MacArthur did mention the names of three other prison gangs in the first guilt phase, but that reference was brief and not elaborated on, and the trial court precluded further testimony on other prison gangs.

This limited testimony on the UBN was relevant and not unduly prejudicial. The prosecutor's theory was that Bankston's Blood gang affiliation and association with the CV 70s motivated him to murder Benson and Sanchez because he perceived them to be rival gang members. Deputy MacArthur's and Lieutenant Wright's brief explanation of the terms "UBN" and "United Blood Nation" in Bankston's album, and their view of Bankston's relationship to the United Blood Nation, were relevant to further establish his Blood gang affiliation. Given the relevance, brevity, and narrow scope of this prison gang evidence, there was no error.

### 3. *Rap sheet evidence*

Bankston contends that the trial court erred by admitting evidence contained on the California Law Enforcement Telecommunication System (CLETS) concerning Bankston's

past arrests and convictions, also referred to as his "rap sheet." We conclude any error was harmless beyond a reasonable doubt.

### a. Factual background

#### (1) First guilt phase

On cross-examination of Linda Jones, Bankston elicited testimony that Benson's wife D.J. had become pregnant by a man named Nate, apparently while Benson was in prison. On cross-examination of both Linda and Benjamin Jones, Bankston elicited testimony that on the day of Benson's murder, Benson had been involved in a physical and verbal altercation with D.J. at home. The police were called, removed Benson from the home, and took him to a different location. Benson nonetheless returned home. At that point Linda and Benjamin picked him up because he and D.J. were arguing. Benson was upset his siblings were picking him up, but Linda told Benson she did not want him to go back to prison. On cross-examination of Lieutenant Wright, Bankston elicited testimony Benjamin and Benson Jones had been "proud" members of the Atlantic Drive Crips in the late 1970s and early 1980s.

The prosecutor contended that by asking questions about and eliciting testimony regarding Benson's violent traits or character, Bankston had opened the door to evidence of his own violence, which the prosecution sought to introduce through his rap sheet. (Evid. Code, § 1103, subd. (b).) The rap sheet was not identified as an exhibit, nor did the prosecutor seek to lay a foundation for admission of its contents under a hearsay exception. After an evidentiary hearing, the court granted the motion, but in response to Bankston's request ordered that all references to individual prisons in which Bankston had been incarcerated be changed to the "Department of Corrections."

The court also found that under Evidence Code section 352, "the probative value outweighs the prejudice." (Evid. Code, § 352 ["The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time or . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury"].)

Before the jury, and over Bankston's objection, Los Angeles County Sergeant Doral Riggs testified regarding Bankston's detentions and convictions as listed on the rap sheet. He described entries from 1980 to 1990 that included, in roughly chronological order, detentions for carrying a firearm and for robbery; convictions for carrying a loaded firearm and for assault with a firearm; detentions as a prisoner for weapons possession, assaults, and a "a tear gas" offense; and detentions for being a felon in possession of a firearm. Based on the rap sheet, Sergeant Riggs was of the view that Bankston had a "tendency towards violence."

On cross-examination, Bankston questioned Sergeant Riggs about and introduced into evidence an abstract of judgment for what Sergeant Riggs had referred to as a detention for a "tear gas" offense. After reviewing the abstract of judgment, Sergeant Riggs said Bankston had been sentenced to two years for attempted possession "of an explosive." The abstract also stated that Bankston's sentence would be consecutive to an incomplete sentence in a different case.

Earlier in the trial, Bankston had asked Deputy MacArthur on cross-examination the "nature of [his] interview" of Bankston in 1989. Deputy MacArthur replied that Bankston had been arrested for firearm possession. Bankston had also introduced into evidence his Penal Code section 969b prison

packet that contained abstracts of judgment for his 1985 conviction for assault with a deadly weapon with great bodily injury, for which he was sentenced to three years; and his 1987 conviction for attempted possession of an explosive, for which he was sentenced to two years. He described this exhibit in front of the jury as "a chronological history of my prison dates."

At the end of the first guilt phase, the trial court instructed the jury: "Evidence has been introduced by both sides that the defendant and/or a victim may have a propensity for violence. Such evidence was received and may be considered by you not for the purpose of establishing the person has a propensity to commit crimes, but only for the limited purpose of establishing the person's character or propensity for violence, if such be the case." The court also instructed the jury: "Evidence was received of the violent character of the defendant. The purpose of such evidence is to show that it is probable that a person of such character acted in conformity with that character trait during the events occurring in this case. Any conflict in evidence of the defendant's character and the weight to be given to such evidence is for you to determine."

### (2) Second guilt phase

Deputy MacArthur testified that certain Los Angeles County law enforcement agencies maintained information about gang members in a computerized GREAT system and on FI cards that documented officer contacts with gang members on the street or after an arrest. He testified that the FI card and the GREAT printout on Bankston showed that his nickname was Ant Dog and he was affiliated with the 92nd or Nine Deuce Bishops. Deputy MacArthur testified that the FI card on Bankston was created in 1984 and updated in 1989.

On cross-examination, Deputy MacArthur testified that gang members were purged from the system after five years if there were no contacts with them. He acknowledged that the FI card showed no contact with Bankston between 1984 and 1989 and that the GREAT printout contacts were limited to 1984, 1989, and 1991 arrests. Bankston confirmed that the printout showed no arrests between 1984 and 1989 or between 1989 and 1991. He then asked Deputy MacArthur why the GREAT system still listed him as an active gang member when there had been no contacts with him between 1984 and 1989, and posed a number of questions to clarify the process for purging gang members from the system.

On redirect, the prosecutor sought to admit evidence from Bankston's rap sheet to demonstrate that Bankston had been arrested at times other than in 1984, 1989, and 1991. Bankston objected and argued that he had been challenging the accuracy of the GREAT printout, noting that if it was not accurate then perhaps his active gang membership was inaccurate. "I didn't say I didn't have arrests." In response, the court stated, "[A]s far as the accuracy of the document, . . . the People have a right to have the members of the jury draw an inference which you're seeking, which is that criminal activities of yours are not all documented on the GREAT computer system." The court allowed the prosecutor to question Deputy MacArthur about Bankston's arrests as reflected on the rap sheet.

Deputy MacArthur then testified about Bankston's arrests between 1984 and 1989. He testified that Bankston was arrested in 1984 for carrying a loaded firearm in a public place and convicted of a misdemeanor; that between 1985 and 1988 Bankston was arrested for offenses at various correctional facilities, noting incidents at Chino, Soledad, Folsom,

Tehachapi, and at an unnamed institution; and that in 1989 he arrested Bankston for being a felon in possession of a firearm. Deputy MacArthur also stated that an individual's arrests while he or she was in custody would not be in the GREAT system. On cross-examination of Deputy MacArthur, Bankston explored at length the details of his rap sheet. The rap sheet was marked for identification but not admitted into evidence.

### b. Analysis

Bankston contends the trial court erred in admitting testimony regarding his rap sheet under Evidence Code section 1103 and state hearsay law at the first guilt phase, as rebuttal at the second guilt phase, and in violation of his Sixth Amendment confrontation clause rights at both guilt phases. Bankston's hearsay and confrontation clause claims are preserved on appeal even though he did not raise them at trial. (See *Perez, supra*, 9 Cal.5th at p. 4; *Rangel, supra*, 62 Cal.4th at p. 1215.) We consider each guilt phase in turn.

### (1) First guilt phase

Evidence Code section 1101, subdivision (a), generally provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." At the first guilt phase, the trial court admitted testimony regarding information on the rap sheet under Evidence Code section 1103, subdivision (b). This section provides an exception to the general rule against propensity evidence in Evidence Code section 1101, subdivision (a), for "evidence of the defendant's character for violence or trait of character for violence (in the form of an opinion, evidence of

66

reputation, or evidence of specific instances of conduct) . . . if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant under" Evidence Code section 1103, subdivision (a)(1).  (Evid. Code, § 1103, subd. (b); see *People v. Gutierrez* (2009) 45 Cal.4th 789, 827–828.)

Bankston contends that because he "had not put into issue any victim's character for violence, testimony about his own purported character for violence was inadmissible," "irrelevant and highly inflammatory."  But on cross-examination of both Linda and Benjamin Jones, Bankston elicited testimony that on the day of his murder, Benson Jones had been involved in a physical and verbal altercation with his wife at home, the police were called and removed Benson from the home, and when Benson nonetheless later returned home, Linda and Benjamin had picked him up against his wishes because he and D.J. were arguing and Linda did not want Benson to return to prison. Although Linda and Benjamin did not expressly testify that Benson had engaged in physical violence against D.J., the jury could fairly draw this inference from their testimony.

It is unclear, however, whether this single inference supported introduction of much of Bankston's criminal history, including convictions for carrying a firearm, assault with a firearm, and attempted possession of an explosive.  We have warned:  " 'Evidence that involves crimes other than those for which a defendant is being tried is admitted only with caution, as there is the serious danger that the jury will conclude that defendant has a criminal disposition and thus probably committed the presently charged offense.' "  (*People v. Calderon*

(1994) 9 Cal.4th 69, 75 (*Calderon*).) It is even less clear that testimony regarding Bankston's mere detentions, as opposed to convictions, was probative of his violent character.

Even assuming the trial court acted within its discretion in finding evidence of Bankston's violent character admissible under Evidence Code section 1103, Bankston contends that the means by which the prosecutor sought to prove Bankston's violent character — expert testimony conveying his rap sheet information — violated state hearsay evidence law and his rights under the confrontation clause. (See *Sanchez, supra*, 63 Cal.4th at pp. 684–685.)

As to state hearsay law, the details of Bankston's criminal history were case-specific facts subject to the usual rules governing admission of hearsay. (See *Sanchez, supra*, 63 Cal.4th at p. 676 ["Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried"].) We have previously upheld the admission of "uncertified computer printouts reporting criminal history information" or rap sheets under the official records exception to the hearsay rule. (*People v. Martinez* (2000) 22 Cal.4th 106, 111–112; *id.* at pp. 119–134; Evid. Code, § 1280.) But here, unlike in *Martinez*, the prosecutor did not seek to admit the rap sheet into evidence under Evidence Code section 1280 or any other section, nor did the trial court rule on its admissibility. (*Martinez*, at p. 113.) We have previously declined to uphold the admission of hearsay in an autopsy report "against a criminal defendant based on an exception that was never presented to the trial court, for which no effort was made to lay the necessary foundation, and on which the court never ruled." (*People v. Turner* (2020) 10 Cal.5th 786, 823.)

As to whether these case-specific facts were testimonial for confrontation clause purposes, this court has not addressed whether evidence from a rap sheet is testimonial.  (Compare *People v. Garcia* (2020) 46 Cal.App.5th 123, 171 [records of prior criminal convictions "used to prove facts other than the fact of conviction itself *are* testimonial"] with *People v. Moreno* (2011) 192 Cal.App.4th 692, 709 [Penal Code section 969b packet documents are not testimonial because they " 'are prepared to document acts and events relating to convictions and imprisonments' " and not to provide trial evidence or determine whether charges will be brought]; see *id.* at pp. 710–711; *People v. Morris* (2008) 166 Cal.App.4th 363, 367−373 [rap sheets are not testimonial hearsay]; *People v. Taulton* (2005) 129 Cal.App.4th 1218, 1224–1225 [same].)  Nor need we do so here.  We conclude that even assuming the case-specific facts from the rap sheet were erroneously admitted in violation of state hearsay law and constituted testimonial hearsay in violation of the confrontation clause, the error was harmless beyond a reasonable doubt.

The rap sheet itself was not admitted into evidence for the jury's perusal.  Moreover, at the time of Sergeants Riggs's testimony, Bankston himself had already introduced into evidence his Penal Code section 969b prison packet that contained abstracts of judgment for his 1985 conviction for assault with a deadly weapon with great bodily injury and his 1987 conviction for attempted possession of an explosive.  These were his most serious prior convictions.  He described this exhibit in front of the jury as "a chronological history of my prison dates."  Evidence that Bankston had also been arrested or detained on certain occasions would necessarily carry less weight than evidence of his convictions.  Moreover, Bankston

69

had previously elicited testimony that in 1989 he had been "arrested for possession of a firearm." Finally, the jury failed to reach a verdict on the Sanchez murder, the Johnson attempted murder, and the assault with a firearm on Linda Jones, indicating that it thoughtfully evaluated the evidence. (See *People v. Romero and Self* (2015) 62 Cal.4th 1, 28 (*Romero and Self*) [even assuming details of the attack on one victim were improperly admitted, the error was harmless in part because the jury acquitted the defendant of different "robbery and kidnapping charges, showing it carefully evaluated the evidence"].)

## *(2) Second guilt phase*

Bankston contends that the trial court erred in admitting evidence from his rap sheet at the second guilt phase as rebuttal to his cross-examination of Deputy MacArthur, which had drawn attention to gaps in the records of arrests contained in the GREAT system.

Under state law, " '[r]ebuttal evidence is relevant and thus admissible if it "tend[s] to disprove a fact of consequence on which the defendant has introduced evidence." [Citation.] The trial court is vested with broad discretion in determining the admissibility of evidence in rebuttal.' " (*Beck and Cruz, supra,* 8 Cal.5th at p. 655.) Bankston contends the trial court erred in concluding the rap sheet evidence tended to disprove any fact he had introduced in evidence through his cross-examination of Deputy MacArthur. He argues his purpose in cross-examination was simply to demonstrate that the GREAT system was "incomplete and unreliable," and therefore the jury should discount the expert's opinion about Bankston's gang affiliation to the extent it was based on information in that

system. But contrary to his argument, the evidence elicited on cross-examination was reasonably susceptible not only to the inference that the GREAT system was generally incomplete and unreliable, but also to the inference that Bankston had no arrests other than those in 1984, 1989, and 1991. The trial court acted within its discretion in concluding this latter inference involved facts of consequence and in allowing the prosecutor to present evidence to demonstrate that the inference was not correct.

Bankston further contends the "trial court erred by permitting the prosecutor to present bad-character evidence that went well beyond that necessary to rebut any inference about the number of times [Bankston] had been arrested." He contends that the trial court should have "excluded [Deputy] MacArthur's testimony about the charges on which [Bankston] was arrested; the fact of [Bankston's] prior conviction; the charges on which [Bankston] was convicted; the fact of [Bankston's] prior prison term; and the name of institutions in which [Bankston] served his time."

At trial, Bankston did eventually object to the scope of Deputy MacArthur's testimony at trial, though the objection was somewhat belated. The issue would not have come as a surprise: Bankston's rap sheet information had been introduced at the first guilt phase; the prosecutor noted the day before Deputy MacArthur's redirect testimony at the second guilt phase that she would seek admission of the arrest information on the rap sheet; and a hearing had been held regarding the admissibility of the arrests on the rap sheet on the day of Deputy MacArthur's testimony. But it was not until after Deputy MacArthur had mentioned the date and crime for the third arrest on the rap sheet, and after he had noted Bankston had

previously suffered a misdemeanor conviction, that Bankston unsuccessfully objected: "Can we have the witness just read the arrests, not where and what for?"

Assuming Bankston's objection suffices to preserve the claim, we consider the scope of Deputy MacArthur's testimony about Bankston's rap sheet to be questionable. To be sure, Deputy MacArthur's testimony was not extensive: He mentioned a misdemeanor conviction and while he did not mention a prior prison term, he did testify that at the time of five of the arrests Bankston had been incarcerated in a correctional facility. This was relevant to Deputy MacArthur's testimony that arrests while a person was in custody would not be in the GREAT system, and so arguably constituted proper rebuttal. But again, " '[e]vidence that involves crimes other than those for which a defendant is being tried is admitted only with caution, as there is the serious danger that the jury will conclude that defendant has a criminal disposition and thus probably committed the presently charged offense.' " (*Calderon*, *supra*, 9 Cal.4th at p. 75.)

Even assuming Deputy MacArthur's testimony otherwise qualified as permissible rebuttal, Bankston argues that evidence from the rap sheet was testimonial hearsay admitted in violation of his confrontation right. If the rap sheet was testimonial hearsay, it is no answer that Bankston may have " 'open[ed] the door' " to the subject of his arrests by eliciting information from other sources. (*Hemphill v. New York* (2022) 595 U.S. 140, 152; see *id.* at p. 154 [ruling that the confrontation clause "admits no exception for cases in which the trial judge believes unconfronted testimonial hearsay might be reasonably necessary to correct a misleading impression" left by the

presentation of other evidence].)  But once again, we need not decide the issue in this case.

Assuming the case-specific facts from the rap sheet were erroneously admitted in violation of state evidentiary law and constituted testimonial hearsay in violation of the confrontation clause, we conclude the error was harmless beyond a reasonable doubt.  As noted, the rap sheet itself was not admitted into evidence.  Moreover, on cross-examination of Deputy MacArthur, without any effective compulsion to do so, Bankston explored at length the details of his rap sheet and elicited negative information beyond that testified to on direct.  Thus, Bankston elicited testimony that he had served three years in prison for his "March 12, 1985 arrest."  Deputy MacArthur again noted Bankston had suffered a misdemeanor conviction and also noted the sentence imposed.  Bankston also appeared to try to identify an arrest that Deputy MacArthur had not mentioned.  At Bankston's request, Deputy MacArthur carefully identified those arrests that had occurred while Bankston was in custody and the overall time periods Bankston had been incarcerated.  He further testified that Bankston had been paroled on March 12, 1991.

In addition, the limited information Deputy MacArthur offered about Bankston's criminal history paled in comparison to the evidence of Bankston's responsibility for the shootings.  Bankston described committing the murder to Torrez, with details similar to those provided by eyewitnesses to the crime.  Melendez, who was with Sanchez when he was killed, identified Bankston at trial as the shooter.  Franco, who also witnessed the shooting, identified Bankston's car as the car from which the shooting occurred.  And ballistics testimony indicated that a

bullet recovered at Sanchez's autopsy was consistent with being fired from Bankston's AK-47-type rifle.

Benjamin and Linda Jones also identified Bankston as the person who had shot Benjamin and Benson, and Linda identified him as the person who then shot at her. Bankston was also connected to the assault with a firearm by ballistics evidence. The jury acquitted Bankston of Johnson's attempted murder, showing that it was capable of carefully evaluating the evidence despite the admission of evidence regarding his criminal history. (*Romero and Self*, *supra*, 62 Cal.4th at p. 28.) We thus conclude beyond a reasonable doubt that the jury would not have reached a different verdict had it not heard the challenged rebuttal evidence.

### 4. *Severance of the assault charge*

Bankston contends that the trial court prejudicially erred at the second guilt phase by failing to sever count 4, the charge of assault with a firearm on Linda Jones, from the Sanchez murder and Johnson attempted murder charges. We conclude that the trial court acted within its discretion in denying severance.

#### a. *Factual background*

In the first trial, Benjamin testified that Bankston and two other men approached Benson and one of the men asked, "What's up Blood?" When Benson, a Crip gang member, turned around and approached Bankston, Bankston pulled out a .38-caliber gun and shot him. Bankston then turned and shot Benjamin. Benjamin could see his sister Linda screaming hysterically. Bankston returned to Benson, shot him in the neck at close range, and fled. Linda testified that she heard shots and saw Benjamin and Benson fall, and saw Bankston shoot Benson

again, shoot in her direction, and flee. Benjamin and Linda identified Bankston from a photo lineup a few days after the murder and later in court during his trial testimony.

Torrez testified about the Sanchez murder in the first trial. He said that Bankston told him he had killed a CCG gang member. Bankston did not give the name of the man he had killed but said the victim had been with "Florentino." Bankston told Torrez that he shot the victim once and shot him again after he fell down and was yelling; Bankston said he did not want to "waste all his bullets" by shooting Florentino and just smiled at him and drove away.

Florentino Melendez testified that he had been walking with Sanchez when they heard shots and ran. After the shots, Melendez made eye contact with the shooter, who was in his car. Melendez described the shooter as a Black male about 25 years old with a shaved head, and who wore prescription glasses and had a somewhat stocky build. Ballistics evidence indicated that a bullet from the Sanchez shooting was fired from an AK-47-type rifle, the same type of gun Bankston had when he was arrested.

As noted, at the first guilt phase, Bankston was convicted of the first degree murder of Benson Jones, the willful, deliberate, and premeditated attempted murder of Benjamin Jones, and possession of a firearm by a felon. (Counts 2, 3, and 5.) The jury failed to reach a verdict and the trial court declared a mistrial on charges that Bankston had committed the Sanchez murder (count 1), assault with a firearm on Linda Jones (count 4), and the Johnson attempted murder (count 6). The jury made no finding on the multiple-murder special-circumstance allegation. (Pen. Code, § 190.2, subd. (a)(3).)

On the first day of jury selection in the second guilt phase, the court and parties discussed the fact that Bankston was charged with a multiple-murder special-circumstance allegation under Penal Code section 190.2, subdivision (a)(3), which applies when "[t]he defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree." (Pen. Code, § 190.2, subd. (a)(3).) The jury at the second guilt phase, however, would be deciding only if Bankston was guilty of one murder, involving victim Sanchez. Bankston made three arguments regarding the multiple-murder special circumstance: (1) that the prior multiple-murder allegation no longer applied because only one murder charge remained to be resolved "in this proceeding" (Pen. Code, § 190.2, subd. (a)(3)); (2) that he could not be tried on a new prior-murder special-circumstance allegation under Penal Code section 190.2, subdivision (a)(2) unless he was granted a preliminary hearing on that allegation; and (3) that, in any event, he was entitled to bifurcate the prior murder conviction and to have a separate trial to determine the validity of that conviction.

The trial court rejected Bankston's arguments regarding the applicability of the multiple-murder special-circumstance allegation, stating that Bankston continued to be charged with the allegation, and that the remaining counts to be tried in the second guilt phase were part of the same proceeding as the first guilt phase. The court nonetheless agreed with Bankston that the multiple-murder special-circumstance allegation should be bifurcated to avoid prejudicing the jury with evidence of Bankston's murder conviction; the court stated that unless the second guilt phase jury convicted him of Sanchez's murder, it would not learn that Bankston had been convicted of Benson's murder (or Benjamin's attempted murder) or reach the issue of

the multiple-murder special-circumstance allegation. The retrial would thus potentially have as many as three parts: one for guilt and one for any special circumstance proceeding, followed by a penalty phase if necessary.

Bankston then orally moved to "sever" count 4, the charge of assault with a firearm on Linda Jones, from the charges involving the Sanchez murder and the Johnson attempted murder. Bankston suggested the court have the jury hear evidence on the assault charge in "the second part of the trial since we're going to take testimony on it anyways." The court responded that the "motion to sever count 4 out" would result in a "four-part hearing." The prosecutor stated that "it appears the defendant is making a motion for bifurcation." The court asked, "[T]ell me if I'm wrong, Mr. Bankston — you want me to bifurcate that [count 4 involving Linda Jones] out from counts 1 and 6." Bankston replied, "Exactly."

When the parties and the court discussed the issue further the following day, the court stated that the issue was not "sever[ance]," but what limitations should be placed on Linda Jones's testimony about the shooting. The court stated that neither Linda nor Benjamin could testify that Bankston had been convicted of Benson's murder and Benjamin's attempted murder. Bankston argued he did not "want the jury knowing I shot Benson Jones." The court replied, "Unfortunately, [Linda] can testify to that." Bankston asserted that such testimony was irrelevant to the assault charge and the "prejudicial effect" of "what happened, other than to Linda Jones . . . clearly outweighs any probative value that that might have." The court stated that the witnesses' observations were relevant, found the "probative value outweighs the prejudice," and noted the

prosecutor had the burden of proving Bankston guilty beyond a reasonable doubt of the remaining counts.

To avoid prejudice from this testimony, Bankston again suggested, "Maybe we can sever this count." The court agreed it had discretion to sever the count and asked Bankston if he wanted the court "to impanel another jury on count 4." Bankston replied that he was asking for the same jury to hear the assault evidence in the second phase of trial, when the prosecution presented the prior murder conviction, and cited the court's discretion to sever the counts under Penal Code section 954. The court ruled: "[T]here isn't going to be any bifurcation, there's not going to be any severance, and counts 1, 4, and 6 will go to trial."

Before Benjamin's testimony at the second guilt phase, the court instructed the jury that Benjamin's testimony concerned "the allegation as to the assault with a deadly weapon[7] as to Linda Jones. He will be testifying as to his observations on the evening in question. His testimony is limited to the issue of motive and identity as to the perpetrator. Credibility, of course, is always in issue. You are to not consider anything he . . . testif[ies] to with regard to a shooting involving himself or his brother." The court added, "Benson Jones and this gentleman, the witness' counts are not before you at this time." In the second guilt trial, Benjamin and Linda testified about the shootings as they had during the first guilt phase.

---

[7]     The actual charge was assault with a firearm, which is proscribed by Penal Code former section 245, subdivision (a)(2), not assault with a deadly weapon "other than a firearm," which is proscribed by Penal Code former section 245, subdivision (a)(1). The court and Bankston, however, frequently referred to the charge as assault with a deadly weapon or ADW.

At the end of the second guilt phase the trial court instructed the jury: "Any testimony regarding the shootings of Benjamin Jones and Benson Jones [is] to be considered only as [it] may apply to identification, motive, or intent as to the charge of assault with a deadly weapon."

### b. *Analysis*

Bankston argues that the trial court erred in denying severance of the count charging assault with a firearm on Linda Jones. We reject the claim.[8]

Two or more different offenses may be consolidated in one trial when they are "connected together in their commission," are "different statements of the same offense," or are "of the same class of crimes or offenses." (Pen. Code, § 954.) "Even where the statutory requirements for joinder are satisfied, however, 'a trial court has discretion to order that properly joined charges be tried separately.' [Citations.] '[A] defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying the defendant's severance motion.' " (*People v. Scott* (2015) 61 Cal.4th 363, 395.) " 'In determining whether a trial court's refusal to sever charges amounts to an abuse of discretion, we consider four factors: (1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case

---

[8] There was confusion during the hearings about whether Bankston was requesting bifurcation or severance. "[S]everance requires selection of separate juries," while a "bifurcated trial is held before the same jury." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1050.) But it appears the trial court understood Bankston's motion to include a request for severance and we address the claim on appeal Bankston has made in that regard.

has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 689.) " 'An appellate court evaluates such claims in light of the showings made and the facts known by the trial court at the time of the court's ruling.' " (*Ibid*.)

Bankston concedes that the Linda Jones assault with a firearm count was properly joined with the Sanchez murder and the Johnson attempted murder counts because they were all of "the same class of offenses" under Penal Code section 954. He contends, however, that the trial court abused its discretion in denying severance of the assault count from the murder count. Where, as here, "two crimes of the same class are joined, cross-admissibility is not required. ([Pen. Code,] § 954.1.)" (*People v. Thomas* (2011) 52 Cal.4th 336, 350.) We therefore consider the remaining three factors to evaluate Bankston's allegations.

In determining whether charges are inflammatory and whether a weak case has been joined with a stronger one, we have observed that " '[t]he danger to be avoided is "that strong evidence of a lesser but inflammatory crime might be used to bolster a weak prosecution case" on another crime.' " (*People v. Westerfield*, *supra*, 6 Cal.5th at p. 690.) Here, Bankston argues that evidence of his assault with a firearm — including testimony regarding the shooting of Benson and Benjamin that was admitted for motive, intent, and identity — was inflammatory evidence that bolstered the weaker evidence of murder regarding Sanchez. At the time of the court's ruling, the court was aware there had been evidence at the first guilt phase that Bankston admitted killing a CCG member to Torrez, saying

that he shot the man a second time after he had fallen, did not want to waste his bullets on the man's companion "Florentino," and smiled at Florentino before driving away. Testimony that Bankston shot Linda's brothers, and then shot at her as she watched screaming, showed a similarly callous crime and was "no more inflammatory" than the Sanchez murder charge. (*Westerfield*, at p. 690.)

Citing *Williams v. Superior Court* (1984) 36 Cal.3d 441, 451–452, Bankston asserts that the trial court considered only judicial economy in denying severance and "failed to weigh the prejudicial effect of joinder against the benefits of that procedure in light of the aberrant circumstances in this case." But in ruling that the prosecutor could present evidence of the circumstances surrounding the assault on Linda with a firearm, the court found that Linda's and Benjamin's observations were relevant, and that the "probative value outweighs the prejudice." Moreover, the court expressly stated that judicial economy in trying the counts before the same jury was but one of the bases for its ruling. To the extent the court noted the "ero[sion]" of *Williams*, this passing remark does not suggest it applied an erroneous severance standard.

Although the first guilt phase jury failed to reach a verdict on the Sanchez murder, the evidence supporting that charge was not, as Bankston asserts, weak. Torrez's testimony about Bankston's telling of the killing largely matched the events Melendez described, and ballistics evidence further connected Bankston to the crime. This was evidence of similar strength as that supporting the Jones assault with a firearm charge — the Sanchez murder rested on an admission and eyewitness testimony, the Jones assault on eyewitness testimony, with ballistics evidence supporting both charges. This "defeats the

notion that strong evidence of one inflammatory crime was improperly used to bolster any weak evidence supporting the other crime." (*People v. Westerfield, supra*, 6 Cal.5th at p. 690; see also *People v. Scott, supra*, 61 Cal.4th at p. 396 ["the potential for a spillover effect was minimal" from nonmurder to murder charge, where evidence of the murder "was also substantial"].) And the assault with a firearm count was not a capital offense, nor did its joinder to the Sanchez murder count convert the matter into a capital case. Bankston has not shown prejudice to establish that the trial court abused its discretion by denying his severance motion.

Bankston further contends joinder of the assault and murder charges, in hindsight, resulted in gross unfairness amounting to deprivation of a fair trial or a denial of due process at the second guilt phase. (See *Romero and Self, supra*, 62 Cal.4th at p. 30.) The Attorney General argues that Bankston has forfeited this aspect of his claim. Even assuming it is preserved, however, we conclude it is not "reasonably probable that the jury was influenced by the joinder in its verdict of guilt." (*People v. Simon* (2016) 1 Cal.5th 98, 130.) The evidence that Bankston shot Linda's two brothers just before he shot at Linda was indeed serious and significant. Notably, however, the Benson and Sanchez murders had been tried together in the first guilt phase, and yet the jury failed to reach a verdict on the Sanchez murder, the Johnson attempted murder, and the assault with a firearm on Linda Jones. In the second guilt phase, despite evidence of the Jones shootings, the jury acquitted Bankston of the attempted murder of Johnson. "Where the jury returns a guilty verdict of a lesser crime, or, as here, fails to convict at all on some charges, we are confident the jury was capable of, and did, differentiate among defendant's

crimes." (*People v. Jones* (2013) 57 Cal.4th 899, 927.) What is more, at the end of the second guilt phase, the court instructed the jury that "[a]ny testimony regarding the shootings of Benjamin Jones and Benson Jones [is] to be considered only as [it] may apply to identification, motive, or intent as to the charge of assault with a deadly weapon." We presume that the jury understood and followed these instructions. (*Simon*, at p. 130.)

### 5. *Evidence Code section 352.2 challenge*

Bankston raises a challenge invoking Evidence Code section 352.2 (section 352.2) governing the admissibility of creative expression. Contending that section 352.2 applies retroactively to nonfinal cases on appeal like his, in which the trial preceded the statute's effective date, Bankston argues that the trial court abused its discretion under this statute when it admitted several poems from a photo album during his 1994 trials. (See *post*, pp. 89–90, fns. 10–12.)

We have held that Evidence Code section 352.2 is not retroactive. (*People v. Aguirre* (2025) 18 Cal.5th 629, 683.) Bankston offers no persuasive reason to revisit this conclusion.

## D.  Racial Justice Act Challenges

In 2020, while this appeal was pending, the Legislature enacted the California Racial Justice Act, which provides a statutory basis for challenging racial, ethnic, and national origin discrimination in the administration of criminal justice. (Pen. Code, § 745; RJA or Act.) Bankston raises several claims based on provisions of the RJA forbidding the use of "language that, to an objective observer, . . . implicitly appeals to racial bias." (Pen. Code, § 745, subds. (a)(2), (h)(4).)

Although the RJA was enacted decades after Bankston was tried, subsequent statutory amendments make clear that

its provisions apply retroactively on appeal to Bankston's claims that are based on the trial record. (Pen. Code, § 745, subds. (b), (j)(1).) Based on our review of the record, we conclude that Bankston has not established grounds for reversal of the guilt judgment under the RJA. But we conclude the death judgment must be reversed because of language used in the prosecutor's penalty phase closing argument, and remand for further proceedings.

### 1. *Racial Justice Act background*

The central provision of the RJA is Penal Code section 745 (section 745), which provides that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) The Legislature's stated intent in enacting the Racial Justice Act was "to eliminate racial bias from California's criminal justice system" and "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing." (Stats. 2020, ch. 317, § 2, subd. (i).)

Bankston's claims in this case invoke the prohibition in section 745, subdivision (a)(2), which provides that a defendant may establish a violation by proving by a preponderance of the evidence that, "[d]uring the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language . . . or otherwise exhibited [racial] bias or animus towards the defendant . . . , whether or not purposeful." The statute defines the term "[r]acially discriminatory language" to mean "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially

coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin. Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory." (*Id*. subd. (h)(4).) The prohibition on racially discriminatory language "does not apply if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (*Id*. subd. (a)(2).)

The RJA initially referred to the filing of a petition for a writ of habeas corpus "if judgment ha[d] been imposed" and the petitioner was still incarcerated. (Stats. 2020, ch. 317, § 3.5; see Pen. Code, former § 745, subd. (b); §§ 1473, subd. (a), 1473.7, subd. (a).) In 2022 the statute was amended to include its current harmless beyond a reasonable doubt error standard of review for cases predating the RJA's effective date: "For petitions that are filed in cases for which judgment was entered before January 1, 2021, and only in those cases, if the petition is based on a violation of paragraph (1) or (2) of subdivision (a), the petitioner shall be entitled to relief . . . unless the state proves beyond a reasonable doubt that the violation did not contribute to the judgment." (Stats. 2022. ch. 739, § 2; see § 745, subd. (k).) In 2023, the Legislature amended the RJA to expressly allow "claims based on the trial record" to be raised on direct appeal. (Stats. 2023, ch. 464, § 1; see § 745, subd. (b).) The statute's remedial provision states: "Notwithstanding any other law, except as provided in subdivision (k), or for an initiative approved by the voters, if the court finds, by a preponderance of

evidence, a violation of subdivision (a), the court shall impose a remedy specific to the violation found," which may include vacating the sentence or conviction and ordering further proceedings. (§ 745, subd. (e)(2).)

### 2. *Discussion*

The RJA's prohibition on the uses of racially discriminatory language covers explicit appeals to bias as well as facially neutral language that implicitly appeals to racial bias. (§ 745, subd. (h)(4).) To identify language that falls in the latter category, in particular, requires a nuanced inquiry that is sensitive to context. The United States Supreme Court has said of one such use of language — there, the word "boy" — that while "it is true the disputed word will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign. The speaker's meaning" — and, one might add, the listener's understanding — "may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." (*Ash v. Tyson Foods, Inc.* (2006) 546 U.S. 454, 456.) Courts have therefore examined neutral statements for indications that they are racially coded; that is, they carry " 'the distinct tone of racial motivations and implications' " and " 'could be seen as conveying the message that members of a particular race are disfavored.' " (*Avenue 6E Investments., LLC v. City of Yuma, Ariz.* (9th Cir. 2016) 818 F.3d 493, 506; see *ibid.* [statements about large families, unattended children, and crime were coded expressions of racial animus toward Hispanic residents that would have been well understood in Yuma, Arizona]; see also, e.g., *Strickland v. City of Detroit* (6th Cir. 2021) 995 F.3d 495, 517, conc. opn. by Gibbons, J. [identifying racially coded language].)

As the RJA's drafters understood, the discriminatory character of a word or phrase may not be evident from examining the language in isolation. This is why the statute advises that "[e]vidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory" (§ 745, subd. (h)(4)); it is also why the statute explicitly excludes statements that "relat[e] language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect" (*id.* subd. (a)(2)). As is true in so many other domains, careful consideration of context often marks significant differences in meaning.

This necessarily sensitive inquiry is complicated when, as here, a reviewing court considers RJA claims for the first time on appeal, in a matter tried long before the RJA's enactment, and particularly where no contemporaneous objection was made or relevant record assembled. Whether an individual "exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin" (§ 745, subd. (a)(1)), or used language "that, to an objective observer, explicitly or implicitly appeals to racial bias" (§ 745(a)(2), (h)(4)), are questions that depend in substantial measure on determinations of fact, made after careful consideration of all relevant circumstances that bear on a reasonable interpretation of the contested behavior or statement. In cases tried before the RJA's enactment, claims presented for the first time on appeal may face significant obstacles of proof and in some instances may require further factual development in the trial court.

We are, however, mindful that the Legislature revised section 745, subdivision (b) in 2023 to expressly address RJA claims on appeal. The changes make clear that an RJA claim in a pre-RJA case such as Bankston's may be raised and adjudicated on direct appeal, provided that the violation is apparent on the trial record and does not require further factual development. Because neither party has professed a need for factual development in the case now before us, we address Bankston's claims based on the existing record of trial.[9]

### a. Guilt phase

Bankston raises multiple claims related to uses of language at his first and second guilt phase trials. We address each in turn.

Bankston contends that his first guilt phase trial was tainted by use of the terms "gang member" and "hardcore gang members," which Bankston claims were coded appeals to racial bias. (§ 745, subds. (a)(2), (h)(4).) We find the argument unpersuasive. This case involved alleged gang-related violence, so the use of the term "gang member" was essentially unavoidable. The use of the descriptor "hardcore" does not alter the analysis. As Bankston himself notes, Deputy MacArthur testified that "hardcore Blood gang members" meant "very active gang members." An objective observer would not have attributed any different meaning to the term. To the extent the gang experts or the prosecutor referred to Bankston's gang membership and his "hardcore" dedication to the gang, it was to demonstrate a highly relevant factor unrelated to racial bias,

---

[9] We express no view on Bankston's ability to pursue RJA relief on habeas corpus.

namely, his motive in murdering and attempting to murder perceived gang rivals.

Bankston also contends that during both the first and second guilt trials, the prosecutors made references to Bankston's poetry that were "racially coded and primed the jurors with the stereotype that African American men are violent and threatening." The poems to which Bankston refers — entitled "Poison of thee Blood Streme,"[10] "Thee Blood

---

[10] The poem read in part: "There is a krying need, all of us know. . . . At this time, more than ever 'B' fore. We seem too 'B' dying of a slower!, more painful 'death.' [¶] Trap[p]ed in a shell of fearful mistrust!. It is important! too 'view' the 'attempts' made in thee past. Too trancend these 'barriers' that encircle us 'U.B.N.' We must start at the kore! and 'eliminate' our 'enemies.'!. [¶] Our 'movement' is true! dedikated; 'Blackism,' leadership, organization, order, and defeating our 'oppressors' by any means necessary. [¶] . . . Death! 'B'fore 'dishonor'!"

Gaidi,"[11] and "The UBN Warrior"[12] were contained in the photo album found in Bankston's motel room and were introduced at both guilt phases.

During each of the guilt phase closing arguments, the prosecutor read a portion of "Thee Blood Gaidi," emphasizing the poem's references to "thee true gangster" who "will krush

---

[11]    The poem read:  "I thee true gangster! shall walk this impoundable earth![]  I am!  The autobiography of man now suggest that 'I' thee true gangster!  'Am' in 'Afrika' a 'warrior' of 'exotikik-quintessence of a universal gangster. []   Thee true gangster[.]"  [¶]  I have lost by force, my land, my language, and in a sense my life . . . .  But so help me I will sieze it back! if necessary, 'I' thee true gangster will krush the korners of the earth and the world shall 'forever tremble' in fear, when 'I' thee true gangster! emerge upon society.  The[] most hated, feared, loved and respekted 'Blood' gangster!, the world has ever known."

The front cover of the album contained other writings, including:  "A man pressed too thee earth! by another mans foot! would 'B' a fool! not too use any and all means 'necessary' for his release."  "A 'warrior' does what he has too.  A soldier! does what he's told."  "I'd rather 'B' dead! than not try.."  "Our burning desire for freedom! is more powerful than thee fear! of their guns."  It also included political messages such as " 'Free' South Afrika!"  and "From a Afro-Amerikan konvikt too a Afrikan politikal prisoner my heart and soul is with you[.]"

[12]    The poem read in part, "From this! day forward 'I' shall not slip!, nor falter!.  [¶]  I will remain forever firm!, and with 'rage' undamned!.  'I''ll give them what they give 'me'.. If 'war' is thee outkome, then 'I' shall proceed with 'force' and strength! of a dragon, for 'I''ve kommitted 'myself' to 'excellence'! and 'aktion!!'  [¶]  'I' am thee 'young brave Blood' of thee 'Umoja* Ilamu* thribe.'  'We' are thee 'righteous krowd' [¶] Thee 'men' who fear not!  A thousand kut's.."  The words, "United Blood Nation Pride" appeared at the bottom of the page, and swords apparently dripping blood were in the top corners of the document.

the korners of the earth" and will be the "most hated, feared, loved and respekted 'Blood gangster!, the world has ever known." At each trial, the prosecutor argued that the poetry reflected Bankston's gang dedication and was evidence of his motive in committing the charged murders.

Bankston has failed to show that the prosecution's reliance on his poetry violated the RJA. (§ 745, subd. (a)(2).) In the challenged argument, the prosecution emphasized language in the poems that appeared to glorify a Blood gang member who sought to become feared and respected. The prosecution quoted this language, and relied on the photo album writings generally, to demonstrate Bankston's gang membership and the degree of his dedication to the gang, and thereby to demonstrate his motive in allegedly murdering and attempting to murder perceived gang rivals. The prosecution's reliance on the poetry for purposes of establishing Bankston's gang affiliation and gang-related motivations did not reflect a prohibited "explicit[] or implicit[] appeal[] to racial bias." (§ 745, subd. (h)(4); cf. *id.* subd. (a)(2) ["relating language used by another that is relevant to the case" does not constitute a violation of the RJA].)

Bankston also contends that in Lieutenant Wright's testimony at the second guilt phase, Wright described the characteristics of Black gangs and Black gang members in terms that improperly appealed to racial bias. His challenge centers primarily on the following exchange. The prosecutor asked Lieutenant Wright, who had told the jury he had previously testified as an expert on Black and Hispanic gangs, to describe the difference between "a gang member and a hardcore gang member." He replied: "A hardcore gang member is the part of the group that is actively involved in the criminal activities, be it any violent activities, anything they enhance to further the

gang's prominence . . . , usually outward especially with Bla[c]k gangs because it's all about showing — to get respect, it's all about showing how — for a term they use — down, meaning how much you get out and do things you're asked. Some members, just associates . . ., they would be around a gang, claim the gang, but not necessarily [be] involved in the activities of the gang." Wright said he would consider the photo album writer to be a hardcore gang member. Referring to Bankston's poetry, the prosecutor asked, "How would a person become the main gangster or . . . the gangster blood?" Wright replied: "One method is by being quite active, being the main person to be involved in most of the criminal activity if not all." Later, on further redirect, Lieutenant Wright agreed with the prosecutor that to gain stature in the gang "one of the main things is to do violent acts against the enemies and show no fear" and that "enemies" are "Crips or rival gangs."

Bankston contends that in this exchange, Lieutenant Wright essentially testified that "Bankston's race, specifically, made him a more lethal type of 'hardcore gang member' more likely to commit outward violent criminal activities because he was a Black gang member," that "Black people in gangs have a heightened need — over and above gang members of other races — to 'get respect,' and that respect was won by 'violent acts against . . . enemies,' " and that "Black gangs were especially violent." Bankston contends that Lieutenant Wright's testimony thus improperly appealed to a "powerful racial stereotype . . . of black men as 'violence prone.' " (*Buck v. Davis* (2017) 580 U.S. 100, 121; see *id.* at pp. 104, 107, 119, 128 [finding that counsel provided ineffective assistance by introducing the report of an expert opining that the defendant

was "statistically more likely to act violently because he is black"].)

Bankston's characterization of Lieutenant Wright's testimony is not accurate. Lieutenant Wright did not, as Bankston asserts, tell the jury that "Bankston's race, specifically, made him a more lethal type of 'hardcore gang member' more likely to commit outward violent crimes" — that is, Wright did not testify that Bankston was more likely to commit violent crimes *because of his race*. But although Lieutenant Wright's statement was somewhat garbled, Lieutenant Wright's testimony did appear to make generalizations about the culture and activities of *Black gangs* that would suggest that Bankston was "especially" likely to commit "outward" violent crimes because of his membership in such a gang. The question, then, is the extent to which Lieutenant Wright's characterization of the practices of "Black gangs" constitutes language that implicitly or explicitly appeals to racial bias.

In addressing this claim, we observe that testimony like Lieutenant Wright's has not been unusual in California courtrooms where gang-related crimes have been tried. Gangs in California are often organized by race or ethnicity. As a result, gang expert witnesses often testify about their knowledge of certain types of gangs organized by race or ethnicity, and testimony describing the culture, practices, and activities of criminal gangs organized by race or ethnicity is common. (See, e.g., *People v. Lamb* (2024) 16 Cal.5th 400, 410–411 (*Lamb*) [prosecution gang expert "testified that a white supremacist gang member earned respect through the use of violence for the benefit of the gang. Bragging about committing a violent crime was expected. One member was expected to back

up another in committing violent crimes. [¶] . . . Disclosing information about the gang to outsiders or to law enforcement was seen as treasonous"]; *People v. Curiel* (2023) 15 Cal.5th 433, 442–443 [prosecution gang expert testified that, "[i]n his experience, most Hispanic gangs were 'turf-oriented,' meaning that they held a particular neighborhood or claimed a particular area"]; *People v. Tran* (2022) 13 Cal.5th 1169, 1185 [prosecution gang expert testified that " '[m]ost of the Asian gangs are in it for the economic gain' "]; *People v. Chhuon* (2021) 11 Cal.5th 1, 32 [expert's "testimony that Asian gangs promote leaders based on their criminal experience, was relevant to defendant's motive to rob and his intent to kill while doing so"]; *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 30 ["In Deputy Arias's opinion, Satele would improve his standing within the Hispanic gangs in jail by attacking a Black man"]; *People v. Johnson* (2016) 62 Cal.4th 600, 611 [prosecution gang expert witnesses testified about "the history, culture, and activities of White supremacist gangs generally and PEN1 in particular"].)

When an expert conveys information about gangs that are organized along racial or ethnic lines, the expert is not necessarily commenting on racial groups in general; testimony about such gangs or groups of gangs is not, without more, racially discriminatory language under the RJA. But there is a meaningful danger that testimony about racially organized gangs might in some cases veer into racial stereotypes rather than neutrally conveying the expert's knowledge and experience concerning the culture and activities of a particular criminal street gang or groups of criminal street gangs. To guard against this danger, we urge trial courts to carefully monitor expert testimony about the culture of racially or ethnically organized gangs so as to differentiate appropriate testimony regarding

gangs organized along racial or ethnic lines from inappropriate testimony that a reasonable observer would understand as commentary on racial groups in general. Litigants, experts, and courts should also consider whether neutral descriptors — for instance, using the names of the gangs in question, rather than racial labels — would suffice to convey the relevant points. Courts must also consider in each case the relevance and probative value of, and time to be devoted to, expert testimony concerning not the traits of the specific gang at issue in the case, but other gangs merely sharing the same predominant race or ethnicity.

After carefully considering the claim of error in this case, however, we conclude that Lieutenant Wright did not use language that, to an objective observer, appealed to implicit racial bias. Considering the context, an objective observer would not have understood Lieutenant Wright's description of the organizational culture and activities of "Black gangs" as an appeal to implicit racial bias, but instead as a way of conveying his knowledge of the organizational culture and activities of the group of gangs to which Bankston belonged and on which Wright professed expertise. This conclusion about context is reinforced by the fact that Bankston, too, used the term "Black gangs" at trial to describe the relevant group of gangs. Considering Lieutenant Wright's comments in context, an objective observer would have understood Wright to testify not that gang members who are Black are, because of their race, especially likely to commit violent crimes, but instead that "hardcore" gang members earn respect by doing what they are asked to do, including engaging in violent activities, and that this was particularly true of the gangs involved in the events in this case. We find no RJA violation in the testimony.

Finally, Bankston contends that the prosecutor exhibited racial bias in certain statements made in the second guilt trial closing argument. In Bankston's opening statement at the second guilt trial, he had urged the jury to "look at my demeanor in this court, let my behavior, let my way that I present my case be a symbol and not let these gang allegations be the sole substance of how you judge this case." Referring back to this statement in her closing argument, the prosecutor argued: "[H]e says to look at me and how I'm dressed and how I conduct myself in this trial. Well, ladies and gentlemen, that is not evidence. You cannot use how Mr. Bankston is dressed in trial or how articulate he is, that is not evidence. The only thing that you can base your determination on is what was testified to up on the stand and any type of physical evidence that was brought forward. You see, because the person that we have here in court is totally different than the person . . . out on the street. The person out in the street is named Ant Dog. The person out in the street is just filled with the desire for power and to be the gangster blood. We have that person and we have a picture of Mr. Bankston, the true Mr. Bankston. You see, you can get a suit and you can get a tie, but you can't get that mentality out of his soul."

Bankston contends this response "exhibited bias or animus towards the defendant because of the defendant's race." (§ 745, subd. (a)(2).) He notes that the prosecutor misstated the point he had made in his opening statement; while Bankston had urged the jury to focus on his demeanor, the prosecutor incorrectly characterized his argument as asking the jury to focus on his clothing as well. In addition, Bankston points to the prosecution's reference to him as "articulate," noting that the

"racialized dimension of referring to a Black person as 'articulate' is well studied."

Although a prosecutor should exercise care when recounting the record, Bankston fails to demonstrate how the prosecutor's misstatement regarding his opening statement "to an objective observer, explicitly or implicitly appeal[ed] to racial bias." (§ 745, subd. (h)(4).) The same is true of the prosecutor's admonition to the jury that it should not base its conclusions on Bankston's demeanor, including how articulately he had represented himself in court, but instead should focus on the evidence that Bankston had committed the murder and other acts of violence with which he was charged. Even if the use of the term "articulate" in some contexts has a "racialized dimension," Bankston fails to explain how, in this context, the prosecutor's comment constituted an implicit "appeal[]" to racial bias. (§ 745, subd. (h)(4).) Having heard Bankston himself invite the jury to judge him based on his self-presentation in court rather than based on the gang allegations, a reasonable observer would have understood the prosecutor's response as a straightforward call to do the opposite. Bankston fails to establish on this record that the prosecutor's response to his opening statement violated the RJA.

### b. Penalty phase

#### (1) Factual background

This brings us to Bankston's claims related to the penalty phase. In her penalty phase closing argument, the prosecutor focused on the circumstances of the two instances of lethal violence, committed within approximately one week of one another. Early in her argument she laid out the central theme: "The evidence has shown in this case that the defendant is a

cold-blooded murderer.  His goal in life, as we see in his writings, is to become the Blood gangster and that he will attain this goal by any means possible.  His actions out on the street say that he wants respect, that he wants prestige.  The actions while he's in custody, the same thing, he wants prestige, he wants respect, he wants to climb that ladder to be the worst of the worst.  His actions show that he's not afraid of anybody . . . He'll do anything anytime to anyone."  The prosecutor went on to describe the harm suffered by the victims' families.  She stated, among other things, that "because of how cold-hearted [Bankston] is, because of what a thug he is, [Benson's] boys aren't going to be able to play baseball, football with their dad."  The prosecutor also recounted multiple incidents in which Bankston committed various weapons violations and acts of violence while incarcerated, including stabbing a fellow inmate in the neck while a prison guard stood approximately six feet away from the victim.  The prosecutor argued, "If you give him life without possibility of parole, you're essentially giving him a gold card to go ahead and commit assaults in there."

At the close of her argument, the prosecutor said:  "[W]e see him here in court.  We know that he's able to represent himself.  You see him in a nice little tie and a suit.  You see that he's articulate.  But, ladies and gentlemen, the person that we see here in court is not the person that was out on the streets, it's not the person that conducts himself in the manner in which we heard about in custody.

"There's a little story called the Bengal tiger.  We have a journalist going to the zoo . . .  and he sees a plaque.  And the plaque says . . . Bengal tiger. . . .  This tiger is just kind of laid out, real lethargic. . . .  Behind him he hears a voice who says, 'That's not a Bengal tiger.'  And the guy . . . turns around and

says, 'What are you talking about?  The sign says that.'. . . . So the two of them make a wager, and they go off to India in search of a Bengal tiger.  As they go into the jungle[] deeper and deeper, the journalist . . . comes along a clearing and he sees this enormous tiger.  He sees the muscles all flexed out, he sees the claws out, he sees the fangs, . . . he hears the growl.  And he runs back to the hunter and the hunter says, 'Now you see a Bengal tiger.' "

The prosecutor continued:  "Ladies and gentlemen, you sit in judgment in this case on the real Anthony Bankston, the man who kills without remorse, the man who cares nothing about human life.  In a short time all of you are going to be representing the community here.  We, as a civilized society, have said that we don't want people taking vengeance into their own hand, we're going to let the jury system do that.  I'm going to have enough confidence that the jury system will do the right thing, so I'll give up my right for vengeance.  Ladies and gentlemen, that's falling into your lap now.  You are the voice of society in this case.  As I said before, enough is enough.  The defendant has shown that he can beat the system.  He can come up with ways to out trick people, even when he's in . . . a security cell.  But don't be fooled, ladies and gentlemen.  When he's in custody, he's going to continue to act the way that he's acted in the past.  If you give him life without possibility of parole, basically there's no stopping him."

The prosecutor added:  "This case is crying out for the only just penalty and that is death.  You, as members of a society, have that in your hand and you have the power to stop this killing machine.  Remember he wants to be the worst of the worst.  The real Anthony Bankston has murder in his heart, he

has evil in his soul, and he has the blood of two people on his hands."

*(2) Analysis*

*(a) Asserted RJA violations*

Bankston asserts that the prosecutor's closing argument contained several instances of racially discriminatory language, including her description of Bankston as a "hardcore gang member," "killing machine," and "thug"; her appeal to the values of "a civilized society"; and her use of a well-worn tale about a Bengal tiger to caution the jurors against judging Bankston based solely on his demeanor in the courtroom. The Attorney General does not address most of these claims, but concedes that the Bengal tiger story involved use of racially discriminatory language within the meaning of the RJA. (§ 745, subds. (a)(2), (h)(4).) The Attorney General further takes the position that the prosecutor's prohibited argument cannot be shown to have been harmless beyond a reasonable doubt and thus requires reversal of the death judgment. (§ 745, subds. (e)(2)(B), (k).) After careful review of the record, we agree that the prosecutor's argument violated the RJA and that reversal of the death judgment is warranted.

As noted, the RJA prohibits the use of racially discriminatory language or "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including . . . *language that compares the defendant to an animal.*" (§ 745, subd. (h)(4), italics added; see *id.* subd. (a)(2).) The Legislature's uncodified findings that accompanied the enactment of the RJA included the following observation: "Existing precedent tolerates the use of racially incendiary or

racially coded language, images, and racial stereotypes in criminal trials. For example, courts have upheld convictions in cases where prosecutors have compared defendants who are people of color to Bengal tigers and other animals, even while acknowledging that such statements are 'highly offensive and inappropriate' (*Duncan v. Ornoski*, 286 Fed. Appx. 361, 363 (9th Cir. 2008); see also *People v. Powell*, 6 Cal.5th 136, 182–83 (2018) (*Powell*). Because use of animal imagery is historically associated with racism, use of animal imagery in reference to a defendant is racially discriminatory and should not be permitted in our court system." (Stats. 2020, ch. 317, § 2, subd. (e).)

In his briefing in this court, Bankston initially suggested that he was entitled to relief because the RJA broadly prohibits the use of *any* " 'language that compares the defendant to an animal,' " though he later retreated from that categorical reading. We agree that the categorical reading is untenable. Although the RJA explicitly prohibits some "language that compares the defendant to an animal" (§ 745, subd. (h)(4)), we are unpersuaded that the RJA categorically forbids *all* such language. A prosecutor might, for instance, refer to a defendant as an "eager beaver," "happy as a clam," "free as a bird," or "quiet as a mouse." Each example involves language comparing a defendant to an animal; none would appear to raise racial discrimination concerns. The legally operative provision of the RJA is the provision prohibiting the use of "racially discriminatory language," which it defined as language that "to an objective observer, explicitly or implicitly appeals to racial bias." (§ 745, subds. (a)(2), (h)(4).) As the statute says, and the uncodified findings affirm, "language that compares the defendant to an animal" can certainly fit this description. (*Id.* subd. (h)(4).) But not all uses of animal imagery raise concerns

about explicit or implicit appeals to racial bias.  The RJA is most naturally understood to prohibit those uses of animal imagery that are objectively understood as appealing to racial bias; it does not categorically prohibit other uses of animal imagery that do not raise the serious racial fairness concerns to which the RJA is directed.  As with the analysis of other types of potentially discriminatory language, we must carefully consider context when determining whether particular statements violate the RJA.

We turn, then, to the specifics of the language Bankston challenges here, which include the prosecutor's telling of the Bengal tiger story.  The legislative findings indicate that this story was a matter of particular concern to the Legislature that enacted the RJA.  (Stats. 2020, ch. 317, § 2, subd. (e).)  As the findings note, different courts — including this court — on several occasions considered arguments that prosecutors committed misconduct by telling versions of the same story.  These cases involved defendants of various racial backgrounds.  In *People v. Duncan* (1991) 53 Cal.3d 955, the defendant, who was Black, argued that the Bengal tiger story "was a thinly veiled racist allusion that constituted prejudicial misconduct." (*Id*. at pp. 976–977.)  This court rejected the argument, concluding that "[t]he prosecutor was entitled to point out that modest behavior in the courtroom was not inconsistent with violent conduct under other less structured and controlled circumstances."  (*Id*. at p. 977.)  We continued:  "Likening a vicious murderer to a wild animal does not invoke racial overtones.  Indeed, the circumstances of the murder might have justified even more opprobrious epithets."  (*Ibid*.)

Likewise, in *People v. Brady* (2010) 50 Cal.4th 547, we rejected the argument that "the prosecutor's use of the 'Bengal

tiger' metaphor [citation] was a thinly veiled racist allusion to his Vietnamese heritage." We explained that "likening a murderer to a wild animal does not *necessarily* invoke racial overtones. [Citations.] On the record before us, it appears the prosecutor's argument was intended merely to note that defendant's docile behavior in the courtroom was not irreconcilable with his violent conduct in less controlled circumstances." (*Id.* at p. 585, italics added.)

In *People v. Spencer* (2018) 5 Cal.5th 642, 687–688, we rejected an argument that the prosecution impermissibly "dehumanized" Spencer by telling the Bengal tiger story, "in which he [was] analogized to a vicious animal." Spencer's race or ethnicity is not recounted in the opinion, but it does not appear he challenged the story on the ground that it was a racist allusion. We observed: "The People may comment on the evidence introduced to convey the viciousness of [the victim's] murder, including by using a story that could be understood by some jurors to describe the murderer as a monster." (*Id.* at p. 688.)

Most recently, in *Powell, supra,* 6 Cal.5th 136, we rejected a claim that "the prosecutor's comments comparing him to a Bengal tiger constituted a 'thinly-veiled racist allusion' that dehumanized him and thus constituted an improper argument regarding his future dangerousness." (*Id.* at p. 182.) The opinion indirectly identifies Powell as Black. (*Id.* at p. 163.) We stated that a prosecutor may "properly remind a penalty phase jury of the circumstances of the offense, including the brutality of the murder, and caution the jury against judging defendant solely based upon his calm demeanor in the courtroom. Here, as in our prior cases, the record makes clear that the prosecutor was using the Bengal tiger analogy only to make the latter

point." (*Id.* at p. 183.) We cautioned, however, that "[i]t goes without saying that a prosecutor may not compare a defendant to a beast for the purpose of dehumanizing him before the jury or in an effort to evoke the jury's racial biases." (*Ibid.*)

In enacting the RJA, the Legislature concluded that the use of certain animal images may pose an unacceptable risk of appealing to racial bias, even if that may not have been the speaker's purpose. The primary example to which the uncodified findings point is the *Duncan* case, discussed above, in which the Ninth Circuit found no reversible error at the guilt phase in the prosecutor's telling of a version of the Bengal tiger story even though it described the "prosecutor's remarks" as "highly offensive and inappropriate." (*Duncan v. Ornoski*, *supra*, 286 Fed. Appx. at p. 363, 2008 WL 2565004 at p. *2; see also *People v. Duncan*, *supra*, 53 Cal.3d at pp. 976–977.) In the remarks at issue, the prosecutor directly (not just impliedly) compared the Black defendant to the Bengal tiger in the story, liberally embellishing the story to make the comparison more vivid and evocative. The prosecutor stated that the defendant was in his "natural habitat" when armed "with a butcher knife, out to get money," even though the defendant had no prior record of committing violent crimes. (*People v. Duncan*, at p. 976; see *id.* at pp. 964–965.)

In light of the passage of the RJA, we now make clear that, whatever the intent behind telling the story may be, the Bengal tiger story should no longer be told in California courtrooms. We have previously cautioned that there is frequently a thin line between permissible comment on the evidence and impermissible appeals to considerations that have no place in the judicial process. (*People v. Nadey* (2024) 16 Cal.5th 102,

184–186.)[13] And as the legislative findings indicate, the oft-told Bengal tiger story is one that carries with it a recognized risk of crossing that line. There is no reason to permit prosecutors to continue running the risk of appealing to biases that undermine the very foundation of a system of equal justice, simply to make an unremarkable point about a defendant's behavior outside a controlled courtroom setting.

As for cases already tried, we need not and do not now decide whether past tellings of the Bengal tiger story, without more, always give rise to an RJA violation. Here, the Attorney General concedes that the prosecutor's argument constituted error under the RJA. After carefully considering the challenged statements in their broader context, we agree with the Attorney General and accept the concession.

Bankston's claim of penalty phase error does not rest merely on the telling of the Bengal tiger story, without more. It also rests on the manner in which the story was told. We do not deny that the moral of the prosecutor's story was a permissible

---

[13]     In *People v. Nadey, supra*, 16 Cal.5th 102, we considered a claim of prosecutorial misconduct based on the prosecutor's penalty phase argument calling the defendant, inter alia, a " 'depraved cancer' " and a " 'tattooed hyena.' " (*Id.* at p. 184.) Though we found insufficient grounds for reversal, we strongly counseled against use of similar epithets in future cases: "The prosecution is permitted to use language to support a penalty that reflects the highest degree of social opprobrium. The descriptions of defendant's behavior as depraved, inhumane, perverted, or vile are fair comment on the trial evidence. . . . [Citation.] Phrases that liken a defendant to an animal or dreaded disease are closer to the line, however, and we do not endorse them. Advocates may argue their cases with vigor, but they are also expected to remain mindful of their obligations to uphold professional decorum." (*Id.* at pp. 184, 186.)

one: That a defendant exhibiting appropriate courtroom decorum might have behaved differently at the time of the capital crimes. But the prosecutor did not tell the story as though she were merely pulling a page from Aesop's Fables. She instead embellished the tale by describing the tiger as "enormous," with his "muscles all flexed out," "claws out," "fangs" visible, and growling, and placed the tiger deep in the "jungle[]." And the manner of telling left no doubt about the connection she wished the jurors to draw, between this image of a vicious predator and the defendant standing before them. None of these embellishments, to be sure, explicitly appealed to racial bias. But they nonetheless evoked a well-known history of the use of language demeaning Black individuals through comparisons to hyperpredatory "jungle" animals, which is the very history the Legislature referenced in the uncodified findings explaining the intended reach of section 745, subdivision (a). (See also, e.g., Purcell, *Exploring the Interpretation and Application of Procedural Rules: The Problem of Implicit and Institutional Racial Bias* (2021) 23 U. Pa. J. Const. L. 2528, 2551 [noting "an investigation after the beating of Rodney King in 1991," the year of Bankston's Los Angeles capital crimes, "unearthed transcripts of conversations between [Los Angeles Police Department] officers that 'likened [B]lacks to jungle animals' . . . , while others used a code for incidents involving Black people — 'NHI,' which stood for '[n]o humans involved' "]; Robinson, et al., I Never Had It Made (1995) pp. 57–58 [Jackie Robinson recounted that in 1947 when he stepped to the plate in the Dodgers' Ebbetts Field, members of the opposing team told him, " 'They're waiting for you in the jungles, black boy!' "].)

Bankston's claim also rests on other references sprinkled throughout the prosecutor's penalty phase closing argument. Most prominently, in addition to her embellished telling of the Bengal tiger story, the prosecutor repeatedly described Bankston as a "thug." The term "thug" might not independently warrant objection; it is a facially neutral term that has often been used in relation to persons of various races. (See Webster's New World Dictionary of the American Language (2d college ed. 1982) p. 1484 [defining the term "thug" as, among other things, "a rough, brutal hoodlum, gangster, robber, etc."]; see, e.g., *Lamb*, *supra*, 16 Cal.5th at p. 421 [referring to news video describing White supremacist group's evolution " 'from punk rockers to racist skinheads to a gang of thugs moving into organized crime' "]; *Horn v. Medical Marijuana, Inc.* (2d Cir. 2023) 80 F.4th 130, 139–140 [referring to "Congress's clear goal [in enacting an antiracketeering law] to thwart ruthless thugs whose violence exerts influence over legitimate business"].) At the same time, it is a term that has historically been associated with racial bias. (See, e.g., *Sewell v. Monroe City Sch. Bd.* (5th Cir. 2020) 974 F.3d 577, 584 [noting that the term " 'thug' " "could be race-neutral or racially charged, depending on context"]; see also Smiley & Fakunle, *From "Brute" to "Thug": The Demonization and Criminalization of Unarmed Black Male Victims in America* (2016) 26 J. of Human Behavior in the Social Environment 350, 351 [describing the term "thug" as a "platform to dismiss Black life as less valuable" that "perpetuates a negative and criminal connotation"].)

Here, the prosecutor may well have subjectively intended to deploy the word "thug" in a racially neutral sense, to describe a gang member convicted of committing several acts of gang-related violence. But the contexts in which the prosecutor used

the word "thug" were not employed as comment on the evidence of Bankston's gang affiliation; they were instead tossed off, in the manner of epithets: "And what did this little thug over here do?"; "We have this thug over here . . ."; "[B]ecause of what a thug he is." Although it would be difficult to draw any firm conclusions based on the use of these terms in isolation, the manner in which the prosecutor used the word "thug" was of a piece with the manner in which the prosecutor told the story of the Bengal tiger: Though the prosecutor may not have intended her language as any kind of appeal to racial bias, the penalty phase argument as a whole employed, as a kind of secondary running theme, images and descriptions that have historically been associated with bias. Considering the penalty phase argument as a whole, we agree with both parties that an objective observer would find that the prosecutor's language constituted an implicit appeal to bias within the meaning of section 745, subdivisions (a)(2) and (h)(4).

### (b) Role of harmless error review

Having found error under the RJA, the remaining question concerns its effect on the judgment. A threshold question is whether we must determine if the error was prejudicial. Bankston argues the answer is no: In any case in which a court finds an RJA violation, the only possible remedy is an automatic reversal of the judgment in its entirety, without regard to whether the violation was harmful. The Attorney General disagrees, noting that such a rule would mean "there might be reversals that result from minor or passing remarks in a trial that was, as a whole, fair — indeed, even when responsibility for those remarks lay entirely with the defense." Although our reasoning differs to some extent from the Attorney

General's, we agree with the Attorney General that the RJA does not prescribe a rule of automatic reversal, at least in cases in which judgment was entered before the RJA was passed and took effect.

Our analysis is mindful of the procedural context. Although Bankston's appeal is subject to the RJA because his judgment is not final (Pen. Code, § 745, subd. (j)(1)), his trial was conducted more than a quarter century before the RJA's January 1, 2021, effective date. The Legislature, too, has been mindful of this context: the RJA expressly prescribes a form of harmless-error review for cases in which judgment was entered before the RJA's effective date, where an RJA claim based on the use of racially discriminatory language or other exhibition of bias is raised by way of petition. (Pen. Code, § 745, subd. (k) (§ 745(k)).) We express no views here about whether and to what extent other types of RJA claims are subject to harmless-error analysis, either in cases in which judgment was entered before the RJA's effective date or in cases tried to judgment afterwards. We conclude that, at least with respect to cases tried to judgment before the RJA took effect, the use of language that implicitly appeals to racial bias is not grounds for reversal if People can show that the use of such language was harmless beyond a reasonable doubt.

This conclusion avoids the serious constitutional questions that would arise were we instead to adopt the automatic reversal rule that Bankston urges. Under the California Constitution, we may reverse a lower-court judgment for legal error only if we conclude that the error has resulted in a miscarriage of justice. More than a century ago, voters acted to inscribe that rule in what is now article VI, section 13 of the California Constitution, which provides: "No judgment shall be

set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13, added by Prop. 1a, as approved by voters, Gen. Elec. (Nov. 8, 1966); see also Sen. Const. Amend. No. 26, added by Prop. 9, as approved by voters, Gen. Elec. (Oct. 10, 1911) [adding former § 4 1/2, from which art. VI, § 13 is derived]; Pen. Code, § 1404, enacted in 1872 ["Neither a departure from the form or mode prescribed by this Code in respect to any pleading or proceeding, nor an error or mistake therein, renders it invalid, unless it has actually prejudiced the defendant, or tended to his prejudice, in respect to a substantial right"].)

"Section 13 was adopted in 1966 as part of a general reorganization of the California Constitution. It derives from former article VI, section 4 1/2 (former section 4 1/2), which was added to the California Constitution in 1911 when the voters approved Senate Constitutional Amendment No. 26. Before the addition of former section 4 1/2, appellate courts had restricted their role to reviewing pure questions of law. They did not review the facts underlying judgments to determine whether they supported a conviction in spite of an error at trial. (Ballot Pamp., Special Elec. (Oct. 10, 1911) argument in favor of Sen. Const. Amend. No. 26, p. 12 (1911 Ballot Pamphlet).) Consequently, most trial errors were reviewed under the functional equivalent of an automatic reversal rule. The addition of former section 4 1/2 to the California Constitution changed the role of appellate courts by requiring review of 'the

entire cause including the evidence' and permitting reversal only after finding a 'miscarriage of justice.'

"In the 1911 Ballot Pamphlet, the proposed amendment's sponsor, Senator Boynton, said: 'The object of this amendment is to enable our courts of last resort to sustain verdicts in criminal cases unless there has been a miscarriage of justice, or, putting it in another way, its purpose is to render it unnecessary for the higher courts to grant the defendant in a criminal case a new trial for unimportant errors. It is designed to meet the ground of common complaint that criminals escape justice through technicalities.' (1911 Ballot Pamphlet, *supra,* argument in favor of Sen. Const. Amend. No. 26, p. 11.)" (*People v. Blackburn* (2015) 61 Cal.4th 1113, 1138–1139, conc. opn. of Liu, J. (*Blackburn*).)

Article VI, section 13, like its predecessor, thus requires courts to review the record to evaluate whether a legal violation was harmless, or else is the sort of error — now commonly denominated "structural error" — that represents a " ' "structural defect[] in the constitution of the trial mechanism" ' " and thus requires reversal without regard to prejudice. (*In re Christopher L.* (2022) 12 Cal.5th 1063, 1074, quoting *Arizona v. Fulminante* (1991) 499 U.S. 279, 309–310.)

Bankston contends that, notwithstanding the instruction to courts in article VI, section 13, the Legislature that enacted the RJA instructed courts to employ a rule of automatic reversal regardless of prejudice, and regardless of whether the error is of a kind that would otherwise be treated as structural. Bankston points in particular to two provisions of the RJA: Penal Code section 745, subdivision (e) (§ 745(e)), which provides: "Notwithstanding any other law, except as provided in subdivision (k), or for an initiative approved by the voters, if the

court finds, by a preponderance of the evidence, a violation of subdivision (a), the court shall impose a remedy specific to the violation found" from an enumerated list. As to cases in which judgment has already been entered, the statute says: "After a judgment has been entered, if the court finds that a conviction was sought or obtained in violation of subdivision (a), the court shall vacate the conviction and sentence, find that it is legally invalid, and order new proceedings consistent with subdivision (a)." (§ 745, subd. (e)(2)(A).) Subdivision (k), referred to in the exception clause of subdivision (e), provides as follows: "For petitions that are filed in cases for which judgment was entered before January 1, 2021, and only in those cases, if the petition is based on a violation of paragraph (1) or (2) of subdivision (a), the petitioner shall be entitled to relief as provided in subdivision (e), unless the state proves beyond a reasonable doubt that the violation did not contribute to the judgment." (§ 745(k).)

Bankston reads these provisions, taken together, to mean that once a court finds any violation of the RJA, it must automatically vacate the conviction and sentence, without considering whether or not the violation of the RJA was harmless error. Bankston's statutory argument relies heavily on *Simmons*, in which a divided Court of Appeal interpreted section 745(e)'s "shall impose a remedy" language to "foreclose[] any traditional case-specific harmless error analysis" for an RJA violation. (*People v. Simmons* (2023) 96 Cal.App.5th 323, 337 (*Simmons*).) Unlike this case, *Simmons* involved a judgment entered after the RJA's effective date, and thus outside the time period addressed in subdivision (k). The RJA violation there involved a prosecutorial argument inviting the jury to disbelieve the defendant because of his racial and ethnic presentation.

(*Simmons*, at pp. 336–337.)  *Simmons* reasoned that a statutory rule of automatic reversal comports with article VI, section 13 of the Constitution because the Legislature is entitled to conclude that " 'racism in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under Article VI of the California Constitution, and violates the laws and Constitution of the State of California.' "   (*Simmons*, at p. 338, quoting Stats. 2020, ch. 317, § 2, subd. (i); see *Simmons* at p. 339; *People v. Stubblefield* (2024) 107 Cal.App.5th 896, 924, review granted March 12, 2025, *S289152* [agreeing with *Simmons* in a pre-RJA case that "[n]o case-specific prejudice analysis is permitted by" the language of section 745(e)].)  In the legislative findings for recent 2025 RJA amendments, the Legislature cited *Simmons* in stating:  "Racial bias in criminal prosecutions, in all its forms or degrees, is never minor or harmless."  (Stats. 2025, ch. 721, §1, subd. (e).)

We do not question the result in *Simmons*, a case concerning what might be characterized as an explicit appeal to racial bias.  But we have no occasion here to pass on the soundness of its interpretation of the remedial provisions of section 745(e) as generally foreclosing any inquiry into whether an error was harmful — including with respect to claims that facially neutral language appealed to implicit bias.  This interpretive question presents a complex issue.  Subdivision (e) does not explicitly address the question of harmless error; at least on its face, it addresses the question of appropriate remedies.  The language "if the court finds, by a preponderance of the evidence, a violation of subdivision (a), the court shall impose a remedy" in subdivision (e), does not on its face preclude a traditional prejudice analysis once a violation is found and

before a remedy is imposed. Moreover, subdivision (e)'s specification of remedies contains an explicit exception "for an initiative approved by voters." (See § 745(e) ["Notwithstanding any other law, except as provided in subdivision (k), *or for an initiative approved by the voters*"], italics added.) Article VI, section 13, the miscarriage of justice provision is, of course, one such voter initiative. So is Penal Code section 190.2, subdivision (a)(3), the law under which Bankston's sentence in this case was entered, which prescribes the death penalty or life imprisonment without the possibility of parole for a person convicted of first degree murder and who is found to have committed multiple murders. (See Prop. 7, as approved by voters, Primary Elec. (Nov. 7, 1978) § 6, adding § 190.2, subd. (a)(3) ["The defendant has in this proceeding been convicted of more than one offense of murder in the first or second degree"].)

We do not need to resolve these complex issues here because, at least with respect to cases in which judgment was entered before the RJA took effect, we read the RJA as permitting an inquiry into whether a miscarriage of justice occurred. The clearest indication of the Legislature's intent on this point comes in subdivision (k), discussed above, which contains an express instruction to apply a form of harmless-error review to certain RJA violations in cases in which judgment was entered before the RJA took effect. Bankston contends that subdivision (k) actually supports his argument, because the provision is limited to cases in which a "petition[]" has been filed. (§ 745(k).) By negative implication, Bankston concludes that no harmless error review is statutorily permissible in any RJA case pending on direct appeal, even though judgment may have been entered — as it was in this

case — decades before the RJA was enacted. The Attorney General responds that the word "petitions" in subdivision (k) is readily interpreted to refer to vehicles other than habeas for raising RJA claims in pre-RJA cases, including direct appeals. He asserts that under subdivision (k) a harmless beyond a reasonable doubt standard applies to "violations in cases whose judgments predate the RJA's January 1, 2021, effective date."

Whether or not subdivision (k) expressly prescribes harmless-error review in pre-RJA direct appeals, we are not convinced subdivision (k) impliedly forecloses it, as Bankston contends it does. A brief review of the drafting history explains why. The language in subdivision (k) predates the amendment expressly permitting defendants to raise RJA claims on direct appeal. (Stats. 2023, ch. 464, § 1; Stats. 2022, ch. 739, § 2.) The evident purpose of the language was not, as Bankston supposes, to draw a distinction between RJA claims raised in habeas petitions and on direct appeal, but instead to draw a distinction between those habeas cases in which judgment was entered before January 1, 2021, and those cases in which judgment was entered after the effective date of the RJA. The wording of subdivision (k), which is addressed to "*petitions* that are filed in cases for which judgment was entered before January 1, 2021" (§ 745(k), italics added), is easily explained by the fact that, at the time the subdivision was enacted, the RJA expressly provided for review in pre-Act cases by way of habeas corpus and made no express provision for raising RJA claims on direct appeal. (Stats. 2022, ch. 739, § 2.) When the Legislature amended section 745, subdivision (b) in 2023 to expressly authorize record-based RJA claims to be heard on appeal, it made no reference to prejudice and left subdivision (k) unchanged. (Stats. 2023, ch. 464, § 1.) By leaving in place in

section 745(k) a prejudice standard applicable to pre-2021 habeas cases — "and only in those cases" — the Legislature did not impliedly foreclose any possible form of harmless error review in appeals from judgments entered before January 1, 2021 (a subject the RJA did not expressly address until the 2023 amendments). (§ 745(k).)

The legislative history materials underscore the point. Before the provision that became subdivision (k) was added, the legislative history materials concerning Assembly Bill No. 256 stated that the RJA "does not require the discrimination . . . to have had a prejudicial impact on the defendant's case." (Assem. Com. on Pub. Safety, Analysis of Assem. Bill No. 256 (2021–2022 Reg. Sess.) as amended Mar. 16, 2021, p. 7.) But after subdivision (k) was added to section 745 — and also after it was amended to say that the standard it set forth applied to pre-RJA petitions "and only in those cases" — a bill analysis stated: "[T]he bill would provide that the petitioner is entitled to retroactive relief, as specified, unless the state proves beyond a reasonable doubt that the error did not contribute to the verdict. . . . The bill is silent as to what standard of prejudice applies to violation of the CRJA prospectively . . . It's an open question whether some or all prospective violations constitute structural error." (Assem. Conc. in Sen. Amends. to Assem. Bill No. 256 (2021–2022 Reg. Sess.) as amended August 24, 2022, p. 3 (Assembly Floor Analysis of Assembly Bill No. 256); see Assem. Bill No. 256 (2021–2022 Reg. Sess.) as amended August 24, 2022, § 2.) In other words, the history suggests: (1) that subdivision (k)'s beyond a reasonable doubt standard was intended to govern claims for retroactive relief; and (2) that there was no settled understanding as to whether or how harmless error analysis would apply going forward.

The same analysis suggests that the Legislature recognized a distinction between challenges that are subject to the constitutional rules regarding reversal for prejudicial error in Article VI, section 13 (direct appeals), and what it described as the "similar" prejudice evaluation performed when error is established by habeas petition. (Assem. Floor Analysis of Assem. Bill No. 256, *supra*, at pp. 2–3.) This might suggest that because the prejudice standard for RJA habeas petitions was uncertain — and because of concern about imposing some limitation on the newly added retroactive claims — the Legislature thought it appropriate to set a specific standard of review for petitions making retroactive challenges, while otherwise leaving to courts to decide whether and under what circumstances an RJA violation might require reversal in cases tried after 2020. Thus, in specifying the standard for reviewing petitions in pre-RJA cases, the Legislature consciously incorporated for all such RJA claims the beyond a reasonable doubt standard for reviewing claims of constitutional error. (Assem. Floor Analysis of Assem. Bill No. 256, *supra*, at p. 3; see *Chapman v. California* (1967) 386 U.S. 18, 24.)

In short, even if we were to conclude that subdivision (k) does not, by its terms, govern in pre-RJA direct appeals, we are not persuaded that subdivision (k) impliedly forecloses harmless-error review on appeal in this pre-RJA case or other cases like it. At most, it does not speak directly to the issue. And if that is so, it remains for us to decide how best to read the statute as a whole in order to understand the role of harmlessness analysis in this context.

In this regard, we consider two points. First, even if subdivision (k) is not directly applicable, it is nonetheless highly instructive. The Legislature crafted subdivision (k) in response

to concerns about how the RJA would apply retroactively to cases in which judgment was entered before the RJA's effective date. There is nothing to suggest that the Legislature wished to adopt a different approach depending on whether claims for retroactive relief are raised first via direct appeal or via petition in the trial court. Rather, as noted, the legislative history of the 2023 amendment expressly allowing RJA claims to be brought on appeal suggests that the Legislature intended to clarify that adjudication may occur on appeal if the record permits — but also recognized that the limitations in trial records would sometimes necessitate a return to superior court for full litigation of the issues. We see no reason why the Legislature would draw a sharp distinction between the mode of review for RJA claims in pre-RJA cases — a rule of harmless-error review versus a rule of automatic reversal — depending solely on whether additional further factual development is required to adjudicate the claim.

Second, and perhaps most fundamentally, by looking to subdivision (k) for guidance on the role of harmless error review in pre-RJA cases, we avoid the serious constitutional questions that would arise were we to conclude that the Legislature intended to override the court's constitutionally assigned role in determining whether a miscarriage of justice has occurred. (*People v. Breverman* (1998) 19 Cal.4th 142, 178, fn. 26 [this court is the "final arbiter" of "the meaning of the 'miscarriage of justice' clause of the California Constitution," article VI, § 13].) We understand Bankston's view that no violation of the RJA can ever be considered "minor or harmless" (Stats. 2025, ch. 721, § 1, subd. (e)) (at least unless the Legislature has specifically and expressly said that it can be, as it did in subdivision (k)). But we also bear in mind that the RJA is written broadly —

deliberately so — such that it covers a wide range of conduct and behaviors by a variety of actors who may have widely varying degrees of connection to the overall fairness and integrity of the criminal proceedings. There are appreciable differences in harm between instances of overt bias displayed by a presiding bench officer and subtle slights by a law enforcement officer who played no significant role in the investigation or trial of the case. So, too, are there appreciable differences between an argument that overtly and flagrantly appeals to racial bias — by, for instance, asking the jury to draw adverse inferences against the defendant because of his racial presentation (see, e.g., *Simmons*, *supra*, 96 Cal.App.5th at p. 335; see *id.* at p. 339) — and the fleeting use of dehumanizing language in an effort to describe egregious harmful behavior.

The voters in 1911 ratified what is now article VI, section 13 precisely because of concerns about the effect on the justice system of a set of rules that would treat all error, no matter its scope or actual effects, as grounds for reversal. As the Legislature itself appeared to recognize when it drafted subdivision (k), these concerns are magnified in the class of cases that were tried before the RJA was enacted, in which parties frequently failed to make the kinds of records that would allow for robust contemporaneous exploration about how an objective observer would view the conduct and language of trial participants, or to make timely objections that could have resulted in appropriate admonitions or other effective remedial measures.

*People v. Superior Court (Zamudio)* 23 Cal.4th 183, is instructive here. In *Zamudio*, we addressed Penal Code former section 1016.5, which required trial courts to advise noncitizens that convictions could result in certain immigration

consequences, and stated if the court fails to do so for an offense that "may have" such consequences, "the court, on defendant's motion, *shall* vacate the judgment and permit the defendant to withdraw the plea of guilty or nolo contendere, and enter a plea of not guilty." (Pen. Code, § 1016.5, subd. (b), italics added; Stats 1977, ch. 1088, § 1; *Zamudio*, at p. 191.) Zamudio contended that the language " 'shall vacate the judgment' " created a "per se rule of reversal." (*Zamudio*, at p. 194.) We rejected this construction and concluded that a court should, before vacating a judgment, inquire as to prejudice under Penal Code section 1404. (*Zamudio*, at pp. 194, 199–200; see *ante* at p. 110.)

We observed that although " 'the word "shall" ' " is " 'ordinarily deemed mandatory,' " Penal Code section 1016.5 was silent as to prejudice, and did not address an error that would be considered structural. (*Zamudio*, *supra*, 23 Cal.4th at p. 194; see also *id.* at pp. 197, 199.) We ultimately concluded that "we need not decide whether defendant's state statutory right to receive specified immigration advisements is 'constitutionally qualified by the duty of California appellate courts' " to affirm a judgment absent a miscarriage of justice under article IV, § 13. (*Zamudio*, at p. 198.) Rather, "in order to avoid whatever constitutional infirmity a contrary construction might engender," we had long held Penal Code section 1404 "constitute[d] a legislative command that courts disregard technical errors in procedure unless they impact the substantial rights of defendants." (*Zamudio*, at p. 199.) There was "no indication the Legislature enacted [Penal Code] section 1016.5 in denigration of, or as an exception to, [Penal Code] section 1404's general proviso that only those procedural errors that prejudice the defendant's substantial rights render

the criminal proceeding invalid." (*Ibid.*) "Moreover, to afford relief for incomplete advisement under section 1016.5 only to defendants who demonstrate they were prejudiced thereby" was consistent with language stating that the purpose of the statute was to address " 'instances' in which pleas are entered 'without the defendant knowing' the immigration consequences." (*Ibid.*)

Here, as in *Zamudio*, the Legislature did not clearly express an intent to dispense with a prejudice analysis in pre-RJA cases. To the contrary, in section 745(k) it expressly enacted a beyond a reasonable doubt prejudice standard for petitions in pre-RJA cases, and as we have explained, there is no persuasive basis on which to conclude it did not intend that standard to apply to pre-RJA cases raising claims on appeal.

Justice Evans's concurring opinion would conclude otherwise, but it does not convincingly dispel the serious constitutional doubts that would arise were the Legislature to adopt a rule of automatic reversal. Justice Evans points to Penal Code section 1387, in which the Legislature provided that a felony charge twice dismissed generally may not be refiled if it is the "same offense." (See conc. opn. of Evans, J., *post*, at pp. 11–12, 24.) This rule " 'implements a series of related public policies,' " such as " 'curtail[ing] prosecutorial harassment by placing limits on the number of times charges may be refiled,' " " 'reduc[ing] the possibility' " of forum shopping through refiling, and " 'prevent[ing] the evasion of speedy trial rights through the repeated dismissal and refiling of the same charges.' " (*People v. Juarez* (2016) 62 Cal.4th 1164, 1170.) This general procedural rule and its underlying policies are wholly distinct from a

legislative blanket predetermination that certain trial-related errors are always reversible per se.[14]

Given the breadth of the RJA and the matters it covers, consideration of harmlessness is a difficult and sensitive enterprise, one best approached in the context of addressing concrete cases. We note that any consideration of the role of harmlessness analysis must take due account of the fact that the RJA covers acts whose effects may well "def[y] ordinary harmless error analysis." (*Blackburn*, *supra*, 61 Cal.4th at p. 1134.) Some error cannot be deemed harmless because the risks to the integrity of the justice system are simply too great. Indeed, some RJA errors would constitute structural error under law established long before the RJA: To take an obvious example, if the record showed that a judge repeatedly displayed racial bias against a defendant in front of the jury, that would constitute grounds for reversal without any inquiry into whether the judge's bias could somehow be deemed harmless. (See *Arizona v. Fulminante, supra*, 499 U.S. at p. 309 [an impartial judge is a "structural defect[] in the constitution of the trial mechanism, which def[ies] analysis by 'harmless-error' standards"].) The RJA's statutory harmlessness standard does not displace or override the standards that would ordinarily govern in these or other similar situations.

---

[14] We have not yet had occasion to address the meaning or effect of Code of Civil Procedure section 231.7, subdivision (j), which provides: "Should the appellate court determine that the objection was erroneously denied, that error shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial." (See conc. opn. of Evans, J., *post*, at pp. 12, 24.) We do not address it here.

For present purposes, we focus our inquiry on the specific claims before us, which concern the use of racially discriminatory language, as that term is defined in section 745, subdivision (h)(4) — specifically, facially neutral language that, Bankston argues, implicitly appealed to racial bias. In this context, the Legislature that drafted subdivision (k) consciously chose the harmless beyond a reasonable doubt standard of *Chapman v. California, supra,* 386 U.S. at page 24. The choice is appropriate, and we adopt it as our own. The selection of the *Chapman* standard reflects the fact that what is at issue in this case, and others like it, is nothing less than the promise of fair adjudication and respect for the dignity of each person in our courts of justice. In this area of the law, courts are often called on to make nuanced judgments about the nature of challenged messages and their probable effects on listeners. (Cf., e.g., *Bailey v. San Francisco Dist. Attorney's Office* (2024) 16 Cal.5th 611, 627–628.) The same is true here. A court may conclude that the use of facially neutral but problematic language is harmless beyond a reasonable doubt under the circumstances of an individual case, just as it may not be actionable in other legal contexts where the nature of the violation is such that it could have no meaningful impact on the fairness or integrity of the proceedings.

In sum, we conclude that in cases in which judgment was entered before 2021, the harmless beyond a reasonable doubt standard applies on appeal to review of RJA claims asserting

the use of racially discriminatory language. (§ 745, subd. (a)(2), (h)(4).)[15]

### (c) *Prejudice analysis*

In evaluating any prejudice from state-law error that occurred at the penalty phase, we ordinarily ask whether there is a reasonable possibility that the complained-of error affected the penalty verdict. This is, in substance, the same as the *Chapman* beyond a reasonable doubt standard. (See *People v. Lancaster* (2007) 41 Cal.4th 50, 94; *People v. Brown* (1988) 46 Cal.3d 432, 448.) The Attorney General asserts that he cannot establish harmlessness under this standard. Although the issue is close, we accept the Attorney General's concession.

To be sure, the jury that tried this case heard significant evidence of the capital crimes and their callousness, through eyewitness testimony concerning the attacks on Sanchez and the Jones family and through Bankston's own description of Sanchez's murder to Torrez. And at the penalty phase, the jury heard considerable evidence of Bankston's additional violent conduct. (See *ante*, pt. I.D.1.) Bankston's penalty case, by contrast, included no witnesses and merely the introduction of two documents that were of modest mitigating value. (See *ante*, pt. I.D.2.)

But the evidence of the harm that Bankston inflicted through gang-related violence must be weighed against the nature of the RJA violation. The prosecutor invited the jury to

---

[15] We disapprove *People v. Stubblefield*, *supra*, 107 Cal.App.5th 896 to the extent its reasoning is inconsistent with our opinion concerning the appropriate analysis in cases in which judgment was entered before the RJA took effect.

imagine Bankston as an "enormous" Bengal tiger with his "muscles all flexed out," "claws out," "fangs" visible, and growling, and placed the tiger deep in the "jungle[]." She repeatedly called him a "thug." These comments were not brief, nor were they pertinent, and, as the Attorney General concedes, an objective observer would understand them as an invitation to judge Bankston's character in a manner that appeals to implicit racial bias.

At the penalty phase, the jurors were tasked with making an " ' "*individualized* determination" ' " of the appropriate penalty — life imprisonment without the possibility of parole or the death penalty — based on " ' "the character of the individual and the circumstances of the crime." ' " (*People v. Landry* (2016) 2 Cal.5th 52, 106–107, quoting *Tuilaepa v. California* (1994) 512 U.S. 967, 972.) "Unlike the guilt determination, 'the sentencing function is inherently moral and normative, not factual." (*People v. Nunez and Satele, supra,* 57 Cal.4th at p. 60.) "[U]ltimately it is a profoundly personal decision qualitatively different from the factfinding required by the jury in determining guilt for the charged offenses." (*Id.* at p. 61.)

Here, the prosecutor's comments were not only unfairly demeaning; they also improperly discouraged the jury from according Bankston the full measure of individual worth and mercy that the law allows. After carefully considering the penalty phase record, we agree with the Attorney General that there was a reasonable possibility that the errors in the prosecutor's penalty phase closing argument affected the jury's penalty verdict — which is to say, the errors were not harmless beyond a reasonable doubt.

### (d) Is the death penalty an available sentence on retrial?

Having concluded that a prejudicial RJA violation has occurred that results in reversal of the death judgment, the next question for us to consider is whether the prosecution may retry the penalty phase if it so chooses. Both sides agree that recent amendments to the RJA, effective January 1, 2026, bear on this question. (Stats. 2025, ch. 721, § 2.) We ordered additional briefing and reargument in this and other pending cases to consider the effect of these 2025 amendments on the proper disposition following a finding of reversible RJA error in a capital case.

Before the 2025 amendments, section 745(e) stated that the court shall "impose a remedy" for violations of subdivision (a), "except as provided in subdivision (k), or for an initiative approved by the voters" (§ 745(e)), and included the following in the list of remedies: "When the court finds there has been a violation of subdivision (a), the defendant shall not be eligible for the death penalty." (Stats. 2020, ch. 317, § 3.5.) In the 2025 amendments, the Legislature moved this language, verbatim, to a standalone subdivision (subdivision (*l*) or section 745(*l*)), which now reads in full: "When the court finds there has been a violation of subdivision (a), the defendant shall not be eligible for the death penalty." (Stats. 2025, ch. 721, § 2.) The uncodified legislative findings for the 2025 amendment state: "[T]his bill clarifies that the prohibition on death sentences for cases in which an RJA violation occurs is categorical, and not a remedy in itself." (Stats. 2025, ch. 721, § 1, subd. (e).)

In general, "[w]hen the death penalty has been imposed, reversal of that judgment on appeal . . . does not bar retrial." (*People v. Wilson* (2023) 14 Cal.5th 839, 856.) Whether section

745(*l*) provides an exception would appear to turn in the first instance on the meaning of section 745(*l*)'s instruction: "When the court finds there has been a violation of subdivision (a), the defendant shall not be eligible for the death penalty." This language is ambiguous as to the scope of subdivision (*l*). It could mean that the defendant is not eligible for the death penalty *in that same proceeding* (such that if an RJA violation is found before judgment to necessitate, for instance, empaneling a new jury in a capital case (see Pen. Code, § 745(e)(1)(B)), the prosecution will thereafter be precluded from continuing to seek the death penalty. Or it could mean that a prejudicial RJA violation, once found, renders the individual ineligible for the death penalty in *any* proceeding, and so precludes any future penalty retrial.

Bankston contends that section 745(*l*), and the legislative findings statement that this subdivision is "categorical," mean he is no longer eligible for the death penalty in any future proceeding. The Attorney General initially asserted that, given the RJA violation in this case, the "death judgment must be vacated and found legally invalid" and "the only remaining sentence that may be imposed is" life imprisonment without the possibility of parole. (See Pen. Code, § 190.2, subd. (a)(3).) In later supplemental briefing, however, the Attorney General changed course; he instead argued that we should remand to allow the trial court to determine the appropriate remedy. The Attorney General has maintained this position following the enactment of subdivision (*l*), though his reasons have changed. Like Bankston, the Attorney General takes the view that subdivision (*l*), properly interpreted, "explicitly removes death-penalty eligibility for a class of individuals charged with offenses listed in the Briggs Initiative, for which the voters determined

that the defendant should be eligible." But unlike Bankston, the Attorney General views this bar on penalty retrials as unconstitutional in most instances in which the RJA violation at issue concerns the use of discriminatory language or other exhibition of bias. He suggests we remand to allow the trial court to decide whether the bar on retrial is unconstitutional as applied in this case.

At a minimum, it is clear that reading section 745(*l*) as a categorical bar to penalty-phase retrial would raise serious constitutional concerns. The central difficulty concerns the constitutional limitations on the Legislature's power to amend statutes enacted by voter initiative.

California's current death penalty law, which sets forth the criteria for death eligibility, is such a statute. Proposition 7, enacted in 1978 (and more commonly known as the "Briggs Initiative"), repealed numerous provisions of the former capital punishment law and added new corresponding provisions establishing much of the current death penalty statutory scheme, setting forth the criteria that establish death eligibility. As particularly relevant here, the Briggs Initiative both repealed and added back the multiple-murder special-circumstance that rendered Bankston eligible for the death penalty.[16] (Prop. 7, *supra*, § 6, adding Pen. Code, § 190.2, subd. (a)(3)"].) It also repealed and added back Penal Code section 190.2, subdivision (a), which provides that the penalty

---

[16] Penal Code section 190.2, subdivision (a) was subsequently amended before Bankston committed his 1991 crimes, in terms not relevant here, by Proposition 114 (Stats. 1989, ch. 1165, § 16) and Proposition 115, both effective June 6, 1990. (See generally *Yoshisato v. Superior Court* (1992) 2 Cal.4th 978.)

for a defendant found guilty of first degree murder shall be death or life imprisonment without the possibility of parole in any case in which a special circumstance has been found true. Finally, as relevant here, the Briggs Initiative also added Penal Code section 190.3, which provides: "[T]he trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and *shall impose a sentence of death* if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances." (Prop. 7, *supra*, § 8, italics added.) As the court later explained, section 190.3, properly understood, means that a capital jury must weigh the aggravating and mitigating evidence, then decide whether death "is the appropriate penalty under all the circumstances." (*People v. Brown* (1985) 40 Cal.3d 512, 541 (*Brown*).)[17]

Under the California Constitution, "the Legislature is powerless to act *on its own* to amend an initiative statute." (*People v. Kelly* (2010) 47 Cal.4th 1008, 1045 (*Kelly*).) As this court has explained, article II, section 10 of the California Constitution makes clear that "a statute enacted by voter initiative may be changed only with the approval of the electorate unless the initiative measure itself permits amendment or repeal without voter approval. [Citation]."

---

[17] We acknowledged in *Brown* "that the language of [section 190.3], and in particular the words 'shall impose a sentence of death,' leave room for some confusion as to the jury's role," and stated trial courts in future death penalty cases "should instruct the jury as to the scope of its discretion and responsibility in accordance with the principles set forth in this opinion." *(Brown, supra*, 40 Cal.3d at p. 544, fn. 17; see *People v. Streeter* (2012) 54 Cal.4th 205, 255 [observing CALJIC No. 8.88 was drafted in response to *Brown*].)

(*People v. Cooper* (2002) 27 Cal.4th 38, 44.) The Briggs Initiative "did not authorize the Legislature to amend its provisions without voter approval," so it is not subject to unilateral legislative amendment. (*Ibid.*)

"[A]n amendment includes a legislative act that changes an existing initiative statute by taking away from it." (*Kelly*, *supra*, 47 Cal.4th at p. 1027.) "To determine whether [a legislative act] impermissibly takes away from [an initiative], 'we must decide what the voters contemplated.'" (*People v. Rojas* (2023) 15 Cal.5th 561, 574 (*Rojas*).) "The Legislature remains free to address a ' "related but distinct area" ' [citations] or a matter that an initiative measure 'does not specifically authorize *or* prohibit.'" (*Kelly*, at pp. 1025–1026.) In deciding whether the RJA amends the Briggs Initiative, "we simply need to ask whether it prohibits what the initiative authorizes." (*People v. Superior Court (Pearson)* (2010) 48 Cal.4th 564, 571 (*Pearson*).)

The language of Penal Code section 190.3, as interpreted in *Brown*, reflects the voters' unmistakable intent to make the death penalty an available sentencing option when a special circumstance allegation like multiple murder has been found true and, as the jury instruction given here states, the aggravating circumstances have been found to be "so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (CALJIC No. 8.88.) The primary question here is whether section 745(*l*), if read in the categorical manner that Bankston urges, represents an unauthorized amendment of these provisions by redefining the circumstances in which a defendant may be considered eligible for the death penalty at any retrial following reversal of a judgment for trial error.

This case contrasts with several other cases in which we have found no conflict between an Act of the Legislature and the Briggs Initiative. In *People v. Superior Court (Gooden)* (2019) 42 Cal.App.5th 270, 286, cited with approval in *Rojas*, *supra*, 15 Cal5th at page 577, the Court of Appeal held that the Legislature's 2018 change to the elements of murder in Senate Bill No. 1437 did not amend the Briggs Initiative. The court observed that the Briggs Initiative was not intended to "reaffirm or amend the substantive offense of murder," but instead "to strengthen the punishments for persons convicted of murder." (*Gooden*, at p. 285.) Because Senate Bill No. 1437 "did not address the issue of punishment for persons convicted of murder," there was no conflict. (*Gooden*, at p. 286.)

Similarly, in *Cooper*, *supra*, 27 Cal.4th 38, we concluded that legislation limiting presentence conduct credits did not amend the Briggs Initiative because the latter provision "address[ed] *only* the manner in which postsentence conduct credits can apply to reduce a murder sentence without any reference to presentence conduct credits." (*Id.* at pp. 43, 47.) In *Rojas*, we concluded Assembly Bill No. 333, which changed the definition of a criminal street gang, did not amend Proposition 21, which added the gang-murder special-circumstance, in part because Assembly Bill No. 333 "did not change the *punishment* associated with gang crimes, including the punishment of death or life without the possibility of parole for individuals convicted of the gang-murder special circumstance" allegation. (*Rojas*, *supra*, 15 Cal.5th at pp. 565, 580, italics added; *id.* at p. 577 ["Assembly Bill 333 does not change the punishment for those convicted of the gang-murder special circumstance"].) The circumstances presented here are not comparable; any legislative definition or redefinition of

death eligibility goes squarely to the issues the voters addressed in the Briggs Initiative.[18]   Indeed the Legislature stated that movement of the language in former subdivision (e)(3) to a standalone subdivision (*l*) was intended to "clarif[y] that the prohibition on death sentences for cases in which an RJA violation occurs is categorical, and not a remedy in itself." (Stats. 2025, ch. 721, § 1, subd. (e).)   To the extent we read subdivision (*l*) as explicitly removing  "death-penalty eligibility for a class of individuals charged with offenses listed in the Briggs Initiative, for which the voters determined that the defendant should be eligible," as the Attorney General asserts, even where the harm from a violation has already been remedied in a previous proceeding (by, for instance, reversing the affected judgment and ordering a new trial), it is difficult to avoid the conclusion that subdivision (*l*) "prohibits what the initiative authorizes" and for that reason constitutes an unauthorized amendment.   (*Pearson*, *supra*, 48 Cal.4th at p. 571.)

Bankston's reading of section 745(*l*) also contrasts with other statutes in which the Legislature has barred the death penalty for certain classes of offenders.   For example, Penal Code section 1376, subdivision (b), enacted after the high court's decision in *Atkins v. Virginia* (2002) 536 U.S. 304, 320, follows that decision in making "ineligible for the death penalty" those who are intellectually disabled.   Penal Code section 1367, subdivision (a), consistent with longstanding United States

---

[18]   In addition, we note that in general categorically precluding retrial because of an error in an *earlier* trial would also raise concerns under article VI, section 13 of the state Constitution.  (See *ante*, pp. 109–111.)

Supreme Court authority, provides that a "person shall not be tried or adjudged to punishment . . . while that person is mentally incompetent," and Penal Code section 3700 requires a condemned inmate's competence to be assessed once an execution date is set. (See *Ford v. Wainwright* (1986) 477 U.S. 399, 401 ["execution of the insane" is forbidden under the federal Constitution].) A similar class-based limitation on death eligibility appears in Penal Code section 190.5, subdivision (a), which was enacted by the voters in 1978 as part of the Briggs Initiative, and which precludes imposition of the death penalty on "any person who is under the age of 18 at the time of the commission of the crime." (See also *Roper v. Simmons* (2005) 543 U.S. 551, 575 [later holding that "the death penalty is disproportionate punishment for offenders under 18"].) Unlike the RJA's provisions governing the conduct of trials, these statutes are rooted or confirmed in high court precedent that disqualifies entire classes of individuals from imposition of the death penalty based on a specified characteristic of those individuals. They do not purport to redefine death eligibility on the basis of errors that occurred in connection with a previous trial, and which presumably could be avoided on retrial.

We do not suggest that article II, section 10 and the Briggs Initiative always compel permitting penalty retrials. For example, under longstanding constitutional precedent, a court may prohibit retrial in individual cases where necessary and appropriate to remedy certain forms of prosecutorial misconduct. (*People v. Peoples* (2016) 62 Cal.4th 718, 750 ["[t]he federal Constitution prohibits a retrial when the prosecution commits misconduct with the intent to provoke a mistrial," and the California Constitution bars retrial after certain prosecutorial misconduct results in a successful mistrial

motion].) And we acknowledge, as does the Attorney General, that certain RJA violations may raise the types of concerns about prosecutorial manipulation that warrant a sanction that precludes retrial. But these types of sanctions do not bear on who is generally eligible for the death penalty. Rather they are intended to punish and deter substantial misconduct in an individual case. A categorical rule prohibiting penalty retrials, regardless of whether that sanction is warranted to remedy either the effect on the jury in a particular case or the effect of a violation on the essential fairness of the process, raises grave concerns about undermining the will of the electorate, as expressed through current law.

"[W]e presume 'the Legislature intended, not to violate the Constitution, but to enact a valid statute within the scope of its constitutional powers.'" (*People v. Superior Court (Guevara)* (2025) 18 Cal.5th 838, 857.) "[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' [citation], we are obligated to construe the statute to avoid such problems." (*I.N.S. v. St. Cyr* (2001) 533 U.S. 289, 299–300; *People v. Buza* (2018) 4 Cal.5th 658, 682 ["the usual rule [is] that a statute will be interpreted to avoid serious constitutional questions if such an interpretation is fairly possible"].) Here, an alternative construction is fairly possible. The language of section 745(*l*) — "When the court finds there has been a violation of subdivision (a), the defendant shall not be eligible for the death penalty" — is most naturally understood to speak to a violation found *in that proceeding*, and is thus reasonably understood to prescribe a rule likewise limited to the same proceeding in which the violation is

found.[19]   Because that interpretation is possible, and because it avoids the serious constitutional doubts that would arise should the Legislature endeavor to enact a categorical rule redefining death eligibility, we are obligated to adopt it.   So understood, subdivision (*l*) does not prevent the People from deciding whether or not to retry the penalty phase following reversal of the judgment.

### E. Asserted Cumulative Error

We have concluded that the prosecutor prejudicially violated the RJA during her penalty closing argument and reverse the death judgment.   Bankston further contends that the cumulative effect of the guilt phase errors requires us to reverse the entire judgment.   We have assumed error but have concluded there was no prejudice in three instances: (1) conducting hearings where Bankston was absent though self-represented; (2) the introduction of any testimonial hearsay contained in Bankston's FI card and GREAT printout; and (3) the introduction of any testimonial hearsay contained in Bankston's rap sheet.   We conclude these assumed errors were also not cumulatively prejudicial as to the guilt phase judgment.

## III. DISPOSITION

We reverse the judgment of death and remand to the trial court for proceedings consistent with this opinion.   The judgment is affirmed in all other respects.

---

[19]   Given that we are reversing the death judgment in this case, we do not here decide the meaning and constitutionality of subdivision (*l*) in the same proceeding or when an RJA violation is determined on appeal to be harmless beyond a reasonable doubt.   That issue is addressed in *People v. Barrera* (2026) __ Cal.5th __, __, filed on the same day as this opinion.

**KRUGER, J.**

**We Concur**:

**GUERRERO, C. J.**
**CORRIGAN, J.**
**GROBAN, J.**
**JENKINS, J.** [*]

---

[*]     Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Concurring Opinion by Justice Liu


The California Racial Justice Act of 2020 (RJA) marks a sea change in our justice system by prohibiting racial bias "in any form or amount, at any stage of a criminal trial." (Stats. 2020, ch. 317, § 2, subd. (i); see Pen. Code, § 745; all statutory references are to this code.) In enacting the RJA, the Legislature observed that our criminal justice system has not delivered equal justice under law, and it rejected the notion that racial disparities are "inevitable" or justified. (Stats. 2020, ch. 317, § 2, subd. (i).)

Among its provisions, the RJA prohibits the use of language that "implicitly appeals to racial bias" (§ 745, subd. (h)(4)), whether or not the appeal was "purposeful" (*id.*, subd. (a)(2)). The Legislature, citing ample science, confirmed what many Californians know from experience: Implicit bias can be just as harmful to fairness and equality as explicit bias. (Stats. 2020, ch. 317, § 2, subds. (e), (i).) In prohibiting language that appeals to implicit bias, the RJA tasks courts with ferreting out a form of discrimination that has long gone unchecked.

This case involves a rather obvious violation of the RJA. In arguing that defendant Anthony George Bankston should be executed, the prosecutor used an allegory comparing Bankston, a Black man, to a Bengal tiger. This tactic, which carries a substantial risk of activating implicit associations of Black people with predatory animals, had been condoned for decades

1

by courts, including this court. The Legislature has now forbidden it. (§ 745, subd. (h)(4).) Today's opinion holds that the prosecutor's telling of the Bengal tiger story, as well as her use of the word "thug," violates the RJA and requires reversal of the death judgment.

But in launching our RJA jurisprudence, this case and three others filed today get things off to an uneven start. (*People v. Barrera* (June 1, 2026, S103358) __ Cal.5th __; *People v. Chhuon and Pan* (June 1, 2026, S105403) __ Cal.5th __; *People v. Demolle* (June 1, 2026, S159120) __ Cal.5th __.) While I agree that the Bengal tiger story has no place in California courtrooms, it must be said that this requires no real feat of construction since the Legislature's express findings identified this particular trope as offensive and unlawful. (Stats. 2020, ch. 317, § 2, subd. (e).) And "thug" has long been a racially charged term. Pernicious appeals to racial bias can and do occur in many other ways, as today's cases illustrate. (*People v. Barrera, supra*, S103358 (conc. opn. of Liu, J.); *id.* (dis. opn. of Evans, J.); *People v. Chhuon and Pan, supra*, S105403 (conc. & dis. opn. of Liu, J.); *People v. Demolle, supra*, S159120 (conc. & dis. opn. of Liu, J.); *id.* (conc. & dis. opn. of Evans, J.); see Stats. 2020, ch. 317, § 2, subd. (h) ["Examples of the racism that pervades the criminal justice system are too numerous to list."].) In this case, a gang expert testified without substantiation that the use of violence to gain respect as a gang member is "especially" true of Black gangs. One need not be a social psychologist to know that such an assertion can activate unconscious associations between Black people and violence. Yet the court gives this testimony a pass. (Maj. opn., *ante*, at pp. 91–96.) In parsing the Bengal tiger story and the word "thug," while concluding that nothing else in this case or in any

of today's other cases violates the RJA, the court seems to miss the forest for the trees.

The Legislature spoke clearly: "We cannot simply accept the stark reality that race pervades our system of justice." (Stats. 2020, ch. 317, § 2, subd. (b).) Parsimony in judicial application of the RJA's prohibitions cannot be squared with the Legislature's robust intent "to eliminate racial bias from California's criminal justice system . . . in any form or amount." (*Id.*, subd. (i).) The RJA states its purposes broadly and explicitly, and it is not for courts to water down its expansive aims through narrow construction. It is precisely because courts have long applied more limited understandings of what constitutes racial discrimination that the Legislature enacted new standards to "create a fair system of justice." (*Id.*, subd. (b).) Our role "is to effectuate the intent of the Legislature, not thwart it." (*People v. Lewis* (2023) 14 Cal.5th 876, 897.)

## I.

Because this case and others filed today comprise this court's first substantive application of the RJA, it is important to begin with an understanding of the paradigm shift that the Legislature sought to effectuate. There is no mystery what the Legislature intended because it wrote its aims into the statute itself. (Stats. 2020, ch. 317, § 2.)

Three themes deserve emphasis here. First, the RJA is an express critique of case law and judicial standards that the Legislature regarded as inadequate: "Even though racial bias is widely acknowledged as intolerable in our criminal justice system, it nevertheless persists because courts generally only address racial bias in its most extreme and blatant forms." (Stats. 2020, ch. 317, § 2, subd. (c).) "Current legal precedent

often results in courts sanctioning racism in criminal trials. Existing precedent countenances racially biased testimony, including expert testimony, and arguments in criminal trials." (*Id.*, subd. (d).) "Existing precedent tolerates the use of racially incendiary or racially coded language, images, and racial stereotypes in criminal trials." (*Id.*, subd. (e).) "Existing precedent also accepts racial disparities in our criminal justice system as inevitable." (*Id.*, subd. (f).) "Current law, as interpreted by the courts, stands in sharp contrast to this Legislature's commitment to 'ameliorate bias-based injustice in the courtroom.' " (*Id.*, subd. (g).)

These statements are a clarion call to the judiciary to depart from settled understandings and think anew. This can be challenging for an institution that values continuity and precedent. But the Legislature left no doubt that the RJA calls on courts to make a sharp break from prior legal standards.

Second, a momentous change effected by the RJA is the rejection of discriminatory purpose or intent as the touchstone of unlawful bias. For decades, courts have required proof of such intent to show unlawful discrimination in criminal cases. (See, e.g., *McCleskey v. Kemp* (1987) 481 U.S. 279, 292 [defendant "must prove that the decisionmakers in *his* case acted with discriminatory purpose"]; *Batson v. Kentucky* (1986) 476 U.S. 79, 93 ["the 'invidious quality' of governmental action claimed to be racially discriminatory 'must ultimately be traced to a racially discriminatory purpose' "]; *Baluyut v. Superior Court* (1996) 12 Cal.4th 826, 833 [to prove discriminatory prosecution, "discrimination must be intentional"].) "[U]nder current legal precedent," the Legislature observed, such proof is "nearly impossible to establish." (Stats. 2020, ch. 317, § 2, subd. (c).)

4

The RJA shifts the focus away from the subjective intent of the alleged discriminator. (Stats. 2020, ch. 317, § 2, subd. (f) [rejecting *McCleskey*'s requirement of "proof of a discriminatory purpose"]; see *id.*, subds. (i), (j); Stats. 2025, ch. 721, § 1, subd. (c) ["The Legislature again emphasizes its rejection of *McCleskey v. Kemp* (1987) 481 U.S. 279"].) It instead requires courts to evaluate allegedly discriminatory language from the perspective of "an objective observer." (§ 745, subd. (h)(4).) It does not matter whether the speaker did or did not intend to appeal to racial bias. (*Id.*, subd. (a)(2).) It does not matter whether the speaker believed her remarks were merely descriptive, explanatory, fair comment on the evidence, or otherwise made in good faith. What matters is whether the speaker used "language that, to an objective observer, explicitly or implicitly appeals to racial bias." (*Id.*, subd. (h)(4).)

Third, in rejecting discriminatory purpose as the touchstone of unlawful bias, the RJA recognizes that "[i]mplicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias." (Stats. 2020, ch. 317, § 2, subd. (i).) The Legislature observed that "all persons possess implicit biases [citation], that these biases impact the criminal justice system [citation], and that negative implicit biases tend to disfavor people of color." (*Id.*, subd. (g); see *id.*, subd. (e).) Because such bias exists outside of our conscious awareness, the Legislature made clear that its "intent . . . is not to punish this type of bias, but rather to remedy the harm to the defendant's case and to the integrity of the judicial system. It is the intent of the Legislature to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing." (*Id.*, subd. (i).)

Implicit bias was not a well-understood concept when courts first held that discriminatory intent is the gravamen of unlawful discrimination. (E.g., *Washington v. Davis* (1976) 426 U.S. 229.) But substantial research in recent decades from multiple disciplines, including psychology, economics, law, and neuroscience, has shown that implicit bias is pervasive and can be just as harmful as explicit bias. (See Liu & Jones eds., *Understanding Implicit Bias: Insights & Innovations* (2024) 153 Dædalus 1 [collecting current research]; see also conc. opn. of Evans, J., *post*, at pp. 4–6, 9.)

"Implicit biases are a subset of one's social knowledge. They include mental associations that are the core of attitudes and stereotypes, acquired continuously, starting early in life. These associations are triggered automatically and without one's awareness during encounters with members of the demographic groups with which they are associated. When activated, the associated attitudes and stereotypes influence thoughts, judgment, and behavior that may thereby be biased toward or against members of those demographic groups." (Greenwald & Newkirk, *Roles for Implicit Bias Science in Antidiscrimination Law* (2024) 153 Dædalus 174, 174; see Kang, *Little Things Matter a Lot: The Significance of Implicit Bias, Practically & Legally* (2024) 153 Dædalus 193, 207 ["These new facts about implicit social cognition have provided us with a more behaviorally realistic model of discrimination."].) "Even as overt prejudice has decreased, implicit bias — the associations we make automatically, outside of our conscious awareness, between certain groups and certain characteristics — is a prominent feature of ordinary cognition that can impair our ability to treat people fairly despite our best intentions. The strength and pervasiveness of implicit bias pose

a major challenge to actualizing our societal commitment to equality." (Liu & Jones, *Introduction: Implicit Bias in the Context of Structural Racism* (2024) 153 Dædalus 8, 8.)

The RJA reflects these understandings and demands that courts integrate them into their evaluations of whether language used in a criminal trial "explicitly *or implicitly* appeals to racial bias." (§ 745, subd. (h)(4), italics added.) The RJA directs us not to tolerate appeals to implicit bias, just as we would not tolerate "racial bias in its most extreme and blatant forms." (Stats. 2020, ch. 317, § 2, subd. (c); see *id.*, subd. (i) [racial bias "in any form or amount . . . is intolerable"].)

## II.

I turn now to the RJA claims in this case.

Before the RJA, this court had repeatedly rejected claims that "comparing [a defendant of color] to a Bengal tiger constitute[s] a 'thinly-veiled racist allusion' that . . . constitute[s] an improper argument." (*People v. Powell* (2018) 6 Cal.5th 136, 182; see *People v. Brady* (2010) 50 Cal.4th 547, 585; *People v. Duncan* (1991) 53 Cal.3d 955, 976–977.) In *Powell*, we explained: "It goes without saying that a prosecutor may not compare a defendant to a beast for the purpose of dehumanizing him before the jury or in an effort to evoke the jury's racial biases. The prosecutor may, however, properly remind a penalty phase jury of the circumstances of the offense, including the brutality of the murder, and caution the jury against judging defendant solely based upon his calm demeanor in the courtroom. Here, as in our prior cases, the record makes clear that the prosecutor was using the Bengal tiger analogy only to make the latter point. Under the circumstances of the case, we find no prejudicial misconduct." (*Powell*, at p. 183.)

The RJA expressly repudiated case law, including *Powell*, that had condoned such use of animal imagery: "Existing precedent tolerates the use of racially incendiary or racially coded language, images, and racial stereotypes in criminal trials. For example, courts have upheld convictions in cases where prosecutors have compared defendants who are people of color to Bengal tigers and other animals, even while acknowledging that such statements are 'highly offensive and inappropriate' (*Duncan v. Ornoski*, 286 Fed. Appx. 361, 363 (9th Cir. 2008); see also *People v. Powell*, 6 Cal.5th 136, 182–183 (2018)). Because use of animal imagery is historically associated with racism, use of animal imagery in reference to a defendant is racially discriminatory and should not be permitted in our court system [citations to research]." (Stats. 2020, ch. 317, § 2, subd. (e).)

As Justice Evans explains, the comparison of Black defendants to wild animals is a disturbingly common trope that carries significant risks of dehumanization, moral exclusion, and unfairly harsh punishment. (Conc. opn. of Evans, J., *post*, at pp. 25–33.) The court notes that the prosecutor in this case "embellished" the comparison "by describing the tiger as 'enormous,' with his 'muscles all flexed out,' 'claws out,' 'fangs' visible, and growling, and placed the tiger deep in the 'jungle[].' " (Maj. opn., *ante*, at p. 106.) The prosecutor also set up the story by describing Bankston as "articulate" in the courtroom with his "tie and little suit," implying that Bankston was naturally inarticulate on the streets and thus uncivilized and violent. (Cf. Clemetson, *The Racial Politics of Speaking Well*, N.Y. Times, Feb. 4, 2007 [discussing how the word "articulate" can be offensive when used to describe Black people].) But even without these embellishments, the prosecutor's comparison of

Bankston to a predatory animal clearly violated the RJA. That is because such "use of animal imagery is historically associated with racism" and risks activating an all-too-familiar form of implicit bias against Black people. (Stats. 2020, ch. 317, § 2, subd. (e).)

The RJA's prohibition on animal comparisons is an easily understood and straightforward rule — or so I would have thought. Even as today's opinion urges that "the Bengal tiger story should no longer be told in California courtrooms" (maj. opn., *ante*, at p. 104), the court relies heavily on the prosecutor's "manner of telling" the story in finding an RJA violation here. (*Id.* at p. 106; cf. *id.* at p. 105 [declining to decide "whether past tellings of the Bengal tiger story, without more, always give rise to an RJA violation"].) These qualifiers have already served to narrow the RJA's prohibition on animal comparisons, as another case today makes clear. (See *People v. Demolle, supra,* __ Cal.5th at p. __ [p. 125] [finding no RJA violation in prosecutor's comparison of defendant to a predatory "wolf in sheep's clothing" and distinguishing the Bengal tiger story in *Bankston* as unlawful because of "all of the[] circumstances [of the manner of telling], in combination"]; but see *id.* at p. __ [p. 2] (conc. & dis. opn. of Liu, J.) [the court today "hold[s], bizarrely, that the RJA is violated when a Black defendant is compared to a violent, predatory tiger but not when compared to a violent, predatory wolf"].) Readers looking for firm legal guidance on animal comparisons may well conclude that today's decisions leave open the possibility that some renditions of even the Bengal tiger story will not be found to violate the RJA. That is not what the Legislature intended.

In addition to the animal comparison at the penalty phase, the prosecution presented gang expert testimony at the second

guilt phase that resulted in another RJA violation. The expert, Lieutenant Reginald Wright, testified that "hardcore gang members" participate in "the criminal activities, be it any violent activities, anything they enhance to further the gang's prominence . . . , usually outward *especially with Bla[c]k gangs* because it's all about showing — to get respect, it's all about showing how — for a term they use — down, meaning how much you get out and do things you're asked." (Italics added.) He agreed with the prosecutor that "one of the main things [to gain stature] is to do violent acts against the enemies and show no fear" and that "enemies" are "Crips or rival gangs." In making these assertions, Lieutenant Wright did not provide any basis for singling out Black gangs as "especially" likely to use violence to gain respect. As today's opinion notes, it is common among gangs of all kinds to have their members engage in violence in order to demonstrate loyalty and earn respect. (Maj. opn., *ante*, at pp. 93–94 [citing similar testimony in cases involving Asian, Hispanic, and White supremacist gangs].) So why "especially" Black gangs?

On this point, the court says: "Considering Lieutenant Wright's comments in context, an objective observer would have understood Wright to testify not that gang members who are Black are, because of their race, especially likely to commit violent crimes, but instead that 'hardcore' gang members earn respect by doing what they are asked to do, including engaging in violent activities, and that this was particularly true of the gangs involved in the events in this case." (Maj. opn., *ante*, at pp. 95–96.) But this is simply not what Lieutenant Wright said. He did not say that engaging in violence to earn respect "was particularly true of the gangs involved . . . in this case." (*Id.* at p. 96.) He said this was true "especially with Bla[c]k gangs."

10

Lieutenant Wright may have been conveying what he had learned from his experience in gang enforcement. But to an objective observer, this unsubstantiated assertion carries a significant risk of activating implicit associations between Black people and violence. Because the testimony offered no reason for distinguishing Black gang members as "especially" prone to violence, there was a real danger that unconscious stereotypes, not ascertainable facts, would lend credence to the testimony. That is how language, used without discriminatory intent, "implicitly appeals to racial bias." (§ 745, subd. (h)(4).)

### III.

With some reluctance, I agree with today's opinion that "in cases in which judgment was entered before 2021, the harmless beyond a reasonable doubt standard applies on appeal to review of RJA claims asserting the use of racially discriminatory language." (Maj. opn., *ante*, at pp. 123–124.) Although I am sympathetic to Justice Evans's powerful exposition of the Legislature's intent in enacting the RJA (conc. opn. of Evans, J., *post*, at pp. 7–26), I ultimately agree that the statute does not foreclose harmless error review in pre-RJA cases on direct appeal and that the availability of such review is necessary to avoid serious questions that would otherwise arise under article VI, section 13 of the California Constitution. Further, in light of the record here, I conclude that the RJA violation resulting from Lieutenant Wright's testimony, whether by itself or together with the other guilt-phase errors assumed in today's opinion, was harmless beyond a reasonable doubt as to the judgment of guilt.

But the multiple RJA violations in this case were not harmless in the penalty phase and require reversal of the death

judgment. (Maj. opn., *ante*, at pp. 124–125; conc. opn. of Evans, J., *post*, at pp. 27–38.) I would underscore that "an appeal to racial bias skews decisionmaking, including the moral and normative sentencing function, against the defendant." (Conc. opn. of Evans, J., *post*, at p. 29.) The typical approach to harmless error analysis — subtracting out improperly admitted evidence or statements and then assessing the aggravating and mitigating circumstances in the remaining record — often will not be adequate or appropriate in evaluating the impact of bias on a penalty judgment. Statements that activate implicit stereotypes of Black people as violent, for example, can thoroughly bias the jury's assessment of aggravating and mitigating evidence by improperly priming jurors to overweigh the former and downplay the latter. (Accord, maj. opn., *ante*, at pp. 124–125.) Because the operation of implicit bias can shift the entire frame through which jurors evaluate the evidence, it is "extraordinarily difficult" for a reviewing court to conclude beyond a reasonable doubt that such bias did not prejudice a capital jury's normative penalty determination. (Conc. opn. of Evans, J., *post*, at p. 34.)

Because the record does not support such a conclusion here, the death judgment must be reversed. And I would leave it to the trial court to decide in the first instance, if urged by the parties, whether the prosecution may seek the death penalty on retrial given the "categorical" bar on the death penalty when an RJA violation has been found. (Stats. 2025, ch. 721, § 1, subd. (e); see § 745, subd. (*l*).)

**LIU, J.**

PEOPLE v. BANKSTON

S044739


Opinion by Evans, J., concurring in the judgment


In this automatic appeal, defendant Anthony George Bankston contends, among other things, that he is entitled to reversal of his death sentence because the prosecutor at his trial appealed to racial bias within the meaning of the California Racial Justice Act of 2020 (Pen. Code, § 745;[1] RJA or Act). The majority opinion provides that relief, and I concur in this holding. But the RJA as construed by my colleagues is substantially diluted and different from the one actually enacted by the Legislature. I write separately to explain how the Act was intended to operate.

The Legislature enacted the RJA to eliminate racial bias, root and branch, from our criminal justice system. (Stats. 2020, ch. 317, § 2, subd. (i).) The Act declares that racism "in any form or amount" and "at any stage of a criminal trial" is in itself "intolerable" and "a miscarriage of justice under Article VI of the California Constitution." (Stats. 2020, ch. 317, § 2, subd. (i).) A defendant whose trial was tainted by an appeal to racial bias need not show anything further to obtain an effective remedy under the Act. (Pen. Code, § 745, subd. (e).)

The majority opinion disagrees. "[A]t least with respect to cases tried to judgment before the RJA took effect," it is willing to tolerate the existence of racial bias and deny relief to

_____

[1]    Further unspecified references are to this code.

1

defendants who suffer appeals to racial bias at their trials if, in the view of the reviewing court, the activation of racial bias "can be shown to be harmless beyond a reasonable doubt." (Maj. opn., *ante*, at p. 109.) The majority says it "adopt[s]" this harmless-error standard "as our own." (*Id.* at p. 123.) This is notwithstanding section 745, subdivision (k), which states explicitly that this harmless-error standard applies only to "*petitions* that are filed" in pre-RJA cases "and *only in those cases*" — and this automatic appeal concededly does not involve a "petition." (Italics added.)

The majority opinion's atextual construction flouts the Act's purpose to eliminate racial bias in our criminal justice system, in defiance of the Act's explicit legislative findings and declarations as well as its legislative history. Moreover, tolerance of racial bias in criminal cases is inconsistent with the majority's recognition that appeals to racial bias "undermine the very foundation of a system of equal justice." (Maj. opn., *ante*, at p. 105.) As explained further below, the majority opinion simply has not made the case for engrafting a separate harmless-error inquiry onto the RJA. Nor does the canon of constitutional avoidance grant us the authority to rewrite this important criminal justice reform statute "to satisfy the court's, rather than the Legislature's, sense of balance and order." (*People v. Carter* (1997) 58 Cal.App.4th 128, 134.)

I take seriously the Legislature's acknowledgment and understanding of the insidious and pernicious effects of appeals to racial bias on how the trier of fact perceives and evaluates the evidence presented in criminal cases. In my view, the RJA's text, purpose, and context all point unmistakably to the conclusion that the RJA does not require a separate inquiry into prejudice when a prosecutor has made an appeal to racial bias

in a criminal trial if the judgment is not yet final.  This is true even if the case preceded the enactment of the RJA.

Under the majority's model, the question will no longer be *Was the language used an appeal to racial bias?* but will instead be *How much racial bias is too much?*  Such an approach seems likely to bring the judicial system into disrepute.  I therefore concur only in the judgment.

## I.

The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law.  (*People v. Pieters* (1991) 52 Cal.3d 894, 898.)  In this case, ascertaining the RJA's purpose is not difficult:  "we have the Legislature's own expression of its intent and the purpose of the law in the statute itself."  (*People v. Ramirez* (2019) 41 Cal.App.5th 923, 931.)

The statute tells us that the Legislature enacted the RJA in response to "what is widely understood to be this country's original sin."  (*People v. Frazier* (2024) 16 Cal.5th 814, 867 (dis. opn. of Evans, J.).)  Its aim was "to eliminate racial bias from California's criminal justice system" and "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing." (Stats. 2020, ch. 317, § 2, subd. (i).)  To achieve this ambitious goal, the Legislature made a point of investigating how racial bias (including implicit bias) damages our criminal justice system and what steps must be taken to guard against its corrosive influence.

The Legislature set forth the findings from its investigation explicitly in uncodified provisions of the statutes enacting and amending the RJA.  These findings and declarations reflect the reality that bias on the basis of race,

ethnicity, or national origin "has a deleterious effect not only on individual criminal defendants but on our system of justice as a whole." (Stats. 2020, ch. 317, § 2, subd. (a).) Yet, as the Legislature also found, courts have repeatedly failed to remedy persistent racism in our criminal justice system. (See *Young v. Superior Court* (2022) 79 Cal.App.5th 138, 157.) Racial bias has persisted "because courts generally only address racial bias in its most extreme and blatant forms" and require "proof of purposeful discrimination," which is "nearly impossible to establish." (Stats. 2020, ch. 317, § 2, subd. (c).) Too often courts have applied "a theory of racism that ignores the persistence of white supremacist structures after the civil rights revolution." (Roberts, *Racism, Abolition, and Historical Resemblance* (2022) 136 Harv. L.Rev. F. 37, 38, cited in Stats. 2025, ch. 721, § 1, subd. (d).) In particular, courts have "tolerate[d] the use of racially incendiary or racially coded language, images, and racial stereotypes in criminal trials." (Stats. 2020, ch. 317, § 2, subd. (e).) By enacting the RJA, the Legislature was "acknowledg[ing] that all persons possess implicit biases," "that these biases impact the criminal justice system" (*id.*, § 2, subd. (g) (even when "unintentional and unconscious" (*id.*, § 2, subd. (i)), "and that negative implicit biases tend to disfavor people of color" (*id.*, § 2, subd. (g)).

Consider the "insidious" effects of racially coded language, images, and stereotypes in our criminal justice system. (Stats. 2020, ch. 317, § 2, subd. (h).) Citing to academic literature, the Legislature recognized that "[b]y using similes that do not explicitly allude to race but conjure up stereotypes of Black people as having animalistic tendencies or behaving like an animal would, prosecutors can conjure up violent images about the defendant in jurors' minds." (Prasad, *Implicit Racial Biases*

*in Prosecutorial Summations: Proposing an Integrated Response* (2018) 86 Fordham L.Rev. 3091, 3105–3106, cited in Stats. 2020, ch. 317, § 2, subd. (e).) This "[d]ehumanization reduces white persons' empathy for Black people," which can thereby "trigger harsher punishments." (Prasad, at p. 3105.) The Legislature also relied upon scientific research demonstrating that the implicit association in the minds of White Americans between Black people and animals influences study participants' basic cognitive processes. The activation of that bias "is linked to dire outcomes in criminal justice contexts" and "influences the extent to which people condone and justify violence against Black suspects," including "the death-sentencing decisions of jurors." (Goff et al., *Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences* (2008) 94 J. Personality and Social Psychology 292, 294, cited in Stats. 2020, ch. 317, § 2, subd. (e).) Such dehumanization "is frequently the most important precursor to moral exclusion, the process by which stigmatized groups are placed 'outside the boundary in which moral values, rules, and considerations of fairness apply.' " (Goff, at p. 293.)

The Legislature further observed that the effect of racial bias " 'cannot be measured simply by how much air time it received at trial or how many pages it occupies in the record. Some toxins can be deadly in small doses.' " (Stats. 2020, ch. 317, § 2, subd. (a), quoting *Buck v. Davis* (2017) 580 U.S. 100, 122 (*Buck*).) The reason for this was a simple one: "no degree or amount of racial bias is tolerable in a fair and just criminal justice system." (Stats. 2020, ch. 317, § 2, subd. (h).) The Legislature therefore defined its goal as the elimination of racial bias from the criminal justice system "because racism in any form or amount, at any stage of a criminal trial, is intolerable,

inimical to a fair criminal justice system, is a miscarriage of justice under Article VI of the California Constitution, and violates the laws and Constitution of the State of California." (Stats. 2020, ch. 317, § 2, subd. (i).) Only this new zero-tolerance approach would "remedy the harm to the defendant's case and to the integrity of the judicial system." (*Ibid.*)

The Legislature further underscored its understanding of racism's effects in a recent amendment to the RJA, when it declared, "Racial bias in criminal prosecutions, in all its forms or degrees, is never minor or harmless" (Stats. 2025, ch. 721, § 1, subd. (e)) and then cited *People v. Simmons* (2023) 96 Cal.App.5th 323 (*Simmons*) — which held that "the statute forecloses any traditional case-specific harmless error analysis" (*id.* at p. 337). The Legislature's justification for this approach was clear and explicit: "Like a metastatic cancer, racial bias in one part of a criminal prosecution infects the whole and cannot be remedied by removing a single diseased cell. Remedies must match the gravity of the ills of racial bias and not be so narrow as to minimize the harm or fail to address it in its entirety." (*Ibid.*) In the Legislature's view, the influence of racial bias in our criminal justice system is not "inevitable" (Stats. 2020, ch. 317, § 2, subd. (i)); "jurors' implicit biases must be triggered before they can adversely affect a defendant's trial." (Prasad, *supra*, 86 Fordham L.Rev. at p. 3101.)

Unfortunately, the RJA as interpreted by the majority opinion bears only a faint resemblance to the Legislature's stated plan to provide "bold, concerted, and ongoing efforts to undo" "centuries of historical and embedded racial injustice." (Stats. 2025, ch. 721, § 1, subd. (f).) Although the court grants relief as to penalty here, I fear its misinterpretation of the Act will snatch relief away from many other defendants the

6

Legislature intended to reach.  (See, e.g., *People v. Barrera* (June 1, 2026, S103358) ___ Cal.5th ___; *People v. Chhuon and Pan* (June 1, 2026, S105403) ___ Cal.5th ___; *People v. Demolle* (June 1, 2026, S159120) ___ Cal.5th ___ .)  The "real risk" (*Barrera*, at p. ___ [p. 104]) for those defendants is that the system will continue to tolerate appeals to racial bias in criminal trials — which is precisely the opposite of the Legislature's goal in enacting the RJA.

## II.

The majority opinion finds, and I agree, that the prosecutor's penalty phase closing argument made an appeal to racial bias.  (Maj. opn., *ante*, at pp. 102–108.)  But the majority errs in grafting a separate prejudice inquiry onto the Act where the Legislature has not seen fit to impose one.  The text, context, and structure of the RJA reveal that when an appellate court determines that a prosecutor appealed to racial bias, *that alone* is a miscarriage of justice requiring an effective remedy.  The majority opinion's view that there *ought* to be a separate inquiry into prejudice is unsupported and ill-advised.

To determine what remedial rule should apply to RJA violations, "courts must begin with an assessment of the fundamental purposes of the right implicated by the error; only then can they select a remedy that will adequately protect that right's basic purposes."  (Stacy & Dayton, *Rethinking Harmless Constitutional Error* (1988) 88 Colum. L.Rev. 79, 90.)  The majority opinion does not undertake such an analysis.  I believe it is critical to do so.

The "central purpose of the RJA" is to provide effective remedies "for proven racial discrimination in the administration of criminal justice" and "to eliminate" — not just to ameliorate,

but to *eliminate* — "racial bias in California's criminal justice system." (*People v. Wilson* (2024) 16 Cal.5th 874, 954.) In this proceeding, Bankston has presented claims that during his trial, the prosecutor and an expert witness used "racially discriminatory language" (§ 745, subd. (a)(2)), which the Act defines as "language that, to an objective observer, explicitly or implicitly appeals to racial bias" (*id.*, subd. (h)(4)). These claims, if proven by a preponderance of the evidence, "establish[]" a "violation" of the RJA. (*Id.*, subd. (a).)

The RJA then says what happens when a violation has been proven: "Notwithstanding any other law, except as provided in subdivision (k), or for an initiative approved by the voters, if the court finds, by a preponderance of evidence, a violation of subdivision (a), the court shall impose a remedy specific to the violation found from the following list." (§ 745, subd. (e).) Where, as here, "judgment has been entered" but is not yet final, the court "shall vacate the conviction and sentence, find that it is legally invalid, and order new proceedings consistent with subdivision (a)." (*Id.*, subd. (e)(2)(A).) If the violation affected only the sentence, "the court shall vacate the sentence, find that it is legally invalid, and impose a new sentence." (*Id.*, subd. (e)(2)(B).) In the specific circumstance where a violation has been proven in a capital case, "the defendant shall not be eligible for the death penalty." (*Id.*, subd. (*l*).)

Accordingly, application of the RJA in this context is straightforward. When a violation has been proven, "*the court shall impose a remedy*" from the specified list. (§ 745, subd. (e), italics added.) Nowhere in the RJA's text did the Legislature suggest there was an additional step between the finding of a

violation — in this case, an appeal to racial bias — and the obligation to provide an effective remedy.

Consideration of the RJA's purpose confirms this straightforward reading. The Legislature's findings and declarations articulate the simple truth that the activation of "[r]acial bias in criminal prosecutions, in all its forms or degrees, is never minor or harmless" because it is "[l]ike a metastatic cancer" in that "bias in one part of a criminal prosecution infects the whole and cannot be remedied by removing a single diseased cell." (Stats. 2025, ch. 721, § 1, subd. (e).) The Legislature supported these findings with scientific research demonstrating how the activation of implicit bias affects the very process by which the factfinder makes decisions. According to those studies, an implicit association of Black people with animals "influences study participants' basic cognitive processes and significantly alters their judgments in criminal justice contexts." (Goff, *supra*, 94 J. Personality and Social Psychology at p. 292, cited in Stats. 2020, ch. 317, § 2, subd. (e).) The effect is especially pronounced at the penalty phase of a capital trial, where studies link this implicit association "to the death-sentencing decisions of jurors" because the activation of racial bias places Black defendants " 'outside the boundary in which moral values, rules, and considerations of fairness apply.' " (Goff, at pp. 294, 293.)

The Legislature's findings and declarations about the activation of racial bias in criminal proceedings must be "given great weight and will be upheld unless they are found to be unreasonable and arbitrary." (*California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575, 583.) The RJA's findings and declarations are neither unreasonable nor arbitrary. Indeed, the majority opinion offers no basis for rejecting them —

and no basis for rejecting the Legislature's determination that the RJA does not require an additional step between a finding that a violation occurred and the required remedy. "[E]ven the 'simplest of racial cues' can automatically evoke racial stereotypes and affect the way jurors evaluate evidence." (Prasad, *supra*, 86 Fordham L.Rev. at p. 3101.) The Legislature reasonably viewed those effects — the influence on jurors' basic cognitive processes, their judgment, and their willingness to view a defendant as *the other* — as a miscarriage of justice in itself.

But there's more. By enacting the RJA, the Legislature also sought "to remedy the harm . . . to the integrity of the judicial system" caused by "[i]mplicit bias." (Stats. 2020, ch. 317, § 2, subd. (i).) This additional purpose, which goes entirely unmentioned in the majority opinion, is yet another argument against the majority's atextual construction of the statute. The majority's approach will, in some cases, leave unremedied the damage palpable racism inflicts on the criminal justice system. Surely the Legislature did not intend to create a statute that would encourage defendants in nonfinal cases to identify and present bona fide claims of racism in the system, only for courts to discount them by deeming them "harmless." (Cf. *Weaver v. Massachusetts* (2017) 582 U.S. 286, 296 ["An error can count as structural even if the error does not lead to fundamental unfairness in every case"]; accord, *People v. Singh* (2015) 234 Cal.App.4th 1319, 1331 [error in sustaining an improper peremptory challenge "puts the judicial system in the untoward place of countenancing invidious discrimination, even if there were no prejudice to the particular defendant"].)

## A.

The RJA's legislative history confirms what its text and purpose tell us. (See Conc. in Sen. Amends. to Assem. Bill No. 2542 (2019–2020 Reg. Sess.) as amended Aug. 25, 2020, p. 3.) An analysis of a recent amendment described the RJA as " 'one of the most important and consequential laws enacted in this state' " and " 'essential to aid courts in effectuating the intent of the legislation to *eliminate* racial bias from California's criminal justice system because racism in any form *or amount*, at any stage of a criminal trial, is intolerable and undermines a fair criminal justice system.' " (Assem. 3d reading analysis of Assem. Bill No. 1071 (2025–2026 Reg. Sess.) as amended Mar. 28, 2025, p. 7, italics added.) Likewise, a Senate committee analysis confirmed that except for habeas corpus petitions challenging pre-RJA judgments, "[t]he RJA requires no prejudice showing." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1071 (2025–2026 Reg. Sess.) as amended June 13, 2025, p. 17.) Such petitions constituted the only circumstance in which the Legislature indicated that the harmless "beyond a reasonable doubt standard was intended to govern." (Maj. opn., *ante*, at p. 116; see Sen. Rules Com., 3d reading analysis of Assem. Bill No. 256 (2021–2022 Reg. Sess.) as amended Aug. 24, 2022, p. 5.)

## B.

A comparison of the RJA with other remedial criminal statutes further demonstrates that the RJA does not require a showing of prejudice independent of the finding that a specified person made an appeal to racial bias at the trial.

For example, section 1387 sets forth what is sometimes referred to as the "two dismissal rule," under which two

dismissals of a felony action generally bar further prosecution. Absent specified circumstances (§§ 1387, subd. (a)(1)–(4), 1387.1), the Legislature has provided that an order terminating an action "is a bar to any other prosecution for the same offense if it is a felony or if it is a misdemeanor charged together with a felony and the action has been previously terminated." (§ 1387, subd. (a).) This statute, like the RJA, articulates what constitutes a violation and, like the RJA, provides a remedy upon a showing that a violation occurred. We have never required an additional inquiry into whether the defendant who suffered two dismissals was actually prejudiced, even in capital cases (see *People v. Trujeque* (2015) 61 Cal.4th 227, 257–258), but the logic of the majority opinion would now seem to require it.

The same may be true regarding another significant criminal justice reform. Code of Civil Procedure section 231.7 establishes a new framework for identifying instances of unlawful discrimination in the exercise of peremptory challenges. Under the statute, if a reviewing court determines that an objection to a peremptory challenge was erroneously denied, "that error *shall be deemed prejudicial*, the judgment shall be reversed, and the case remanded for a new trial." (Code Civ. Proc., § 231.7, subd. (j), italics added.) Under the majority's logic, what weight, if any, will be accorded this similarly unequivocal language?

## III.

All of this reinforces my conclusion that the text, structure, and purpose of the RJA compel the conclusion that an appellate court "shall impose a remedy" (§ 745, subd. (e)) upon a finding that the prosecutor (or other specified persons) made an

appeal to racial bias during a criminal trial. The majority's reading, which imposes a separate prejudice inquiry even after the prosecution has been found to have made an appeal to racial bias, does not find much support even among the prosecution and prosecution-allied entities appearing as amici curiae. Amici curiae the Los Angeles County District Attorney, the San Diego County District Attorney, the California District Attorneys Association, and the Criminal Justice Legal Foundation have each conceded that the clear text of the RJA requires an effective remedy upon a finding of a violation. In addition, the Attorney General concedes that "for any violation of the statute, regardless of prejudice, the death penalty is categorically prohibited," citing section 745, subdivision (*l*).[2]

## A.

In coming to the opposite conclusion, the majority opinion relies in large part on section 745, subdivision (k), which adds a harmless error inquiry for a *different* category of cases than Bankston's case ("and only in those cases"). "For *petitions* that are filed in cases for which judgment was entered before January 1, 2021, *and only in those cases*, if the petition is based on a violation of paragraph (1) or (2) of subdivision (a), the petitioner shall be entitled to relief as provided in subdivision (e), unless the state proves beyond a reasonable doubt that the violation did not contribute to the judgment." (*Ibid.*, italics added.) While conceding that subdivision (k) "is not directly applicable" (maj. opn., *ante*, at p. 117), the majority nevertheless

---

[2] He otherwise contends, contrary to the majority opinion, that section 745, subdivision (k) applies to direct appeals in preenactment cases, "notwithstanding the provision's use of the term 'petition.'"

surmises the subdivision must be "highly instructive" because "[t]here is nothing to suggest that the Legislature wished to adopt a different approach depending on whether claims for retroactive relief are raised first via direct appeal or via petition [for writ of habeas corpus] in the trial court." (*Id.* at pp. 117, 118.)

I respectfully but strenuously disagree. What was actually animating the Legislature's differing treatment of claims brought on habeas corpus and claims brought on direct appeal was the long-recognized distinction between judgments that are final and those that are not. "Our cases have long emphasized that habeas corpus is an extraordinary remedy 'and that the availability of the writ properly must be tempered by the necessity of giving due consideration to the interest of the public in the orderly and reasonably prompt implementation of its laws and to the important public interest in the finality of judgments.' " (*In re Morgan* (2010) 50 Cal.4th 932, 944; see *In re Reno* (2012) 55 Cal.4th 428, 451 ["This limited nature of the writ of habeas corpus is appropriate because use of the writ tends to undermine society's legitimate interest in the finality of its criminal judgments, a point this court has emphasized many times"].) To safeguard the interest in finality, we have held that certain claims cognizable on direct appeal are not cognizable on habeas corpus. (See, e.g., *In re Sterling* (1965) 63 Cal.2d 486, 487 [refusing to entertain challenges to searches or seizures on habeas corpus]; *In re Lindley* (1947) 29 Cal.2d 709, 723 [challenges to the sufficiency of the evidence are not cognizable on habeas corpus].)

For similar reasons, the federal courts apply a less stringent standard of prejudice for claims brought on federal habeas corpus as compared to direct appeal. (See *Brown v.*

14

*Davenport* (2022) 596 U.S. 118, 122.) The high court's reasoning has emphasized the interest in finality. "Direct review is the principal avenue for challenging a conviction." (*Brecht v. Abrahamson* (1993) 507 U.S. 619, 633 (*Brecht*); accord, *United States v. Smith* (4th Cir. 2013) 723 F.3d 510, 517 ["the *Brecht* standard of review for harmlessness is better suited to [28 U.S.C.] § 2255 cases than is the *Chapman*[3] standard applicable to direct appeals"].) So when the process of direct review comes to an end, "a presumption of finality and legality attaches to the conviction and sentence." (*Brecht*, at p. 633.) "Accordingly, it hardly bears repeating that ' "an error that may justify reversal on direct appeal will not necessarily support a collateral attack." ' " (*Id.* at p. 634; see generally Lessnick, *Structurally Harmless: Why* Brecht *Should Apply on Collateral Review of Structural Errors* (2025) 100 Notre Dame L.Rev. 165, 176 ["the logic for applying structural error is *less* forceful in habeas than it is on direct appeal"].)

We can glean from the RJA's legislative history that the Legislature was motivated by similar concerns. The "Comments" section of the Assembly's Concurrence in Senate Amendments to Assembly Bill No. 256 began by noting that this court "has recognized 'society's legitimate interest in the finality of its criminal judgments.' (*In re Reno* (2012) 55 Cal.4th 428, 451.)" (Assem. Conc. in Sen. Amends. to Assem. Bill No. 256 (2021–2022 Reg. Sess.) as amended Aug. 24, 2022, p. 2.) The comment went on to note that the bill would nonetheless make the RJA "fully retroactive," even for final judgments, although its protections would be phased in, and the comment then described the newly created prejudice standard in section 745,

---

³    *Chapman v. California* (1967) 386 U.S. 18.

subdivision (k) for habeas corpus challenges to preenactment judgments. (Assem. Conc. in Sen. Amends. to Assem. Bill No. 256, *supra*, at pp. 2–3.) From this sequence, one can infer that the Legislature created a prejudice requirement "[f]or *petitions that are filed in cases for which judgment was entered before January 1, 2021, and only in those cases*" (§ 745, subd. (k), italics added) because of concerns about finality.[4] (Cf. *In re Estrada* (1965) 63 Cal.2d 740, 744 ["The key date is the date of final judgment. If the amendatory statute lessening punishment becomes effective prior to the date the judgment of conviction becomes final then, in our opinion, it, and not the old statute in effect when the prohibited act was committed, applies"].)

## B.

The majority opinion also rests its construction of the RJA on a series of policy arguments. The problem is that these are not the policy concerns that animated *the Legislature* in enacting the RJA.

---

[4] The majority opinion apparently finds it significant that an analysis of the 2022 amendment to the RJA stated " 'It's an open question whether some or all prospective violations constitute structural error.' " (Maj. opn., *ante*, at p. 116.) But this uncertainty merely reflected the fact that no court had yet ruled on the question. A little over a year later, *Simmons, supra*, 96 Cal.App.5th 323 held that the RJA "forecloses any traditional case-specific harmless error analysis," noting that the RJA's purpose "was 'to eliminate racial bias from California's criminal justice system because *racism in any form or amount*, at any stage of a criminal trial is intolerable, inimical to a fair criminal justice system, [and] *is a miscarriage of justice under Article VI of the California Constitution*.' " (*Simmons*, at p. 337.) The Legislature then explicitly embraced *Simmons* in its 2025 RJA amendments. (Stats. 2025, ch. 721, § 1, subd. (e).)

For example, the majority opinion constructs an elaborate hypothetical involving underdeveloped RJA claims on appeal and then deduces that the Legislature could not have wanted to treat defendants who needed to further develop their appellate RJA claims differently from those whose claims could be asserted on the existing record. The short answer is that the Legislature did *not* want to treat those two groups differently — but the explanation why only further undermines the majority's construction of the statute.

According to the majority opinion's hypothetical, whether challenged language appeals to racial bias will "depend in substantial measure on determinations of fact" and therefore "claims presented for the first time on appeal may face significant obstacles of proof and in some instances may require further factual development in the trial court." (Maj. opn., *ante*, at p. 87.)[5] The majority opinion in turn assumes that "a return to superior court for full litigation of the issues" in such circumstances would require the defendant to file a petition for writ of habeas corpus. (*Id*. at p. 118.) It then concludes, "We see no reason why the Legislature would draw a sharp distinction between the mode of review for RJA claims in pre-RJA cases — a rule of harmless-error review versus a rule of automatic reversal — depending solely on whether additional further factual development is required to adjudicate the claim." (*Ibid*.)

---

[5] The majority opinion admits that the claims *in this case* do not need further factual development. (Maj. opn., *ante*, at p. 88.) Nor, apparently, did any of the claims in the other cases decided today. (See *People v. Barrera, supra,* ___ Cal.5th at p. ___ [pp. 72–73]; *People v. Chhuon and Pan, supra,* ___ Cal.5th at p. ___ [p. 115]; *People v. Demolle, supra,* ___ Cal.5th ___ .)

It is true that the Legislature *didn't* perceive a hard line between record-based RJA claims that could be brought on appeal and those that might require "further factual development." But, contrary to the majority opinion, it did not thereby assume that a defendant could obtain further factual development of an RJA claim only by way of a petition for writ of habeas corpus. Under section 745, subdivision (b), a defendant who is on direct appeal but believes further factual development would be helpful to an RJA claim may "move to stay the appeal and request remand to the superior court to file a motion pursuant to this section." Consequently, the Legislature did not envision that a defendant who realizes that an RJA claim brought for the first time on appeal could benefit from further factual development would be forced to pursue relief via a petition for writ of habeas corpus, which conditions relief on the separate showing of prejudice in section 745, subdivision (k). Instead, to "ensure that the basic civil rights protections provided by the RJA can be accessed in *an efficient and effective manner*" (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1118 (2023–2024 Reg. Sess.) as amended May 18, 2023, p. 9, italics added), the Legislature contemplated that the appeal would be stayed and the matter remanded to allow the defendant to file an RJA motion and demonstrate that a miscarriage of justice occurred at trial. The line drawn by the Legislature, therefore, is not between those appellate claims that arise originally on the record and those appellate claims that arise (if necessary) from an augmented record following a stay and remand. Rather, the line in the RJA is between those claims that are adjudicated on appeal and those claims that are adjudicated on habeas corpus, the latter of which will largely involve final judgments. The dividing line between final and

nonfinal judgments reflects what the language of section 745, subdivision (k) says; it's consonant with what the purpose and structure of the RJA requires; and it represents the balance the Legislature struck between the urgent need to redress racism in all its forms and the public interest in the finality of judgments.[6]

## C.

The majority opinion resists the conclusion that the Legislature was concerned with finality by relying heavily on the canon of constitutional avoidance. In the majority's view, we should be "looking to" the separate prejudice inquiry in section 745, subdivision (k) to avoid the "serious constitutional questions" that could arise from giving the Act a natural reading. (Maj. opn., *ante*, at p. 118.) But the invocation of the avoidance canon here is inappropriate. As *Warger v. Shauers* (2014) 574 U.S. 40, 50, makes clear: "Given the clarity of both the text and history of [the provision] . . . the canon of

---

[6] The majority opinion speculates, incorrectly, that the Legislature would also have wanted a separate harmless-error inquiry to be made in every case that was "tried before the RJA was enacted," regardless of whether the claim was presented on direct appeal or on habeas corpus, out of concern that the parties in those cases "frequently failed to make the kinds of records that would allow for robust contemporaneous exploration about how an objective observer would view the conduct and language of trial participants, or to make timely objections that could have resulted in appropriate admonitions or other effective remedial measures." (Maj. opn., *ante*, at p. 119.) But *Simmons*, *supra*, 96 Cal.App.5th 323 itself was a case tried before the RJA was enacted (*Simmons*, at p. 331), yet (as the majority opinion elsewhere concedes) it too fell "outside the time period articulated in subdivision (k)" and the court undertook no separate prejudice inquiry (maj. opn., *ante*, at p. 112). Once again, the lines the majority seeks to draw are refuted by the RJA's text, structure, and purpose.

constitutional avoidance has no role to play here. The canon 'is a tool for choosing between competing plausible interpretations' of a provision. *Clark v. Martinez*, 543 U.S. 371, 381, 125 S. Ct. 716, 160 L. Ed. 2d 734 (2005). It 'has no application in the absence of . . . ambiguity.' *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494, 121 S. Ct. 1711, 149 L. Ed. 2d 722 (2001)." There is no ambiguity here.

By invoking the avoidance canon nonetheless, the majority opinion fails to comprehend or respect the RJA's text and purpose. For example, the majority strains to create an ambiguity by drawing a distinction between "an argument that overtly and flagrantly appeals to racial bias" and "the fleeting use of dehumanizing language in an effort to describe egregious harmful behavior." (Maj. opn., *ante*, at p. 119.) Perhaps a statute might have been written to recognize "appreciable differences" (*ibid.*) between those scenarios, but the RJA does not do so. The RJA's bar on racially discriminatory language encompasses equally "language that, to an objective observer, explicitly *or implicitly* appeals to racial bias" (Pen. Code, § 745, subd. (h)(4), italics added). This is because "[i]mplicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias." (Stats, 2020, ch. 317, § 2, subd. (i).) Indeed, "[c]oded language is particularly powerful in triggering stereotypes precisely *because it does not reference race explicitly*, and thereby does not violate our current egalitarian norms. Explicit references to race allow low-prejudice individuals to evaluate and reject stereotypical appeals. Coded language, on the other hand, allows our minds to quickly grasp complex concepts and the associated cultural values, while obscuring the racial stereotypes underlying these cultural values." (Bowman,

*Seeking Justice: Prosecution Strategies for Avoiding Racially Biased Convictions* (2023) 32 So.Cal. Interdisciplinary L.J. 515, 527, italics added & fn. omitted; see Prasad, *supra*, 86 Fordham L.Rev. at p. 3101 [" 'subtle manipulations' of a defendant's background affect juror decision-making to a greater extent than explicit references to race"].) The majority opinion's attempt to discern "appreciable differences in harm" between "subtle slights" and "overt bias" (maj. opn., *ante*, at p. 119) therefore only reinforces the fact that " 'subtle references to racial bias are 'just as insidious' and '[p]erhaps more effective.' " (*State v. Zamora* (2022) 199 Wn.2d 698, 715 (*Zamora*).)

Moreover, the majority opinion's approach perpetuates precisely the courts' blinkered view of racial bias that the Legislature sought to overturn. (Roberts, *supra*, 136 Harv. L.Rev. F. at p. 57 [criticizing the high court's " 'particularly narrow understanding of what constitutes a racial injury' "], cited in Stats. 2025, ch. 721, § 1, subd. (d).) As another academic article cited by the Legislature (Stats. 2020, ch. 317, § 2, subd. (e)) observed, "courts do not fully appreciate the unfair impact implicitly racial arguments can have on trial outcomes for Black defendants or on society at large." (Prasad, *supra*, 86 Fordham L.Rev. at p. 3115.) For example, "[c]ourts often argue that subtle references are '*merely descriptive*' and are unwilling to recognize the impact the references could have on jurors' implicit biases." (*Ibid.*, italics added.) And we see this very trope play out in the majority opinion, which minimizes "the fleeting use of dehumanizing language *in an effort to describe* egregious harmful behavior." (Maj. opn., *ante*, at p. 119, italics added; see Prasad, at p. 3118 ["The fact that some courts find subtle racial

arguments plausible suggests that the jurors might find them persuasive"].)[7]

The Legislature understood and sought to address the fact that courts for too long have deemed implicit appeals to race "neutral and harmless, *regardless of the effect on the listener*." (Prasad, *supra*, 86 Fordham L.Rev. at p. 3115, italics added.)  In addition, "[c]ourts are also reluctant to find that racial remarks have prejudiced a trial when they believe that other evidence weighs against the defendant.  Courts often use this analysis to find that a defendant has not been prejudiced by a prosecutor's racial arguments, even if those arguments have an easily inferable prejudicial effect on the jury."  (*Id*. at pp. 3115–3116, fn. omitted.)

In other words, the majority opinion's refusal to recognize that an appeal to racial bias at a criminal trial *is* a miscarriage of justice is directly contrary to the Legislature's clear mandate. It is also contrary to how racial bias actually works, and the science that confirms as much.  Consequently, the costs will

---

[7]    The majority opinion likewise errs in assuming that dehumanizing language that is "fleeting" (maj. opn., *ante*, at p. 119) is somehow unimportant.  Here, too, the Legislature has taken the opposite view.  It compared racial bias to "a metastatic cancer" that "in all its forms or degrees, is never minor or harmless."  (Stats. 2025, ch. 721, § 1, subd. (e); see *Zamora, supra*, 199 Wn.2d at p. 715 [" 'Like wolves in sheep's clothing, a careful word here and there can trigger racial bias' "].)  If, on the other hand, the majority opinion meant instead to suggest that the "fleeting" language was too fleeting *to appeal to racial bias*, then it would not even constitute a violation of the Act (see Pen. Code, § 745, subd. (h)(4)) — and no question of prejudice or remedy would arise.

continue to be borne by criminal defendants, the criminal justice system, and society as a whole.

Even if a different construction of the RJA were "fairly possible" (maj. opn., *ante,* at p. 134), the majority opinion has failed to demonstrate that the more plausible interpretation of the RJA — i.e., that an appeal to racial bias *is* a miscarriage of justice — raises serious constitutional concerns. The miscarriage-of-justice provision in our Constitution was aimed at *courts*, not the Legislature. (Cf. *People v. Sivongxxay* (2017) 3 Cal.5th 151, 179 [failure to obtain a separate jury trial waiver for a special circumstance allegation was not a structural error where neither the statutory text nor the legislative history of the applicable statute or initiative indicated the Legislature or the voters "saw a structural error as occurring" in those circumstances].) Indeed, the majority does not cite a single instance in which this court has disregarded a *legislative* determination that an error constituted a miscarriage of justice. (See *People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 213, fn. 1 (dis. opn. of Mosk, J.) (*Zamudio*) ["I have found no authority for the suggestion that the constitutional provision prevents *the Legislature* from imposing a particular remedy for a particular trial court error"].)

Moreover, the Legislature's determination that an appeal to racial bias is a miscarriage of justice, even if not conclusive, would at a minimum be entitled to " 'significant weight and deference' " (*Property Reserve, Inc. v. Superior Court* (2016) 1 Cal.5th 151, 193), and, as demonstrated above, academic and scientific research amply support its determination. To characterize this considered legislative choice as one that nonetheless raises serious constitutional questions would likewise place a cloud over a number of longstanding statutes.

(See, e.g., Pen. Code, §§ 1382, subd. (a), 1387, subd. (a); Code Civ. Proc., § 231.7, subd. (j).)  The majority opinion's invocation of the avoidance canon therefore seems especially unwise here. (Cf. *Briggs v. Brown* (2017) 3 Cal.5th 808, 890 (conc. & dis. opn. of Cuéllar, J.) ["It is not judicial modesty that authorizes a court to distort the text of a statute in a way that subverts its purpose"].)

## D.

Finally, the majority opinion claims *Zamudio*, *supra*, 23 Cal.4th 183 is "instructive" (maj. opn., *ante*, at p. 119), but the case — as well as the statute at issue there — are soundly distinguishable.  *Zamudio* construed former section 1016.5, which required courts accepting a plea from a noncitizen defendant to advise the defendant that conviction " 'may have' " certain immigration consequences; the statute then provided that if the required advisement was not provided, " 'the court, on defendant's motion, *shall* vacate the judgment and permit the defendant to withdraw the plea.' " (*Zamudio*, at p. 191, italics added.)  We held that to construe the statute to require reversal without a showing that the court's failure to advise the defendant was actually prejudicial would "not accord with the legislative purpose underlying section 1016.5," which nowhere signaled an intent "to depart from the normal rules . . . governing withdrawal of a plea for misadvisement regarding collateral consequences." (*Id.* at pp. 194, 198.)  We further found that "afford[ing] relief for incomplete advisement under section 1016.5 only to defendants who demonstrate they were prejudiced thereby accords with the Legislature's expressly stated purpose of addressing 'instances' in which pleas are entered 'without the defendant knowing' the immigration consequences." (*Id.* at p. 199.)  Under those circumstances, we

concluded the Legislature did not intend to offer relief for mere "technical errors." (*Ibid*.)

*Everything* about the RJA, by contrast, points to a different outcome. The RJA explicitly articulated the need to depart from the mode of analysis courts had been applying because of the nature and effect of racial bias on how the trier of fact perceives and evaluates evidence at trial. Racial bias needed to be "eliminate[d]," the Legislature explained, because it, "in all its forms and degrees, is never minor or harmless" (Stats. 2025, ch. 721, § 1, subd. (e)) and "in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, [and] is a miscarriage of justice" (Stats. 2020, ch. 317, § 2, subd. (i)). The language the Legislature used to describe the prohibition ("all," "any") was categorical, and so was its characterization of the effects of bias at trial ("never minor or harmless"). Indeed, as noted, the Legislature recognized that "racial bias in one part of a criminal prosecution infects the whole and cannot be remedied by removing a single diseased cell." (Stats. 2025, ch. 721, § 1, subd. (e).) And if things weren't already clear enough, the Legislature emphasized that "the prohibition on death sentences for cases in which an RJA violation occurs" — i.e., the situation presented here — "is *categorical*." (*Ibid*., italics added.) Far from being "silent on the question" (*Zamudio, supra*, 23 Cal.4th at p. 194), the Legislature was explicit that an appeal to racial bias *is* a miscarriage of justice, save for pre-Act judgments that are final — "and only in those cases." (Pen. Code, § 745, subd. (k).)

In justifying the new remedies it was creating for incidents of racial bias, the Legislature emphasized our shared duty " 'to stare at racial disparity unblinkingly, and then do what evidence and experts tell us is required to level the playing

field.' " (Stats. 2025, ch. 721, § 1, subd. (f).) The evidence and experts on which the Legislature relied (see Stats. 2020, ch. 317, § 2, subd. (e)) support the choices the Legislature has made. They explain how comparing criminal defendants to animals is a technique of dehumanization, which in turn is "the most important precursor to moral exclusion, the process by which stigmatized groups are placed 'outside the boundary in which moral values, rules, and considerations of fairness apply.' " (Goff, *supra*, 94 J. Personality and Social Psychology at p. 293; see *id*. at p. 294 ["a Black-ape association influences the extent to which people condone and justify violence against Black suspects, and we link this association to the death-sentencing decisions of jurors"].) Because the activation of implicit bias permeates the jury's assessment of the moral and normative decision whether a defendant should live or die, it is in no way a "technical error" within the meaning of *Zamudio, supra*, 23 Cal.4th at page 199. Nor is its effect on the fact finder in a criminal proceeding "nuanced." (Maj. opn., *ante*, at p. 123.) The Legislature manifested its understanding of those crude effects by imposing a "categorical" bar on the death penalty upon a finding of an RJA violation. (Stats. 2025, ch. 721, § 1, subd. (e); see Pen. Code, § 745, subd. (k).)

It is not reasonable to read the RJA, as the majority opinion does, "as permitting an inquiry into whether a miscarriage of justice occurred." (Maj. opn., *ante*, at p. 114.) The Legislature already determined, based on its own investigation, that an appeal to racial bias, especially if it affects the penalty phase of a capital trial, *is* a miscarriage of justice. That legislative choice was "appropriate" (maj. opn., *ante*, at p. 123) by any measure. We ought not write it out of the statute.

## IV.

For nonfinal cases that predated the RJA, the majority opinion adopts the stringent *Chapman* standard of prejudice when specified persons violate the RJA by making an appeal to racial bias at the guilt or penalty phase of a capital trial. (Maj. opn., *ante*, at p. 123.) That standard "requires reversal unless it appears ' "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' " (*People v. Schuller* (2023) 15 Cal.5th 237, 261.) This is a substantial hurdle: "Unlike a sufficiency of the evidence claim, where we view the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of any facts the jury might reasonably infer from the evidence," a reviewing court's task in analyzing prejudice under *Chapman* is markedly different: " 'whether any rational fact finder could have come to the opposite conclusion.' " (*People v. Hin* (2025) 17 Cal.5th 401, 462, quoting *People v. Mil* (2012) 53 Cal.4th 400, 418 (*Mil*); see *People v. Lamb* (2024) 16 Cal.5th 400, 452.) The burden is even higher at a capital penalty trial, when the jury's "role is not merely to find facts, but also — and most important — to render an individualized, *normative* determination about the penalty appropriate for the particular defendant — i.e., whether he should live or die." (*People v. Brown* (1988) 46 Cal.3d 432, 448 (*Brown*).)

If (as the majority opinion concludes) the *Chapman* standard applies, then I agree with the majority that the RJA violations here were not harmless. The majority is mistaken, though, in characterizing the "issue" as a "close" one. (Maj. opn., *ante*, at p. 124.) Yes, as the majority opinion acknowledges, the evidence of Bankston's multiple murders was "significant" (as was evidence of "their callousness"), and the penalty phase

included "considerable evidence of [his] additional violent conduct." (*Ibid.*) The mitigation case, by contrast, was virtually nonexistent: Bankston presented no witnesses and offered in evidence, without any explanation, only a cell inspection sheet — apparently to rebut just *one* in "a long series of [violent] incidents while Bankston was incarcerated" — as well as a form reflecting that he declined on one occasion to speak with a prosecution gang expert in 1989, prior to the charged crimes. (*Id.* at p. 11.)

So it is noteworthy that the prosecutor's appeal to racial bias, even in these circumstances, cannot be deemed harmless. The reason is simple and easy to grasp: An appeal to racial bias is at its most pernicious when the decision to be made is one that rests on individual moral and normative considerations. By invoking a well-known history of language demeaning Black individuals through comparisons to a predatory animal, the prosecutor dehumanized Bankston and unfairly "discouraged the jury from according [him] the full measure of individual worth and mercy that the law allows." (Maj. opn., *ante*, at p. 125.)

It's worth elaborating, though, on *how* appeals to racial bias infect and distort the penalty determination, and *why* an appeal to racial bias at the penalty phase will almost invariably require reversal of the death judgment, even if relief is conditioned on a separate finding that the appeal to racial bias was not harmless beyond a reasonable doubt. The majority opinion lacks an explanation of racism's effects on a criminal trial. Fortunately, the RJA's legislative findings, as well as the academic literature on which those findings depend, illuminate how appeals to racial bias can improperly lead the trier of fact to resolve ambiguities and conflicts in the evidence *against the*

*defendant*. To remedy the error the Legislature has identified, any prejudice analysis must account for the way in which an appeal to racial bias skews decisionmaking, including the moral and normative sentencing function, against the defendant. That means courts, in assessing beyond a reasonable doubt whether manifestations of racial bias did not infect the verdict in a particular case, should credit all conflicting inferences and credibility determinations *in favor of the defendant*.

## A.

The purpose of reviewing the record to assess whether an error was prejudicial is to "consider all the ways that error can infect the course of a trial." (*Brecht*, *supra*, 507 U.S. at p. 642 (conc. opn. of Stevens, J.).) "[T]he question is *not* 'were they [the jurors] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. *The crucial thing is the impact of the thing done wrong on the minds of other men*, not on one's own, in the total setting.' " (*Id.* at pp. 642–643 (conc. opn. of Stevens, J.), quoting *Kotteakos v. United States* (1946) 328 U.S. 750, 764, second italics added.)

What, then, are those effects? We have long recognized that "racial prejudice can strongly compromise a juror's impartiality" (*People v. Cudjo* (1993) 6 Cal.4th 585, 625) and poses a "serious threat to objective deliberation by jurors." (*People v. Bain* (1971) 5 Cal.3d 839, 849; accord, *United States ex rel. Haynes v. McKendrick* (2d Cir. 1973) 481 F.2d 152, 157 ["Racial prejudice can violently affect a juror's impartiality and must be removed from the courtroom proceeding to the fullest extent possible"]; *id.* at p. 161 ["[r]acially prejudicial remarks are . . . so likely to prevent the jury from deciding a case in an

impartial manner and so difficult, if not impossible, to correct once introduced, that a good argument for applying a more absolute standard may be made"]; *Weddington v. State* (Del. 1988) 545 A.2d 607, 614–615 ["[T]he right to a fair trial that is free of improper racial implications is so basic . . . that an infringement upon that right can never be treated as harmless error"].)

By enacting the RJA, the Legislature has likewise recognized the " 'pernicious' " effects in the criminal justice system (Stats. 2020, ch. 317, § 2, subd. (a)) of appeals to racial prejudice, including comparisons of the defendant to an animal. (See Pen. Code, § 745, subd. (a)(2).) Such dehumanization can make the trier of fact "less likely to properly weigh the evidence of Black defendants' guilt" (Prasad, *supra*, 86 Fordham L.Rev. at p. 3107), more likely to view the defendant as " 'outside the boundary in which moral values, rules, and considerations of fairness apply' " (Goff, *supra*, 94 J. Personality and Social Psychology at p. 293), less likely to extend sympathy (Prasad, at p. 3107), and more likely to impose harsher punishment (*id.* at p. 3105).

Studies have long shown that stereotyped racial priming encourages jurors to form negative judgments about Black defendants, increasing the likelihood of guilty verdicts against them. (See Levinson & Young, *Different Shades of Bias: Skin Tone, Implicit Racial Bias, and Judgments of Ambiguous Evidence* (2010) 112 W.Va. L.Rev. 307.) Racial priming can also influence jurors' assessment of a defendant's personal responsibility. (See Kang, *Trojan Horses of Race* (2005) 118 Harv. L.Rev. 1489, 1566.)

An appeal to racial bias can likewise affect the manner in which jurors interpret ambiguous evidence. "Implicit racial bias, once activated, can cause jurors to misremember case facts in racially biased ways and to evaluate ambiguous evidence differently based on bias." (Note, *Black Lives Discounted: Altering the Standard for Voir Dire and the Rules of Evidence to Better Account for Implicit Racial Biases Against Black Victims in Self-Defense Cases* (2021) 134 Harv. L.Rev. 1521, 1526; see Hilton, *The Danger of Unfair Prejudice: Racial Disparities in the Federal Rules of Evidence* (2022) 52 Stetson L.Rev. 153, 158 [discussing 2004 study finding that jurors "with an implicit bias against Black defendants have a strong tendency to evaluate ambiguous evidence unfavorably to Black defendants"]; Levinson et. al., *Devaluing Death: An Empirical Study of Implicit Racial Bias on Jury-Eligible Citizens in Six Death Penalty States* (2014) 89 N.Y.U. L.Rev. 513, 548 [implicit bias effects include the evaluation of "ambiguous evidence in a stereotyped way"].)

Another effect of implicit bias is on the assessment of credibility. "Implicit biases can affect a juror's ability to evaluate[] the credibility of witnesses . . . and the culpability of the defendant." (Priyadarshini Das, *What Counts As "Racist Enough?": A Clearer Standard for New Trials When Jurors Demonstrate Racial Bias* (2022) 31 J.L. & Pol'y 136, 166; see *State v. Bellerouche* (2025) 33 Wn.App.2d 877, 947 (conc. & dis. opn. of Coburn, J.) ["Coded language that evokes racial stereotypes can assist prosecutors in indirectly hurting a witness's credibility by identifying the witness as the 'other' "]; Taslitz, *Wrongly Accused Redux: How Race Contributes to Convicting the Innocent: The Informants Example* (2008) 37 Sw. L.Rev. 1091, 1091 ["[S]ubconscious racial biases lead

decisionmakers . . . in the processing of a criminal case to view racial minorities, especially African-Americans, as more dangerous and less credible than whites"].)

**B.**

The academic literature also supports the Legislature's concerns about the effects of implicit bias on the punishment a defendant receives.  (See Levinson et al., *Race and Retribution: An Empirical Study of Implicit Bias and Punishment in America* (2019) 53 U.C. Davis L.Rev. 839, 884.)  Implicit biases cause jurors to "value [Black capital defendants] less as humans than they value their White American counterparts."  (Levinson, *supra*, 89 N.Y.U. L.Rev. at p. 564.)  Further, "the amorphous nature of the [penalty phase] inquiry as compared to an ordinary question of fact (e.g., did the defendant fire this weapon) increases the opportunity for racial bias to manifest." (*Id.* at p. 532.)  In considering mitigating evidence, for instance, implicit bias can cause jurors to "evaluate the evidence in different ways depending on the race of the defendant" by attributing less importance to mitigation proffered by Black defendants.  (*Ibid.*)  These effects on capital jury decisionmaking are particularly important because, as the author demonstrates, "[j]urors who were death-qualified displayed higher levels of implicit racial bias." (*Id.* at p. 559.)

As a general matter, the activation of implicit bias can also trigger confirmation bias — people who "unconsciously make associations between a racial outgroup and a negative trait will attend more closely to stereotype-consistent information, remember new information supportive of the stereotype better than they remember information impeaching the stereotype or its application to the defendant, remember the stereotype-

consistent information in an exaggerated form and stereotype-inconsistent information in a diminished form if at all, and emphasize the importance of stereotype-consistent information." (Johnson, *Explaining the Invidious: How Race Influences Capital Punishment in America* (2022) 107 Cornell L.Rev. 1513, 1544.) Thus, a juror "who associates African Americans with animals," whether or not the juror consciously holds this association, is more likely to "remember and emphasize testimony that the defendant ignored the pleas of the victim when evaluating the defendant's character and deciding on his sentence, while forgetting or dismissing testimony that the defendant himself was locked in a closet for days as a child, and rejecting as unimportant testimony that he risked his own life to save a prison guard from another prisoner's assault." (*Id.* at pp. 1544–1545.) These and other subconscious cognitive effects can "eas[e] the path toward a death sentence when the defendant is a person of color." (*Id.* at p. 1545.)

## C.

A "careful review of the record" (maj. opn., *ante*, at p. 100) to assess the impact of an RJA violation therefore requires the court to examine the possibility that an appeal to racial bias can cause jurors to resolve ambiguities in evidence and testimony against the defendant, to credit conflicting testimony in favor of witnesses who speak against the defense narrative, and to seek harsher punishments against the defendant. To deem the error harmless in this context thus requires the reviewing court to be certain, *beyond a reasonable doubt*, that racial bias did not have these pernicious and insidious effects. In other words, when courts assess RJA violations involving appeals to implicit bias, the examination of the entire record for possible prejudice must account for the fact that such errors tend to cause factfinders to

resolve ambiguities and conflicts in the evidence *against the defendant*. To counter this tendency, reviewing courts should apply the "converse" of the ordinary substantial-evidence test for sufficiency-of-the-evidence claims (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1166) and resolve any conflicts or ambiguities in favor of the defendant so as to determine "whether any rational fact finder could have come to the *opposite* conclusion." (*Mil*, *supra*, 53 Cal.4th at p. 418.)

The normative character of the penalty determination, in particular, makes it extraordinarily difficult for the prosecution to demonstrate that an appeal to racial bias could ever be harmless beyond a reasonable doubt. (See *Brown*, *supra*, 46 Cal.3d at p. 448.) After all, "a juror is never *required* to vote for the death penalty," no matter how brutal the crimes. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 401, italics added; cf. Johnson, *supra*, 107 Cornell L.Rev. at p. 1551 ["comparing a capital defendant to an animal triggers associations that cannot be dispelled, and are central to deciding whether a person should live or die, so at least with respect to capital sentencing, animal imagery is never harmless, regardless of the strength of the evidence"].)

This is not one of those extraordinary cases.

Reviewing all inferences in Bankston's favor (and accounting for the fact the choice of penalty reflects a normative judgment), I cannot say the appeal to racial bias in this case was harmless beyond a reasonable doubt. The sole special circumstance in this case was multiple murder, which was based on the Benson Jones and Jesus Sanchez murders. (Maj. opn., *ante*, at p. 9.) As to the Jones murder, both eyewitnesses were convicted felons, so "the jury was entitled to disbelieve [their]

34

testimony." (*People v. Jones* (1960) 180 Cal.App.2d 95, 98.) As to the Sanchez murder — on which the first jury was unable to reach a verdict — the evidence of identity, as Bankston points out, "was fraught with uncertainty and inconsistencies." Florentino Melendez, who was walking with Sanchez when the shooting started, was unable to identify Bankston either in a photo lineup shortly thereafter or at the first trial. Two other eyewitnesses were also unable to identify Bankston in a photo lineup; one eyewitness could not identify him at the second trial, either, and the other was unable to do so at a prior proceeding. What's more, the forensic testing was inconclusive, and the police informant who claimed Bankston confessed was impeached with his own plea bargain as well as the fact that information about the crime had been provided to him by the police.

Lingering doubt, which is a valid consideration at the penalty phase, can have "particular potency" where (as here) there are inconsistencies in the eyewitness identifications. (*People v. Gay* (2008) 42 Cal.4th 1195, 1226.) But there's a reasonable possibility that this mitigating factor was wrongly foreclosed by the prosecutor's activation of the jurors' racial bias, which may have subconsciously dissuaded the jurors from resolving ambiguities in the defendant's favor. As the majority opinion points out, the prosecutor likened Bankston to an " 'enormous' " and "vicious" predatory animal, with its " 'muscles all flexed out,' 'claws out,' 'fangs' visible, and growling," "deep in the 'jungle[].' " (Maj. opn., *ante*, at pp. 106, 125.)

The prosecutor's argument also prejudiced Bankston in another way, well beyond the jury's resolution of evidentiary conflicts and ambiguities. The jury's discretion in exercising its sentencing function is broad; even when the aggravating factors

outweigh the mitigating factors, neither sentence is mandated or prohibited. What we ask jurors to do is to apply their moral and normative judgment. Such judgments, however, are particularly vulnerable to the malign influences of racial bias. (See Johnson, *supra*, 107 Cornell L.Rev. at p. 1542 [a juror who associates "Black with bad . . . is likely to interpret ambiguous information about the purposefulness of a Black defendant's conduct more harshly than [] he would were the defendant white"]; see *id.* at pp. 1544–1545.) In short, dehumanization "reduces white persons' empathy for Black people." (Prasad, *supra*, 86 Fordham L.Rev. at p. 3105.) Thus, even assuming that an appeal to racial bias requires a court to go further and determine whether the injection of racism in the case was prejudicial, this case is not so unusual within the category of capital cases as to refute the ordinary inference that the activation of implicit bias could have influenced the selection of penalty.

## D.

The prejudice suffered by Bankston was augmented by the prosecution gang expert's testimony about Black gangs, in which the expert asserted that Bankston's race made him more likely to commit violent crimes against nonmembers of the gang.

Under examination by the prosecutor, the gang expert testified that "[a] hardcore gang member is the part of the group that is actively involved in the criminal activities, be it any violent activities, anything they enhance to further the gang's prominence for that matter, usually outward *especially for Bla[c]k gangs* because it's all about showing — to get respect, it's all about showing how — for a term they use — down,

meaning how much you get out and do things you're asked." (Italics added.)

The majority opinion concedes that the expert's testimony "did appear to make generalizations about the culture and activities of *Black gangs* that would suggest that Bankston was 'especially' likely to commit 'outward' violent crimes because of his membership in such a gang." (Maj. opn., *ante*, at p. 93.) Yet the majority opinion finds no violation of the RJA because, in its view, an objective observer would have understood the expert's observation to convey his knowledge of the "culture and activities of the group of gangs to which Bankston belonged and on which Wright professed expertise." (Maj. opn., *ante*, at p. 95.)

I respectfully disagree. "[T]he culture and activities" being talked about involved violence against nonmembers; the "group of gangs to which Bankston belonged" was defined only by its racial composition; and the expert lent his "professed expertise" to a comparison of Black gangs with *other* gangs. (Maj. opn., *ante*, at p. 95.) That is, comparing apples to apples (or gangs to gangs), the expert testified that *Black* gangs were "especially" likely to commit violent crimes against nonmembers, based on their need to "get respect" and "show[] how down . . . they are." Such testimony would, "to an objective observer, explicitly or implicitly appeal[] to racial bias" (§ 745, subd. (h)(4)) because it suggested that Black gangs were more violent than other gangs — invoking a well-known racist trope. (See *People v. Hardin* (2024) 15 Cal.5th 834, 905 (dis. opn. of Evans, J.) ["The superpredator myth 'relied heavily on "racist imagery and stereotypes" and harkened back to "historic representations of African Americans [and other people of color] as violence-prone, criminal and savage" ' "].) The error here is not that the expert "used the term 'Black gangs' at trial to

describe the relevant group of gangs" (maj. opn., *ante*, at p. 95), but that the expert declared, with the aura of authority, that Black gangs were comparatively more dangerous than other gangs. The sole ground identified by the expert as to why "this was particularly true of the gangs involved in the events in this case" (*id.* at pp. 95–96) *was* their race.

This testimony was "potent evidence," appealing "to a powerful racial stereotype — that of black men as 'violence prone.' " (*Buck, supra*, 580 U.S. at pp. 121–122.) What's more, it carried the imprimatur of "professed expertise" (maj. opn., *ante*, at p. 95) on "the key issue" at the penalty phase of Bankston's future dangerousness. (*Buck*, at p. 120; see *People v. Stayner* (Apr. 30, 2026, S112146) ___ Cal.5th ___, ___ [p. 4] (conc. & dis. opn. of Evans, J.) ["a defendant's future dangerousness is one of the most significant (if not *the* most significant) of the factors juries consider in deciding whether to sentence a defendant to death"].) The expert may have articulated his point only one time, but it was enough to be effective. "[W]hen a jury hears expert testimony that expressly makes a defendant's race directly pertinent on the question of life or death, the impact of that evidence cannot be measured simply by how much air time it received at trial or how many pages it occupies in the record. Some toxins can be deadly in small doses." (*Buck*, at pp. 121–122.) Whether considered on its own or in conjunction with the other RJA violations, there is more than a reasonable possibility the appeal to racial bias "contribute[d] to the judgment." (§ 745, subd. (k).)

## V.

The RJA is the product of a simple truth that courts have struggled to accept: racial bias, once activated, " 'is a thief which

steals reason.' " (*People v. Taylor* (1992) 5 Cal.App.4th 1299, 1312.) The Legislature made careful and thoroughly supported findings about the "insidious" effects that result from injecting racial bias into criminal proceedings (Stats. 2020, ch. 317, § 2, subd. (h)) as well as the extent to which courts have repeatedly failed to provide effective and responsive remedies to it (*id.*, § 1, subd. (d)). The RJA, in other words, is a directive to courts to *change*. The change the Legislature mandated requires courts to be willing to recognize racism when it occurs and to provide an effective remedy each and every time.

At an earlier point in our nation's history, President Lincoln recognized a similar need: "As our case is new, we must think anew, and act anew." (Annual Message to Congress (Dec. 1, 1862), reprinted in 5 The Collected Works of Abraham Lincoln (Basler ed. 1953) 518, 537.) Some courts have already done so. (See, e.g., *Zamora, supra*, 199 Wn.2d at p. 722 [" 'the prosecutor's injection of racial discrimination into this case *cannot be countenanced at all*, not even to the extent of contemplating to any degree that the error might be harmless' "].) The court today, sadly, resists the Legislature's heed to change. I therefore concur only in the judgment.

**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Bankston

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S044739
**Date Filed:** May 28, 2025

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Nancy Brown

_____

**Counsel:**

Michael J. Hersek, Mary K. McComb and Galit Lipa, State Public Defenders, Alexander Post, Assistant Chief Counsel, Arnold Erickson, William Whaley and Erik Levin, Deputy State Public Defenders, for Defendant and Appellant.

Sean K. Kennedy and Priscilla Ann Ocen for the Center for Juvenile Law & Policy and the Loyola Anti-Racism Center at Loyola School of Law as Amici Curiae on behalf of Defendant and Appellant.

Shaleen Shanbhag; and Joseph Doyle for the Fred T. Korematsu Center for Law and Equality at the University of California, Irvine School of Law, the Center for Law, Equity and Race at Northeastern University School of Law, the Center on Law, Race & Policy at Duke University School of Law, the Center for Civil Rights and Critical Justice at Seattle University School of Law, the Center for Security, Race and Rights at Rutgers Law School, the Gibson-Banks Center for Race and the Law at the University of Maryland Francis King Carey

School of Law, the Center on Race, Inequality, and the Law at New York University School of Law, Devon Carbado, Rachel D. Godsil, Jerry Kang and L. Song Richardson as Amici Curiae on behalf of Defendant and Appellant.

Orrick, Herrington & Sutcliffe, Nathan D. Shaffer and Amanda H. Schwartz for Assemblymember Ash Kalra as Amicus Curiae on behalf of Defendant and Appellant.

Claudia Van Wyk, Megan Byrne; Avram Frey and Neil Sawhney for the American Civil Liberties Union Foundation, the ACLU of Northern California, the ACLU of Southern California, the ACLU of San Diego and Imperial Counties, the Habeas Corpus Resource Center and the California Appellate Project-San Francisco as Amici Curiae on behalf of Defendant and Appellant.

Kamala D. Harris, Xavier Becerra and Rob Bonta, Attorneys General, Dane R. Gillette, Gerald A. Engler, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, James William Bilderback II, Assistant Attorney General, Dana Muhammad Ali, Jaime L. Fuster, Stacy S. Schwartz, and Steven E. Mercer, Deputy Attorneys General, and Joshua A. Klein, Deputy State Solicitor General for Plaintiff and Respondent.

Summer Stephan, District Attorney, Linh Lam, Valerie Ryan, Karl K. Husoe and Ronald A. Jakob, Deputy District Attorneys, for the San Diego County District Attorney as Amicus Curiae on behalf of Plaintiff and Respondent.

Dan Dow, District Attorney, and Richard J. Sachs, Deputy District Attorney, for the Office of the District Attorney for the County of San Luis Obispo as Amicus Curiae.

Nathan J. Hochman, District Attorney, John Harlan II and Patrick Frey, Deputy District Attorneys, for the District Attorney of Los Angeles County as Amicus Curiae.

Kent S. Scheidegger for the Criminal Justice Legal Foundation as Amicus Curiae.

Gregory D. Totten and Philip P. Stemler, Deputy District Attorney (San Bernardino), for the California District Attorneys Association as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Erik Levin
Deputy State Public Defender
1111 Broadway, Suite 1000
Oakland, CA 94607
(510) 267-3300

Joshua A. Klein
Deputy State Solicitor General
1515 Clay Street, Suite 20000
Oakland, CA 94612
(510) 879-0756

Steven Mercer
Deputy Attorney General
300 Spring Street
Los Angeles, CA 90013
(213) 269-6126